IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RONALD QUALLS, Inmate
No. W55388
      Petitioner,     )

**05 10888 NMG**

)
v.                )     PETITION FOR WRIT OF
)     HABEAS CORPUS RECEIPT # _63883_
LOUIS RUSSO, Superintendent, )     AMOUNT $ _____
Souza-Baranowski Correctional )     SUMMONS ISSUED _N/A_
Center,       MAGISTRATE JUDGE _MBB_  LOCAL RULE 4.1 _____
      Respondent.     )     WAIVER FORM _____
_____)     MCF ISSUED _____
                                        BY DPTY. CLK. _____
                                        DATE _4/29/05_

Now comes petitioner, Ronald Qualls, by his Attorneys, Bradford Bailey and Jeffrey Denner, and moves for a new trial, pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

This Habeas Corpus Petition arises out of Mr. Qualls's conviction after retrial on the charges of first-degree murder, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and unlawful possession of a firearm.

Mr. Qualls was originally indicted, tried and convicted for offenses occurring on October 3, 1992. His first trial was a jury trial (Banks, J.) where he was found guilty of the above charges. An appeal was taken and the Supreme Judicial Court reversed the conviction on the ground that improperly admitted hearsay evidence had caused

1

prejudice.  In particular, the Court found that out-of-court statements made by Dallas Price ("Price"), the deceased, that he feared Mr. Qualls and thought Mr. Qualls was going to kill him were irrelevant and not admissible under the state-of-mind exception to the hearsay rule.  *See Commonwealth v. Qualls*, 425 Mass. 164, 172-173 (1997).

After a re-trial by jury (Brady, J.), Mr. Qualls was found guilty of the above charges in which further out-of-court statements by Price were admitted.  Mr. Qualls's convictions were affirmed by the Supreme Judicial Court on December 15, 2003.  *See Commonwealth v. Qualls*, 440 Mass. 576 (2003).  On December 30, 2003, Mr. Qualls's appellate attorney filed a Petition for Rehearing, which was denied by the Court on January 29, 2004 (SJC-08088), thereby exhausting his state remedies on this issue.

This petition for habeas corpus relief is being filed in order to present Mr. Qualls's claims arising under the recent decision from the United States Supreme Court in *Crawford v. Washington,* 124 S.Ct. 1354 (2004).  Therein, the United States Supreme Court announced that:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law - as does *Ohio v. Roberts,* 448 U.S. 56 (1980) - and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.  Where testimonial evidence is at issue, however, the Sixth

2

> Amendment demands what the common law required:
> unavailability and a prior opportunity for cross-
> examination. We leave for another day any effort to
> spell out a comprehensive definition of "testimonial."

*Crawford v. Washington*, 124 S.Ct. at 1374.

In this case, the Commonwealth admitted Price's testimonial statements against Mr. Qualls, despite the fact that Mr. Qualls had no opportunity to cross-examine Price. That alone is sufficient to make out a violation of the Sixth Amendment.

### TIMELINESS OF HABEAS CORPUS PETITION

Under 28 U.S.C. § 2254, Mr. Qualls has one year from the date his case became final to file a Petition for Habeas Corpus Relief. For purposes of commencing the statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), however, Mr. Qualls is entitled to add an additional 90 days, pursuant to Supreme Court Rule 13, during which time he could have filed a petition for writ of *certiorari* in the United States Supreme Court. 28 U.S.C. § 2244(d)(1)(A); *Neverson v. Farquharson*, 366 F.3d 32, 36 (1st Cir.2004). Mr. Qualls's case became "final" for AEDPA purposes, therefore, on April 29, 2004, with a presumptive expiration date of April 29, 2005. This petition is timely filed, being filed on April 29, 2005.

## EXHAUSTION OF REMEDIES

Mr. Qualls raised the issue that he was denied his right of confrontation of witnesses under the Sixth Amendment of the U.S. Constitution at trial and on direct appeal. *See* [T3/67][1] and Exhibit A. This issue was considered on direct appeal by the Supreme Judicial Court and was presented again on Petition for Rehearing (Exhibit C). This petition presents constitutional issues which directly challenge the judgments and life sentence imposed upon Mr. Qualls and the state court's review of his convictions and life sentence during the appellate process.

Mr. Qualls submits the following state court materials, which are attached under separate cover:

Exhibit A:      Brief and Argument for Defendant-Appellant in Commonwealth v. Qualls, No. SJC-08088;

Exhibit B:      Brief and Argument for the Commonwealth-Appellee in Commonwealth v. Qualls, No. SJC-08088;

Exhibit C:      Petition for Rehearing in Commonwealth v. Qualls, No. SJC-08088;

Exhibit D:      *Commonwealth v. Qualls*, 425 Mass. 164 (1997); and

Exhibit E:      *Commonwealth v. Qualls*, 440 Mass. 576 (2003).

---

[1] References to the 10-volume trial transcripts are cited as [Tx/xx].

## REQUEST FOR ORAL ARGUMENT

Mr. Qualls requests oral argument on this petition.

## STATEMENT OF FACTS

The facts of the case, generally, are contained within the
two Supreme Judicial Court opinions, *Commonwealth v.
Qualls*, 425 Mass. 164 (1997) (Exhibit D) and *Commonwealth
v. Qualls*, 440 Mass. 576 (2003) (Exhibit E). Specifically
related to the issues raised herein, the reported facts
state, in part[2]:

> On the evening of October 2, 1992, Leroyal
> Holmes, Fred Monroe, and the victims, Ronald
> Price, known as "Dallas," and his brother,
> Roosevelt Price, known as "Tony," got together at
> the Biarritz bar in the Roxbury section of
> Boston.  There, Dallas saw the defendant and told
> him that he had heard that the defendant had been
> looking for him.  The defendant said that he did
> not know who Dallas was.  Dallas replied that he
> was the person who stabbed the defendant's
> cousin.  A fist fight between the two ensued.
> During the fight, Tony became involved, grabbed
> the defendant, and placed him in a headlock.  An
> off-duty police detective and a bouncer at the
> bar broke up the fight, and the detective
> escorted the defendant outside.

> \*    \*    \*

> Moments later, outside the bar, the defendant got
> into a fight with Tony.  During the fight, the
> defendant pulled out a knife and swung it at
> Tony.  The defendant then got into the front

---

[2] The facts set forth are as reported.  Mr. Qualls maintains
his innocence, continues to deny involvement in the
homicides, and contests any identification suggesting he
was the "shooter" in this case.

passenger seat of Williams's automobile, a dark-colored Ford Escort, and the two drove off.

Tony, Dallas, Holmes, and Monroe went to another bar.

*    *    *

The group discovered that Tony had been stabbed near and beneath his right armpit. Tony and Dallas got into the back seat of Carrington's vehicle so that she could drive Tony to a nearby hospital. Tony sat in the back seat behind Carrington, and Dallas sat in the right rear passenger seat next to Tony.

As Tony and Dallas were getting into the vehicle, Dallas observed Williams's automobile drive by. Monroe saw that Williams was the driver and that the defendant was the passenger. Concerned, Holmes walked over to where Williams's automobile was headed and the defendant "popped up" in front of him. Holmes grabbed the defendant and told him to "let it go." The defendant pulled out a .38 caliber revolver and pointed it at Holmes, stating that he would blow Holmes's head off if he did not get out of the way. As the defendant approached Carrington's vehicle, Holmes shouted that the defendant was "strapped," meaning that he was armed.

Hearing Holmes's warning, Buford ran across the street. Monroe ran to the corner of the parking lot. The defendant approached the rear of Carrington's vehicle and fired multiple shots into the plastic covering in the back of the vehicle, then, from the front passenger side of the vehicle, through the open window, fired more shots into the back seat. The defendant then fled on foot, running past Buford.

Monroe ran to Carrington's vehicle and jumped in. Carrington drove to Tony's apartment. Tony went into the apartment. Dallas was slumped over in the back seat, blood running out of his mouth. Holmes, who ran behind the vehicle as it drove off, got into the passenger seat and told Monroe

6

> to get inside the vehicle and drive Dallas to a
> hospital.  Dallas died within minutes of his
> arrival.
>
> Police and emergency medical workers went to
> Tony's apartment.  Tony approached the police and
> told them that Junior Williams had shot him,
> adding that Junior drove a black or blue Ford
> Escort.  He also gave them Junior's address, and
> told them that Junior had a sister who lived on
> Ruggles Street.  He stated that two males had
> been in the Ford Escort when it drove by.  Tony
> was transported to a hospital, where he
> subsequently died.

Commonwealth v. Qualls, 440 Mass. at 578-580.

Mr. Qualls's objection at trial was on the basis that

the admission of hearsay evidence (i.e., Price's statement

to Mr. Qualls:  "I am the one that stabbed your cousin.")

was a denial of his right to confrontation.  Fred Monroe

("Monroe") testified to Dallas's statement during trial

over defense counsel's objection. See [T3/66].  Monroe's

testimony of Price's statement had no effect on Mr.

Qualls's state of mind where there was no evidence

whatsoever that the person Price allegedly killed was

actually Mr. Qualls's cousin.  Without this additional

proof, there would be no effect on Mr. Qualls's state of

mind, no proof of motive, and no justification for

admitting the evidence. See Exhibits A and C.

Mr. Qualls's objection was overruled. [T3/67].  The

Supreme Judicial Court affirmed on the basis that the

testimony was not hearsay because it was not admitted for
its truth, but to show Mr. Qualls's state of mind and
possible motive. *See* Exhibit E (*Commonwealth v. Qualls*,
440 Mass. at 585).

**MEMORANDUM OF LAW**

**THE ADMISSION AT TRIAL OF MONROE'S TESTIMONY REGARDING
PRICE'S STATEMENTS TO MR. QUALLS WAS A DENIAL OF MR.
QUALLS'S SIXTH AMENDMENT RIGHT OF CONFRONTATION.**

Mr. Qualls challenges the trial court's theory that
Dallas's hearsay statements were admissible as they were
made only for the purpose of implicating Mr. Qualls
indirectly *vis-à-vis* Monroe's testimony. The Commonwealth
had no direct evidence or reliable testimony of Mr.
Qualls's involvement in the shooting. *See* Exhibit D
(*Commonwealth v. Qualls*, 425 Mass. at 171:  "Monroe had
been previously convicted of conspiracy to violate the drug
laws . . . and, at the time of trial, Monroe faced pending
charges of assault and battery by means of a danger weapon,
threats, and possession of a stolen motor vehicle. There
was no physical or scientific evidence that decisively
resolved the question of the killer's identity."). Mr.
Qualls asserts that Monroe's testimony was used to
surreptitiously introduce fatally incriminating evidence
stated by the deceased that should have had no substantive

8

value whatsoever, while avoiding Mr. Qualls's right to confrontation.

Both the state trial court and appellate court misapplied controlling law when they found that no error had occurred as a result of the admission of Price's statements. The rulings of both the state court and the appellate court violated Mr. Qualls's due process rights because both were "contrary to, or involved in an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; and . . . [were] based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *Price v. Vincent*, 123 S.Ct. 1848, 1852 (2003).

The prejudicial effect of admitting Price's statement was the jury considered it substantively to support the Commonwealth's position that the statement served as motive for Mr. Qualls to kill Price and his brother, Tony. Where the Commonwealth had no other direct evidence that Mr. Qualls was the shooter (or any other theory as to motive), the admission of Price's statement without the benefit of cross-examination violated Article 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments of the United States Constitution. *See Crawford*

v. Washington, 541 U.S. 36 (2004); White v. Illinois, 502
U.S. 346, 352-354 (1992); Idaho v. Wright, 497 U.S. 805,
813-817 (1990).

The ruling of the trial court and the Supreme Judicial
Court relied on the reliability standard promulgated by
Ohio v. Roberts, 448 U.S. 56 (1980) - a standard that was
renounced in Crawford. Ohio v. Roberts held that the
Confrontation Clause does not bar admission of an
unavailable witness's statement against a criminal
defendant if the statement bears adequate "indicia of
reliability;" that is, it either falls within a "firmly
rooted hearsay exception" or it bears "particularized
guarantees of trustworthiness." Ohio v. Roberts, 448 U.S.
at 66. The Court in Crawford concluded that "the principal
evil at which the Confrontation Clause was directed was the
. . . use of ex parte examinations as evidence against the
accused." Crawford v. Washington, 541 U.S. at 50. On this
basis, the Court held that the Confrontation Clause is not
limited to in-court testimony during trial, but includes,
as well, the use at trial of out-of-court statements, such
as the unsworn statement Mrs. Crawford gave to the police
against her husband in that case.

The Confrontation Clause, the Court continued,
"commands, not that evidence be reliable, but that

10

reliability be assessed in a particular manner:  by testing
in the crucible of cross-examination." *Crawford v.
Washington*, 541 U.S. at 61.  The Court condemned the
*Roberts* reliability framework as "unpredictable" and "an
amorphous, if not entirely subjective, concept." *Crawford*
at 63.  The Court concluded that "[w]here testimonial
evidence is at issue, the Sixth Amendment demands what the
common law required:  unavailability and a prior
opportunity for cross-examination." *Crawford* at 68.

## The Applicable Law

The Confrontation Clause has two primary purposes:  to
ensure that the defendant may personally cross-examine the
witnesses against him and to have such witnesses stand
before the jury so that jurors have an opportunity to judge
the witness's credibility for themselves. *Mattox v. United
States,* 156 U.S. 237, 242-243 (1895); *California v. Green,*
399 U.S. 149, 158 (1970).  Any denial or significant
diminution of this right deprives the accused of an
essential means to test the credibility of his accusers and
thus calls into question the ultimate integrity of the
fact-finding process. *Chambers v. Mississippi,* 410 U.S.
284, 295 (1973).  "Of course, the right to confront and to
cross-examine is not absolute ..." *Ibid.* at 295; and see
*Maryland v. Craig,* 497 U.S. 836 (1990).  There have been

11

traditional exceptions to the confrontation requirement. In order to avoid violating a defendant's rights under the Confrontation Clause by the admission of hearsay evidence, the prosecution must establish the unavailability of the declarant, and that the out-of-court statement bears some "indicia of reliability." *Idaho v. Wright,* 497 U.S. 805, 815 (1990); *Ohio v. Roberts,* 448 U.S. at 66. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Ibid.*

After the Supreme Judicial Court issued its decision on the instant case, the Supreme Court decided *Crawford v. Washington,* 541 U.S. 36 (2004). In *Crawford,* the United States Supreme Court abandoned the standard set forth in *Ohio v. Roberts,* finding, "Where testimontial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68. Under *Crawford,* the court must first ask whether the statements in question are "testimonial" in nature, and then whether the defendant had an opportunity to cross-examine the declarant.

## Application to this Case

The Commonwealth failed to ensure Mr. Qualls's right
of confrontation, yet was nonetheless permitted to
introduce Price's hearsay statements through a third-party
witness.  There was no "indicia of reliability" as to the
hearsay statements which were introduced at trial.  There
was no evidence that Price killed Mr. Qualls's cousin or
that Mr. Qualls even had a cousin that was killed.  Though
the Supreme Judicial Court affirmed the admission of these
statements to show motive on Mr. Qualls's part, there is no
question the statements were admitted substantively --- and
relied on substantively by the Commonwealth[3] --- as no
limiting instruction was given.

In criminal cases, the Confrontation Clause prohibits
the prosecution's introduction of out-of-court statements
if four conditions are present:  (1) the statement is
"testimonial" in nature; (2) it was made by a declarant who
is unavailable to testify at trial; (3) the defendant had
no prior opportunity to cross-examine said declarant; and

---

[3] The Commonwealth's case was premised upon Price's
statement to Mr. Qualls that he (Price) killed Mr. Qualls's
cousin.  With no direct evidence otherwise, the
Commonwealth was forced to rely on this theory and it
formed the central theme to its case.  *See* T1/188
(Commonwealth's opening statement):  "Revenge . . . cold-
blooded revenge;" T1/189:  "Dallas stabbed Ronald Qualls'
cousin . . . Ronald Qualls had his own form of punishment
for Dallas Price."

(4) the statement is offered for the truth of the matter asserted therein. *Crawford v. Washington*, 541 U.S. 36 (2004). There is no question of Dallas Price's unavailability under this standard. The statement was testimonial in nature as it went to the very heart of the Commonwealth's case and theory. There was no opportunity to cross-examine the declarant of the statement and, given the absence of a limiting instruction, the jury was allowed -- and the Commonwealth intended it -- to consider the statement substantively. This was error.

## *Crawford Should be Applied Retroactively*

There is an issue as to whether *Crawford* may be retroactively applied to a habeas corpus case. This question can be answered by looking to *Teague v. Lane*, 489 U.S. 288, 311-315 (1989). Under *Teague*, a new decision may not be applied retroactively unless it merely clarifies an existing rule, or constitutes a watershed decision which affects the truth-finding process. *Id.* In *Bockting v. Bayer*, 399 F.3d 1010, 1012-1013 (9th Cir.2005), the Ninth Circuit found that *Crawford* created a watershed rule and applied retroactively to cases on collateral review ("Because the *Crawford* rule is both a watershed rule and one without which the likelihood of an accurate conviction is seriously diminished . . . the rule is retroactive.").

14

Other courts have found otherwise. *See*, e.g., *Mungo v. Duncan*, 393 F.3d 327 (2d Cir.2004). The First Circuit has not yet addressed this issue.

*Crawford* should be given retrospective application under the "watershed rule" exception of *Teague*. In order to constitute a watershed rule, a decision must alter our essential understanding of the bedrock procedural guarantees necessary to the fairness of a criminal proceeding. *Sawyer v. Smith*, 497 U.S. 227, 242 (1990). The decision in *Crawford*, itself, indicated that it was dealing with a subject involving "bedrock procedural guarantees." *See Crawford v. Washington*, 541 U.S. at 42. In his dissent, joined by O'Connor, J., Chief Justice Rehnquist deemed the majority decision as "a new interpretation of the Confrontation Clause ..." 541 U.S. at 69. One could hardly ask for a more definitive indicator of the Court's view --- both the majority and the dissenters --- of the magnitude of the *Crawford* decision. Whether analyzed under the *Roberts* test or *Crawford*, the hearsay statements admitted in this case violated the Confrontation Clause.

And the importance of Price's statement cannot be overstated. In her closing argument, the prosecutor emphasized Monroe's testimony, who related to the jury the

hearsay statements of Dallas Price, and the weight she
thought the jury should give such evidence – "Not only do
you know what happened. You know why it happened; the
motive, the words that set Ronald Qualls off:  'I'm the one
who killed your cousin.'  That is what started this
senseless murder."  [T6/71].

The purpose of the *Crawford* rule is to return to the
intent of the Framers and restore to the law the core
values of the Confrontation Clause. When a capital
defendant has been subjected to a court proceeding in which
he has been denied the right to confront the witnesses
against him, the Confrontation Clause is robbed of its
purpose. "Dispensing with confrontation because testimony
is obviously reliable is akin to dispensing with a jury
trial because a defendant is obviously guilty. This is not
what the Sixth Amendment prescribes." *Crawford*, 124 S.Ct.
1354, 1371 (2004).

Moreover, "the Framers would not have allowed
admission of testimonial statements of a witness who did
not appear at trial unless he was unavailable to testify,
and the defendant had had a prior opportunity for cross-
examination." *Crawford*, 124 S.Ct. at 1365. Inadvertently,
but nonetheless harmfully, the United States Supreme Court
lapsed for a time and enfeebled the right of confrontation

16

through its rulings in *Ohio v. Roberts*.  The Court's retrenchment restored that right as a "fundamental" guarantee of the United States Constitution.  Therefore, *Crawford* should be applied retroactively.

By virtue of *Crawford*, the constitutional error that occurred in the proceedings against Mr. Qualls is now revealed. Mr. Qualls's conviction and life sentence must be vacated, and a new trial ordered at which Mr. Qualls's right of confrontation shall be honored.

## CONCLUSION AND RELIEF REQUESTED

WHEREFORE, Mr. Qualls, through counsel, respectfully urges that the Court issue its Writ of habeas corpus and vacate his unconstitutional convictions and life sentence.

Respectfully submitted,
Ronald Qualls,
By and through his Attorneys:

Bradford Bailey, BBO #549749
Jeffrey A. Denner, BBO #120510
DENNER O'MALLEY, LLP
4 Longfellow Place, 35th Floor
Boston, MA  02114
(617) 227-2800

IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RONALD QUALLS, Inmate
No. W55388
        Petitioner,

    v.

LOUIS RUSSO, Superintendent,
Souza-Baranowski Correctional
Center,
        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

No. **05 10888 NMG**

## TO THE CLERK OF THE COURT

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United State District Court, the following state court materials are being filed in the case of Qualls v. Russo:

Exhibit A:    Brief and Argument for Defendant-Appellant in Commonwealth v. Qualls, No. SJC-08088;

Exhibit B:    Brief and Argument for the Commonwealth-Appellee in Commonwealth v. Qualls, No. SJC-08088;

Exhibit C:    Petition for Rehearing in Commonwealth v. Qualls, No. SJC-08088;

Exhibit D:    Commonwealth v. Qualls, 425 Mass. 164 (1997); and

Exhibit E:    Commonwealth v. Qualls, 440 Mass. 576 (2003).

1

Respectfully submitted,
Ronald Qualls,
By and through his Attorneys:


Bradford Bailey, BBO #549749
Jeffrey A. Denner, BBO #120510
DENNER O'MALLEY, LLP
4 Longfellow Place, 35th Floor
Boston, MA  02114
(617) 227-2800

Westlaw.

2003 WL 23282258                FOR EDUCATIONAL USE ONLY                    Page 1
2003 WL 23282258 (Mass.)

For opinion see 800 N.E.2d 299

**Briefs and Other Related Documents**

Supreme Judicial Court of Massachusetts.
COMMONWEALTH OF MASSACHUSETTS,
v.
Ronald QUALLS, Defendant-Appellant.
**No. SJC-08088.**
May 30, 2003.
On Appeal from a Decision of the Suffolk County Superior Court

Brief and Record Appendix of Ronald Qualls
Greg T. Schubert, BBO # 447340, Market Place, 1365 Main Street, Springfield, MA
01103, (413) 746-1313.

*i *TABLE OF CONTENTS*

TABLE OF AUTHORITIES ... iv

QUESTIONS PRESENTED FOR REVIEW ... 1

STATEMENT OF THE CASE ... 2

 Nature of the Case ... 2

 Prior Proceedings and Disposition in the Court below ... 2

STATEMENT OF FACTS ... 3

 Case Overview ... 3

 Commonwealth's Case ... 6

  Conflict In The Biarritz Bar ... 6

  Confrontation Outside the Biarritz ... 7

  The Shooting Outside Studio 88 ... 7

  Identification Issues ... 10

  Qualls Alleged Pretrial Contact With Holmes ... 12

  Witness Not On Witness List Disclosing That Qualls Was Reporting to A Probation
Officer ... 12

  Improper Reference to Qualls' First Trial ... 13

  Erroneous Admission of Autopsy Photographs ... 13

  Improper Opening Statement ... 14

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282258          FOR EDUCATIONAL USE ONLY                    Page 2
2003 WL 23282258 (Mass.)

  Improper Closing Argument ... 14

  Defendant's Case ... 14

    Tony Named Williams As the Shooter ... 14

SUMMARY OF THE ARGUMENT ... 15

*ii ARGUMENT ... 18

I. QUALLS WAS DENIED HIS RIGHTS TO HAVE THE COMMONWEALTH PROVE EVERY ELEMENT OF THE
CRIME CHARGED, AND THE EVIDENCE WAS INSUFFICIENT TO CONVICT, BECAUSE THE SOLE ISSUE
WAS IDENTIFICATION, TONY IDENTIFIED WILLIAMS AS HIS KILLER, AND HOLMES, MONROE, AND
BUFORD WERE EFFECTIVELY IMPEACHED AND UNRELIABLE ... 18

  A. *Leroyal Holmes Was Effectively Impeached* ... 20

  B. *Fred Monroe Was Effectively Impeached* ... 21

  C. *Mattie Buford Was Effectively Impeached* ... 22

II. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND THERE WAS
PREJUDICIAL ERROR, BECAUSE THE TRIAL COURT DENIED A MOTION FOR A MISTRIAL AFTER
HOLMES MENTIONED QUALLS' PREVIOUS TRIAL TWICE, AND BECAUSE THE TRIAL COURT FAILED
TO GIVE AN SECOND CURATIVE INSTRUCTION ... 26

III. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AND THERE WAS
PREJUDICIAL ERROR BECAUSE THE TRIAL COURT ADMITTED TESTIMONY FROM AN ASSISTANT
CHIEF PROBATION OFFICER, WHO WAS NOT ON THE WITNESS LIST, AND WHOSE TESTIMONY
INDIRECTLY DISCLOSED THAT QUALLS WAS REPORTING TO HER BEFORE HIS MURDER TRIAL ...
30

IV. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AND TO
CONFRONTATION, AND SUFFERED PREJUDICIAL ERROR, BECAUSE THE TRIAL COURT ADMITTED AN
OUT-OF-COURT STATEMENT TO SHOW MOTIVE THAT DALLAS TOLD QUALLS THAT HE KILLED
QUALLS' COUSIN EVEN THOUGH THERE WAS NO EVIDENCE THAT THE PERSON DALLAS KILLED WAS
QUALLS' COUSIN ... 32

V. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BECAUSE THE
PROSECUTOR ASSERTED AN OUT-OF-COURT STATEMENT FOR ITS TRUTH IN OPENING STATEMENT
AND ARGUED INCORRECTLY THAT THIS EVIDENCE SHOWED MOTIVE EVEN WITHOUT THE NECESSARY,
ADDITIONAL EVIDENCE THAT THE PERSON DALLAS KILLED WAS QUALLS' COUSIN ... 35

*iii VI. QUALLS WAS HIS DENIED RIGHTS TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL ...
38

  A. *Qualls Had a Right to Competent Counsel* ... 38

  B. *Counsel Failed to Object to Improper Prosecutorial Statement and Argument that
Violated the Confrontation Clause* ... 40

  C. *Counsel Failed to Request Contemporaneous Final Limiting Instruction for the
Evidence Limited to Showing Motive, Further Ensuring a Further Violation of the
Confrontation Clause* ... 41

  D. *Trial Counsel Did not Request a Curative Instruction After Leroyal Holmes
Mentioned His First Trial for the Second Time* ... 43

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282258          FOR EDUCATIONAL USE ONLY                    Page 3
2003 WL 23282258 (Mass.)

  E. *Trial Counsel Failed to Move For Relief from Prejudicial Joinder of the Charge
for Assault and Battery With A Dangerous Weapon On Grounds That its Prejudicial
Effect Outweighed Its Probative Value* ... 43

VII. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AND THE TRIAL
COURT ABUSED ITS DISCRETION ADMITTING AUTOPSY PHOTOS SHOWING MEDICAL INSTRUMENTS
PROTRUDING FROM TONY'S BODY, BUT WHICH DID NOT OTHERWISE ASSIST THE COMMONWEALTH'S
CASE ... 47

VIII. THIS COURT SHOULD GRANT RELIEF UNDER G.L. C. 278, SECTION 33E UNDER THE FACTS
AND CIRCUMSTANCES OF THIS CASE ... 49

CONCLUSION ... 50

ADDENDUM ... 51

## *iv TABLE OF AUTHORITIES

### Cases

*Arthur v. Bordenkircher*, 715 F.2d 118 (4th Cir. 1983) ... 29

*Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974) ... 40

*Berger v. United States*, 295 U.S. 78 (1935) ... 37

*California v. Green*, 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930  (1970) ... 42

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) ... 50

*Chapman v. California*, 386 U.S. 18 (1967) ... 18,28,30,33,47

*Cool v. United States*, 409 U.S. 100 (1972) ... 27

*Cooper v. Sowders*, 837 F.2d 284 (6th Cir. 1988) ... 50

*Commonwealth v. Adams*, 374 Mass. 722 (1978) ... 40

*Commonwealth v. Amirault*, 404 Mass. 221 (1989) ... 29

*Commonwealth v. Arsenault*, 361 Mass. 287 (1972) ... 28

*Commonwealth v. Bastarache*, 382 Mass. 86, (1980) ... 47

*Commonwealth v. Boateng*, 2003 Mass. LEXIS 92, 16 (January 21, 2003, Decided) ... 47

*Commonwealth v. Cancel*, 394 Mass. 567 (1985) ... 49

*v *Commonwealth v. Carlino*, 429 Mass. 692 (1999) ... 48

*Commonwealth v. Christian*, 430 Mass. 552 (2000) ... 37

*Commonwealth v. Coren*, 437 Mass. 723 (2002) ... 35,38

*Commonwealth v. Cuneen*, 389 Mass. 216 (1983) ... 29

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Commonwealth v. Cyr,* 425 Mass. 89 (1997) ... 32

*Commonwealth v. Dagenais,* 437 Mass. 832 (2002) ... 47

*Commonwealth v. Davis,* 380 Mass. 1 (1980) ... 49

*Commonwealth v. Delaney,* 425 Mass. 587 (1997) ... 44

*Commonwealth v. DelValle,* 353 Mass. 684 (1968) ... 34,40,41,42

*Commonwealth v. DeSouza,* 428 Mass. 667 (1999) ... 47

*Commonwealth v. DiMonte,* 427 Mass. 233 (1998) ... 30

*Commonwealth v. Dyous,* 436 Mass. 719 (2002) ... 30

*Commonwealth v. Fayerweather,* 406 Mass. 78 (1989) ... 31

*Commonwealth v. Fazio,* 375 Mass. 451 (1978) ... 35

*Commonwealth v. Flebotte,* 417 Mass. 348 (1994) ... 37

*Commonwealth v. Garabedian,* 399 Mass. 304 (1987) ... 49

*vi *Commonwealth v. Gallison,* 383 Mass. 659 (1981) ... 44

*Commonwealth v. Hoppin,* 387 Mass. 25 (1982) ... 44

*Commonwealth v. Howard,* 8 Mass. App. Ct. 318 (1979) ... 38

*Commonwealth v. Hunter,* 416 Mass. 831 (1994) ... 32

*Commonwealth v. Iglesias,* 426 Mass. 574 (1998) ... 39,43

*Commonwealth v. Johnson,* 420 Mass. 458 (1995) ... 25-26

*Commonwealth v. Kowalski,* 33 Mass. App. Ct. 49 (1992) ... 49

*Commonwealth v. Kozec,* 399 Mass. 514 (1987) ... 38

*Commonwealth v. Kelly,* 417 Mass. 266 (1994) ... 38

*Commonwealth v. Latimore,* 378 Mass. 671 (1979) ... 18,19

*Commonwealth v. Lodge,* 431 Mass. 461 (2000) ... 19

*Commonwealth v. Lowe,* 391 Mass. 97, 105, cert. denied, 469 U.S. 840 (1984) ... 32

*Commonwealth v. MacKenzie,* 413 Mass. 498 (1992) ... 39

*Commonwealth v. Maia,* 429 Mass. 585 (1999) ... 19

*Commonwealth v. Martino,* 442 Mass. 267 (1992) ... 29

*Commonwealth v. McCravey,* 430 Mass. 758 (2000) ... 26,32,33,36,49

*vii *Commonwealth v. Montanez,* 410 Mass. 290 (1991) ... 44

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Commonwealth v. Neuymer*, 432 Mass. 23 (2000) ... 26,32,33,36,49

*Commonwealth v. Niemic*, 427 Mass. 718, (1998) ... 49

*Commonwealth v. Oliveria*, 431 Mass. 609 (2000) ... 38

*Commonwealth v. Payne*, 426 Mass. 692 (1998) ... 37

*Commonwealth v. Qualls*, 425 Mass. 163 (1997) ... 3,23,34

*Commonwealth v. Richard*, 398 Mass. 392 (1986) ... 38

*Commonwealth v. Saferian*, 366 Mass. 89 (1974) ... 38,39

*Commonwealth v. Seabrooks*, 433 Mass. 439 (2001) ... 28

*Commonwealth v. St. Peter*, 48 Mass. App. Ct. 517 (2000) ... 48

*Commonwealth v. Sylvester*, 388 Mass. 749 (1983) ... 44

*Commonwealth v. Todd*, 394 Mass. 791 (1985) ... 44

*Commonwealth v. Torres*, 420 Mass. 479 (1995) ... 18,24

*Commonwealth v. Trapp*, 396 Mass. 202 (1985) ... 44

*Commonwealth v. Vardinsky*, 438 Mass. 444, 2003 Mass. LEXIS 10 (January 15 2003, decided) ... 20,42

*Commonwealth v. Vaughn*, 23 Mass. App. Ct. 40 (1986) ... 19,20

*viii *Commonwealth v. Vinnie*, 428 Mass. 161, 172 (1998) ... 34

*Commonwealth v. Wright*, 411 Mass. 678 (1992) ... 39,43

*Commonwealth v. Zagranski*, 408 Mass. 278 (1990) ... 34

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ... 36

*Estes v. Texas*, 381 U.S. 532 (1965) ... 27,29,32,33,36,49

*Francis v. Franklin*, 471 U.S. 307 (1985) ... 18,24

*Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) ... 29

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973) ... 27

*Garceau v. Woodford*, 275 F.3d 769 and (9th Cir. 2001), *cert. granted*, 123 S.Ct. 32 (2002) ... 46

*Ham v. South Carolina*, 409 U.S. 524 (1973) ... 27

*Hill v. Lockhart*, 474 U.S. 52 (1985) ... 39-40

*Idaho v. Wright*, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990) ... 34,40,41,42

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*In re Winship*, 397 U.S. 358 (1970) ... 18,24

*Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979) ... 18,19

**\*ix** *Manson v. Brathwaite*, 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977) ... 26

*Maryland v. Craig*, 497 U.S. 836, 111 L. Ed. 2d 666, 110 S. Ct. 3157 (1990) ... 42

*Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) ... 34,40,42

*Powell v. Alabama*, 287 U.S. 45 (1932) ... 39

*Strickland v. Washington*, 466 U.S. 668 (1984) ... 39

*United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975) ... 45

*United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993) ... 49-50

*United States v. Sorondo*, 845 F.2d 945 (11th Cir. 1988) ... 27,43

*United States v. Vance*, 871 F.2d 572 (6th Cir. 1989) ... 44

*Ward v. Monroeville*, 409 U.S. 57 (1972) ... 27

*Wardius v. Oregon*, 412 U.S. 470 (1973) ... 27

*Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) ... 40

*Webb v. Texas*, 409 U.S. 95 (1972) ... 27

*White v. Illinois*, 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992) ... 34,40,41,42

**\*x** *White v. McAnich*, 235 F.3d 988 (6th Cir. 2000) ... 42

*Woodford v. Garceau*, 2003 U.S. LEXIS 2491 (U.S., Mar. 25, 2003) ... 46

*Statutes. Constitutions, and Other Authorities*

U.S. Const. Amend 5 ... 26,32,36,49

U.S. Const. Amend 6 ... 34,36,40,42

U.S. Const. Amend 14 ... 26,32,36,40,42,49

Mass. Const. Part. 1, Art. 10 ... 26,32,36,49

Mass. Const. Part. 1, Art. 12 ... 26,32,34,36,40,42,49

G.L. c. 278, sec. 33E ... 39,49

Mass R. Crim. P. Rule 9(a)(3) ... 43,44

Prop. Mass. R. Evid. 401 ... 31

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Prop. Mass. R. Evid. 404(b) ... 44

Fed. R. Evid. 404(b) ... 44

Gross, *Loss of Innocence: Eyewitness Identification and Proof of Guilt,* 16 J. Legal
Stud. 395, 396 (1987) ... 26

Note, *Twenty-Years of Diminishing Protection: A Proposal to Return to the Wade
Trilogy's Standards,* 15 Hofstra L. Rev. 583, 605-606 (1987) ... 26

**\*1 *QUESTIONS PRESENTED FOR REVIEW***

1. Was a defendant denied his rights to have the Commonwealth prove every element
of the crime charged, and was the evidence insufficient to convict, where the sole
issue was identification, a victim identified a different person as his killer, and
the eye-witnesses were effectively impeached and unreliable?

2. Was a defendant denied his rights to due process and a fair trial, and was
there abuse of discretion and prejudicial error, where the trial court denied a
motion for a mistrial after a witness mentioned the defendant's first trial twice
and the trial court failed to give a second curative instruction?

3. Was a defendant denied his rights to due process and a fair trial, and was
there prejudicial error, where the trial court admitted testimony from an assistant
chief probation officer whose testimony disclosed that the defendant was reporting
to her before trial?

4. Was a defendant denied his rights to due process, a fair trial, and
confrontation, and was there prejudicial error, where the trial court admitted an
out-of-court statement to show motive that a victim told the defendant that he
killed the defendant's cousin, without a limiting instruction, and where there was
no evidence that the person the victim killed was the defendant's cousin?

5. Was a defendant denied his rights to due process, a fair trial, and
confrontation where the prosecutor asserted an out-of-court statement for its truth
in opening statement and argued incorrectly that this evidence showed motive, where
the evidence did not show motive without additional evidence that the person the
victim killed was the defendant's cousin?

6. Was a defendant denied his rights to effective assistance of counsel where
counsel (1) failed to object to improper opening statement and closing argument,
(2) failed to request a limiting instruction for an out-of-court statement offered
to show motive, ensuring a confrontation violation, (3) failed to request a
curative instruction after a witness mentioned his previous trial a second time,
and (4) failed to move to sever a charge for assault and battery with a dangerous
weapon having prejudicial effect greater than its probative value?

**\*2** 7. Was a defendant denied his rights to due process and a fair trial, and was
there abuse of discretion causing prejudicial error, where the trial court admitted
autopsy photos showing medical instruments protruding from a victim's body and
exposed internal organs from autopsy incisions that did not assist the
Commonwealth's case?

8. Should this court grant relief under G.L. c. 278, section 33E under the facts
and circumstances of this case.

*STATEMENT OF THE CASE*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282258              FOR EDUCATIONAL USE ONLY                    Page 8
2003 WL 23282258 (Mass.)

*Nature of the Case*

 This is an appeal from a jury verdict finding Ronald Quails guilty of two counts
of murder, and related charges, in the shooting deaths of Ronald ("Dallas") Price
and Roosevelt ("Tony") Price.

 *Prior Proceedings and Disposition in the Court Below*

 On November 10, 1992, a Suffolk County grand jury returned indictments 92- 11850-
001 and 92-11850-002, each charging Quails with murder (R.1-2). [FN1] It returned
indictment 92-11850-003 charging assault and battery with a dangerous weapon,
indictment 92-11850-004 charging assault with dangerous weapon, and indictment 92-
11850-005 charging unlawful possession of a firearm (R.3-5).

    FN1. The Trial Transcripts will be cited by volume and page as (Tr. / ), and
    the Record Appendix will be cited as (R. ??).

 From October 25, 1993, to November 3, 1993, the indictments were tried to a jury
in Suffolk Superior Court (Banks, J., presiding).

 *3 On November 3, 1993, the jury returned guilty verdicts (R.8). Banks, J.,
imposed two consecutive life sentences on the murder charges to be served at M.C.I
Cedar Junction (Tr. ??). [FN2] This Court reversed Quails' conviction. *Commonwealth
v. Quails*, 425 Mass. 163, 170-71 (1997).

    FN2. Banks, J. sentenced Quails to nine to ten years for the assault and
    battery with a dangers weapon conviction, to be served concurrently with a
    life sentence, and three to five years for the unlawful possession of a
    firearm (R.9). The assault by means of a dangerous weapon was placed on file
    (R.9).

 From March 23, 1998, to March 31, 1998, Quails was tried a second time to a jury
(Brady, J., presiding) (R.11; Tr.I/4). On March 31, 1998, the jury again returned
guilty verdicts (R.13,14; Tr.VI/165-79). Brady, J., imposed two consecutive life
sentences for the murder convictions to be served a M.C.I at Cedar Junction (R.14;
Tr.VI/165-179). [FN3] Quails appealed (R.14), and this Court entered the case on
August 5, 1999 (R.19)

    FN3. Brady, J, sentenced Quails to nine to ten years for the assault and
    battery with a dangerous weapon conviction, and two to five years for the
    assault by means of a dangerous weapon conviction, both to be served
    concurrently with a life sentence. The firearms conviction was placed on file
    (R.14; Tr.VI/165-79).

                           *STATEMENT OF FACTS*
 *Case Overview*

 *Commonwealth*

 According to the Commonwealth, Tony and Dallas Price *4 were in the Biarritz Bar
in Roxbury, Massachusetts, on October 2, 1992. Defendant Ronald Quails and his
friend, Junior Williams, were in the same bar.

 For reasons unknown, Dallas Price approached Quails and told him that he   (Dallas)
was the one who killed Quails' cousin a few years earlier. This disclosure
triggered a fight between Dallas and Quails inside the bar. Quails' friend,
Williams, who was a cousin to Tony and Dallas Price, began fighting with Tony.

                © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282258          FOR EDUCATIONAL USE ONLY                    Page 9
2003 WL 23282258 (Mass.)

Eventually, Qualls and Tony were escorted outside where these two started fighting, during which Qualls stabbed Tony, then drove off with Williams.

Later, Tony and Dallas were in a nearby parking lot with four friends, one of whom was driving a Geo Tracker. [FN4] Tony and Dallas were in the back seat of this vehicle. This group noticed Williams' car driving by, then allegedly saw Qualls approaching their vehicle. When one of the Prices' friends tried to stop Qualls, Qualls threatened him with a gun. Qualls then allegedly fired through the back window of the vehicle. Next, he moved to the rear passenger door and fired into the back seat killing Tony and Dallas.

> FN4. Leroyal Holmes, Fred Monroe, Donna Carrington, and Mattie Buford. See Argument I, below.

**\*5** *The Defendant*

According to Qualls, Williams was the shooter. There was no joint venture theory or instruction. Williams was arrested that night wearing clothes similar to the shooter's clothes. His sweatshirt was spotted with blood consistent with the victims' blood. Before he died, Tony told the police that Williams was his killer. The eyewitnesses had motives to lie and were thoroughly impeached. The trial court admitted prejudicial evidence showing that Qualls was reporting to a probation officer. It refused to grant a mistrial after a witness referred to Qualls' first trial. There was no curative instruction after the second mention of the prior trial.

The court erroneously admitted an out-of-court statement to show motive, with no limiting instruction. The prosecutor asserted this hearsay as truth in opening statement and argued motive unsupported by evidence. The court admitting autopsy photographs showing medical instruments protruding from Tony's body and exposed internal organs. Finally, Qualls was denied effective assistance of counsel for failure to avoid or cure the above problems and for failure to sever a prejudicial assault and battery charge.

**\*6** *Commonwealth's Case*

*Conflict in the Biarritz Bar*

Bouncer Jessie Lee Simms, (Tr.II/33-34), testified that on October 3, 1992, Tony, Dallas, Qualls, and Williams were in the Biarritz Bar (Tr.II/39). Simms saw Dallas (Tr.II/69), fighting with Qualls (Tr.II/39). Also present were Leroyal Holmes, (Tr.II/88-89), and Fred Monroe (Tr.II/88-89, 95; Tr.III/61-62).

According to Holmes, he was sitting with off-duty Detective Tommy Montgomery when fighting broke out (Tr.II/96). Montgomery stopped the fight between Dallas and Qualls (Tr.II/98). Monroe testified that he also saw the conflict between Dallas and Qualls (Tr.III/65,67-68). According to Monroe, Dallas said to Qualls; "I am the one that stabbed your cousin" (Tr.III/67). This out-of-court statement was admitted, over objection, to show motive (Tr.III/67). There was no limiting instruction and none was requested (Tr.III/67).

Detective Montgomery escorted Qualls outside, but his companion (Williams) stayed behind (Tr.II/43-44,68-69; Tr.III/70-71). Another Biarritz bouncer escorted Tony outside at the same time (Tr.II/74). After Qualls and Tony left the bar, Dallas argued with Williams saying; "We're cousins. We're cousins. I don't understand why you **\*7** are with this ... dude (Qualls), against me" (Tr.II/71). Williams responded, "Hey, I'm down with him. He's my man from over in Columbia point." (Tr.II/72-73)

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Confrontation Outside the Biarritz*

 Meanwhile, outside the Biarritz, a new fight broke out (Tr.II/46) According to
Holmes, Tony and Qualls argued and Qualls produced a knife (Tr.II/103). Holmes
broke up this fight and returned to the bar with Tony (Tr.II/107). Qualls got into
the passenger seat of Williams' car and drove off (Tr.II/100,105-07; Tr.III/73-74).
According to bouncer Simms, when Tony walked back into the bar (Tr.II/47), he said,
"I just got stabbed," (Tr.II/50), or "I almost got stabbed" (Tr.II/76).

*The Shooting Outside Studio 88*

 After the fight at the Biarritz, Holmes, Monroe, and the Price brothers went to
the apartment of Mrs. Price's apartment, mother to Tony and Dallas (Tr.II/108).
From there, Monroe and Holmes went to another bar called "Studio 88." The Price
brothers agreed to join them later (Tr.II/109-10).

 Meanwhile, Monroe's girlfriend, Mattie Buford, (Tr.III/58-59), and her friend,
Donna Carrington, drove to Studio 88 in Carrington's vehicle looking for Monroe
(Tr.II/111). They parked in a lot facing Washington *8 Street were they met Tony,
Dallas, Monroe, and Holmes (Tr.II/114; Tr.III/75-78,170-73). Soon after the women
arrived, Tony felt pain and realized that he had been stabbed and needed medical
care (Tr.II/115-16; Tr.III/79-81,177). As they discussed this, Holmes noticed
Williams' car traveling down nearby Palmer Street (Tr.II/117). According to Holmes,
Dallas said, "There goes the car" (Tr.II/135). Monroe testified that Dallas said,
"Oh man. That's Junior's car. That's them, right there" (Tr.III/82). According to
Monroe, Williams was driving and Qualls was a passenger (Tr.III/82-83). Carrington
testified that two men were in the car (Tr.III/238).

 As Holmes looked down Palmer Street, a man appeared in front of him  (Tr.II/120).
Holmes grabbed the man, who said; "Let me go" (Tr.II/121). When Holmes let him go,
the man pulled a .38 caliber revolver [FN5] from his coat, pointed it at Holmes and
said, "Get the fuck out of my way or I'll blow your head off" (Tr.II/124). Holmes
turned to warn Tony and Dallas, but could not see them (Tr.II/124).

     FN5. A police ballistician both described and demonstrated how a revolver
     operates (Tr.IV/107-19).

 Monroe testified that he saw the gunman walking toward Carrington's vehicle and
that he saw Holmes try to stop him (Tr.III/86-87). Buford, by contrast testified *9
that the gunman was running up to the vehicle (Tr.III/179). As the man approached,
Holmes said, "[H]e's strapped (armed)" and Buford ran away (Tr.III/89-90,178).

 The man walked to the back of the vehicle and fired through the rear window
(Tr.II/125-28). Then he moved to the rear passenger window and fired into the back
seat (Tr.II/129; Tr.III/91-94). [FN6] According to Holmes, the man stood still as
Carrington drove away (Tr.II/130-31). Monroe and Buford said that the shooter ran
away (Tr.III/93,181-82).

     FN6. The chief ballistician testified that of the three bullets recovered
     from the bodies of Tony and Dallas, at least one from each body was fired
     from the same weapon (Tr.IV/124-31).

 Holmes chased the vehicle a short distance to Tony's apartment at 1111 Harrison
Avenue, where both Tony and Carrington jumped out (Tr.II/137-40; (Tr.III/96-
97,186). Tony ran inside his apartment (Tr.II/141). [FN7] Holmes told Fred Monroe
to drive Dallas to the hospital, where Dallas died (Tr.II/142- 47; (Tr.III/98-100).

          ©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN8] At the hospital, Holmes refused to talk to security personnel and took off
running (Tr.II/147-48). When Holmes returned to 1111 *10 Harrison Avenue to find an
ambulance and cruisers, he took off again refusing to talk to the police
(Tr.II/149-51).

> FN7. Dallas' fiancé, Marie Fletcher, heard the shots, and called the police
> (Tr.III/274,277-89). Paramedics arrived at approximately 2:30 a.m. and
> transported Tony Price, who was alert and cooperative to the hospital
> (Tr.IV/5-21).

> FN8. Both Price brothers died of gunshot wounds to the chest (Tr.V/42).

Monroe also refused to cooperate with police and gave a fake name (Tr.III/100-
02). He eventually identified Qualls as the shooter (Tr.III/103-04). Monroe and
Buford also testified that the shooter was Qualls (Tr.III/103-04,189). Eventually,
Holmes agreed to give a statement and identified Qualls (Tr.II/155- 62).

*Identifications Issues*

Holmes testified that the shooter was wearing a blue "Members Only" brand jacket
(Tr.II/224,226). He was able to give a detailed description of the shooter's gun,
which he said he was staring at, including an estimate of the barrel length
(Tr.II/228-30). Holmes did not give hospital security personnel a description of
the shooter (Tr.II/235-36). After Williams was arrested, Holmes went to the station
with the police, but refused to give them any information about the shooter
(Tr.II/241-42).

According to Monroe, the shooter was wearing a black or dark colored hooded
sweatshirt, with the hood pulled up on top of his head, covering part of his face
(Tr.III/161-62). Monroe admitted, in contrast to his direct testimony, that he told
the grand jury that he did *11 not see Holmes try to stop the gunman, but merely
heard what they said (Tr.III/129-30). Monroe also admitted that he ran when the
shooting started, but stopped and returned to the Carrington's vehicle
(Tr.III/133). He admitted that he lied to the police about his running all the way
across the street, explaining this lie as reluctance to involve Mattie Buford in
the case (Tr.III/135).

According to Mattie Buford, the shooter ran up to the back of the vehicle
(Tr.III/180). She admitted, during cross-examination, that she changed her
testimony after lunch recess about the direction from which the shooter arrived at
the scene after going over the testimony "a little" with the prosecutor
(Tr.III/192).

Donna Carrington could not identify the shooter, (Tr.III/256), but described him
as five-feet seven-inches tall with a medium build, wearing a Champion sweatshirt,
either blue or purple (Tr.III/258-59,264). [FN9] Consistent with Monroe and
Carrington's description of the shooter's clothing, a criminalist testified that
police collected *12 a gray sweatshirt from Williams the night he was arrested
(Tr.IV/152). This sweatshirt had blood that was the same blood type as both victims
(Tr.IV/153-54,174).

> FN9. Williams is five-feet, nine-inches tall, and weighed two-hundred pounds
> (Tr.IV/196). He was wearing a gray sweatshirt when arrested (Tr.IV/195).
> Qualls, who turned himself in on October 29, 1992, also is five-feet, nine-
> inches tall, and weighs one-hundred-forty pounds (Tr.IV/204). He had a
> partially healed cut on his right hand (Tr.IV/209- 10).

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Qualls Alleged Pretrial Contact With Holmes*

In June of 1993, Holmes received a telephone call from Qualls, (Tr.II/162-64), who asked him to tell Buford and Monroe that they picked out the wrong person (Tr.II/164-65). On March 10, 1998, Holmes was walking on Washington Street when Qualls approached him (Tr.II/16771). According to Holmes, Qualls said that he knew where Holmes was staying and where his son's mother lived (Tr.II/176-78). Qualls allegedly said that the courts were trying to put him away for life and that he had nothing to lose (Tr.II/180-81).

*Witness Not On Witness List Disclosing That Qualls Was Reporting to A Probation Officer*

Before Tanya Brooks testified, defense counsel objected, both because her name was not on the witness list, and because her testimony would disclose to the jury that Qualls was on probation before trial (Tr.III/50-54). Brooks testified that, while acting in her role as assistant chief probation officer, she had reason to know that Qualls was in the area of the courthouse on Ashburton Place on March 10, 1998, at **13** approximately 2:00 p.m. (Tr.III/55-56). This testimony allegedly corroborated Holmes story that Qualls approached him on March 10, 1998.

*Improper Reference to Qualls' First Trial*

When Holmes was describing his encounter with Qualls on March 10, 1998, he testified that he told Qualls that he was not going to testify again and that he did not want to go through that again (Tr.II/175). Holmes testified that the prosecutor gave him "transcripts from the trial last time" (Tr.II/174). Defense counsel moved to strike and the trial court told the jury to disregard this reference to Qualls' first trial (Tr.II/174). During cross-examination, Holmes asked defense counsel if he were "talking about the [first] trial ... when we testified at the [first trial]" (Tr.II/197). The trial court denied defense counsel's motion for a mistrial (Tr.II/199). Counsel did not request a second curative instruction and none was given.

*Erroneous Admission of Autopsy Photographs*

The prosecutor offered autopsy photographs, (Tr.V/28-29; R.20-21), over objection, (Tr.V/27-28; (Tr.I/50-52; R.13), which showed medical instruments impaled through a bullet wound in Tony arm (Tr.V/28-29; R.20). A second photograph showed two bullet holes in **14** Tony's arm and a knife wound in his side, and a graphic image of Tony's body from autopsy procedures, including a large surgical incision running from the rib cage down to the stomach area with substantial intestine, tissue, or internal organs exposed (Tr.29-30; R.21).

*Improper Opening Statement*

Former Detective Bruce Holloway testified that Dallas, as a juvenile, was convicted of manslaughter for killing Paul Mahoney in 1988 (Tr.I/210-11). There was no evidence that Mahoney was related to Qualls. Despite this, in opening statement, the prosecutor said that Dallas killed Qualls' cousin, (Tr.I/188-89 ["I will prove that ... Dallas Price stabbed a cousin of the defendant, Ronald Qualls"]).

*Improper Closing Argument*

During closing argument the prosecutor said the following:
Not only do you know what happened. You know why it happened; the motive, the words that set Ronald Qualls off: "I am the one who killed your cousin." That is

what started this senseless murder. That is what started the fighting, the
struggling, the tussling, the stabbing. That is what set it all off" (Tr.VI/71).

 *Defendant's Case*

 *Tony Named Williams As the Shooter*

 Officer Clifton Haynes arrived at 1111 Harrison to **\*15** find Tony (Tr.IV/32).
Haynes asked Tony who shot him and he said that "Junior [Williams]", shot him, that
Junior drove an Escort, lived on Columbia Point, and had a sister who lived on
Ruggles Street (Tr.IV/33,34,44-45). Officer Haynes' partner corroborated this
identification (Tr.IV/62,80-81). When the police arrested Williams later that
evening, he was alone in his Escort, (Tr.IV/67-68,90-99). [FN10] The initial police
incident for this shooting indication only one perpetrator and that perpetrator was
Junior Williams (Tr.V/84-88).

     FN10. A criminalist testified that there was blood on the passenger side of
     Williams' car that matched Qualls's blood type (Tr.IV/157,160). A print
     specialist testified that a print taken from the exterior of the passenger
     side window of Williams' car belonged to Qualls (Tr.V/4-12).

 Holmes, Monroe, and Buford were not credible, and had extensive criminal records
and pending cases when they testified. Their accounts were conflicting and
inconsistent. *See* Argument I, below.

                         *SUMMARY OF THE ARGUMENT*
 I. Qualls' due process rights were violated where the only evidence connecting him
to a shooting was testimony from three alleged eye-witnesses, whose testimony was
so unreliable that it failed to prevent this Court from reversing Qualls'
conviction after his first conviction. Further, these three witnesses had **\*16**
extensive criminal records and serious motive to lie. Finally, one of the victims
indentified someone other than Qualls as his killer. PP.18-26.

 II. Qualls' due process rights to an impartial jury were violated where a witness
referred to his prior trial twice, and where there was no curative instruction
after the second reference because the jury was exposed to information that a prior
jury convicted Qualls on the same charges, tainting their impartiality. PP.26-29.

 III. Qualls' rights to a fair trial were violated when a probation officer
testified that she had contact with Qualls before trial implying that he was
already in the system and that he was a criminal. PP. 30-32.

 IV. Qualls' due process rights and his right to confrontation were violated when
hearsay evidence was admitted allegedly to show his motive to kill the victims.
This evidence would not have provided motive unless it were true making it
inadmissible hearsay and denying Qualls the right to confront this declarant. PP.
32-35.

 V. The prosecutor argument improperly after asserting that this hearsay evidence
was true during opening and by arguing in closing that it provided motive, since in
could not provide motive unless it were **\*17** true, which reinforced the
confrontation violation. PP. 35-38.

 VI. Qualls was denied effective assistance of counsel, because counsel did not
object to the prosecutor's opening statement and closing argument that misused
hearsay evidence ensuring the confrontation clause violation, counsel failed to
request a limiting instruction on the use of hearsay evidence, which further

                    ©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282258          FOR EDUCATIONAL USE ONLY                    Page 14
2003 WL 23282258 (Mass.)

guaranteed the confrontation violation, he did not request a curative instruction
when a witness referred to Qualls' first trial, and failed to move for relief from
prejudicial joinder of crimes, which exposed the jury to bad acts evidence without
an instruction. PP. 38-46

VII. Qualls' due process rights and rights to a fair trial were violated where the
court admitted autopsy photos showing instruments protruding from a victim's body
and showing exposed internal organs. PP. 47-48

VIII. The cummulative errors and the facts and circumstances of this case justify
relief under G.L. c. 278, sec. 33E. It was a close case on the evidence, the
witnesses' credibility was weak, and Qualls was denied effective assistance of
counsel and suffered violations of due process and the right to confront witnesses.
PP. 49-50.

                              *18 *ARGUMENT*
I. QUALLS WAS DENIED HIS RIGHTS TO HAVE THE COMMONWEALTH PROVE EVERY ELEMENT OF
THE CRIME CHARGED, AND THE EVIDENCE WAS INSUFFICIENT TO CONVICT, BECAUSE THE SOLE
ISSUE WAS IDENTIFICATION, TONY IDENTIFIED WILLIAMS AS HIS KILLER, AND HOLMES,
MONROE, AND BUFORD WERE EFFECTIVELY IMPEACHED AND UNRELIABLE.

Because Qualls moved for a required finding, this issue is preserved (Tr.V/49-
54,104-05; R.13). Review is for harmlessness, beyond a reasonable doubt. *Chapman v.
California*, 386 U.S. 18, 24 (1967).

The Due Process clause of the Fourteenth Amendment and article 12 of the
Massachusetts Declaration of rights require the government to prove all elements of
the crime charged to convict lawfully. *Francis v. Franklin*, 471 U.S. 307, 313-327
(1985); *In re Winship*, 397 U.S. 358, 364 (1970); *Commonwealth v. Torres*, 420 Mass.
479, 489 (1995).

Evidence is sufficient to support a verdict "if all the circumstances including
inferences are of sufficient force to bring minds of ordinary intelligence and
sagacity to the persuasion of [guilt] beyond a reasonable doubt." *Commonwealth v.
Latimore*, 378 Mass. 671, 676 (1979); *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L.
Ed. 2d 560, 99 S. Ct. 2781 (1979).Each element of the crime must be supported by
such evidence. *Latimore*, 378 Mass. at 676. This Court must decide if, after viewing
the *19 evidence in a light most favorable to the prosecution, any rational trier
of fact could have found the essential elements of the crime charged, beyond a
reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Commonwealth v.
Lodge*, 431 Mass. 461, 465 (2000); *Latimore*, 378 Mass. at 676-677.

Normally this Court would look to the jury to weigh identification testimony
against the evidence offered to support a defense. To avoid the conviction of an
innocent person, it is necessary that there be an exception. The exception includes
cases with evidence of innocence in the form of documents, photographs, or other
physically-verifiable items, which an appellate court is in a position equal to
that of the jury to consider. *Commonwealth v. Maia*, 429 Mass. 585, 589 (1999);
*Commonwealth v. Vaughn*, 23 Mass. App. Ct. 40, 43- 44 (1986). Here, the
identification evidence was suspect. The eye-witnesses were motivated by numerous
pending cases to please the police and the prosecutor. Tony identified Williams as
the shooter. Under these circumstances, even though the evidence of innocence is
not documentary, it is so strong that failure to reverse leaves open a grave
possibility that an innocent person was convicted. The victim, with no motive to
lie, *20 identified his own killer. This evidence is as probative as that in
*Vaughn*.

              ©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The only evidence against Qualls was from eye-witnesses. "Studies conducted by psychologists and legal researchers ... have confirmed that eyewitness testimony is often hopelessly unreliable." *Commonwealth v. Vardinsky,* 438 Mass. 444, 2003 Mass. LEXIS 10, 13 (January 15 2003, decided). Qualls and Williams were the same height and their weight differed by only sixty pounds, (Tr.VI/196,204), a difference hidden by bulky cold weather clothing. Darkness, and a hood pulled partially over the shooter's face, camouflaged the difference in their complexions, according to Monroe (Tr.III/161-62).

Each of the three identification witnesses had extensive criminal records and multiple pending cases for serious crimes, creating a danger that they lied to please the prosecution and the police.

A. *Leroyal Holmes Was Effectively Impeached.*

Holmes told Detective Montgomery that he did not know who shot Dallas and Tony (Tr.V/66-67). Holmes was unwilling to talk to the police. He admitted that he lied to the police about not knowing Qualls and about not talking to Qualls in about a year (Tr.III/13-14) He **\*21** admitted saying that he did not know who the shooter was (Tr.III/13-14). He had a pending drug case in the Boston Municipal Court with a hearing scheduled for five days before Qualls' second trial (Tr.II/185-87,260-61). He failed to show up for a court date on charges of assault and battery with a dangerous weapon (Tr.II/187-88). He had multiple past convictions for possession of a firearm, possession of ammunition, distribution of a class B substance, and assault and battery (Tr.II/241-60). He was on probation for possession of cocaine with intent to distribute when he testified (Tr.II/251).

B. *Fred Monroe Was Effectively Impeached.*

When he testified, Monroe had default warrants against him, including a warrant for receiving stolen property over $250 (Tr.III/152-53). He had pending cases against him, including a 1987 charge of use of a motor vehicle without authority, and pending charges for using a false credit card and for receiving a false credit card and forgery. Monroe had a pending case for assault and battery by means of a dangerous weapon and a pending case for possession of cocaine with intent to distribute (Tr.III/151-57). With the assistance of the police, the default warrants were removed (Tr.III/158-59). He had a conviction for burglary in Georgia in 1996, and was **\*22** arrested for a new offense while on probation (Tr.III/159-61). He admitted past arrests for drunk driving and burglary (Tr.III/104-05). He was convicted for conspiracy to violate the controlled substance act (Tr.III/164). The prosecutor called the probation office on Monroe's behalf to deal with one of his defaults and the case was eventually cleared several years later (Tr.III/166).

When first questioned, Monroe gave a false name and social security number (Tr.III/145-46). The police had to hound him for ten days before he gave a statement (Tr.III/148-49).

C. *Mattie Buford Was Effectively Impeached.*

Because of an outstanding warrant, Buford refused to talk to the police (Tr.III/218). She feared being locked up herself (Tr.III/219-20). When she eventually talked, on November 5, 1992, a police officer drove her to the courthouse to clear up her warrants (Tr.III/220). Buford was convicted on February 16, 1996, of possession of a class B substance with intent to distribute. She was convicted on November 14, 1996 of distribution of cocaine. She was on probation when she testified at Qualls' second trial (Tr.III/223- 24). Buford also had many pending cases against her when she first talked to **\*23** the police in November 1992

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Tr.III/224-25).

These criminal histories undermining confidence in the eye-witnesses' testimony impressed this Court when it reviewed Quakls' first conviction. There is no reason to take the substantial evidence on lack of credibility less seriously this time. Specifically, this Court reversed Qualls' conviction after his first trial because the trial court erroneously admitted hearsay evidence tending to show motive to kill where the issue was identification. This Court reasoned that it could not say that the jury would not be influenced by the erroneous admissions because the three witnesses identifying Qualls as the shooter were thoroughly impeached. *Commonwealth v. Qualls,* 425 Mass. 163, 170-71 (1997). It was the efficacy of the impeachment of the eye-witnesses that persuaded this Court that the inadmissible motive evidence could not be deemed harmless. These three eye-witnesses were just as incredible this time. Weighing their suspect testimony against that of Tony Price, who was unequivocal that Williams was the shooter, (Tr.IV/32,62,67-68,80-81,90-99; Tr.V/84-88), should similarly persuade this Court to reverse again to avoid conviction of an innocent man. There was no joint-venture theory and no joint-venture instruction. On the unreliable evidence provided **\*24** here, a reasonable jury could not have found Qualls guilty beyond a reasonable doubt. *Francis,* 471 U.S. at 313-327; *In re Winship,* 397 U.S. at 364; *Torres,* 420 Mass. at 489.

In addition to the criminal histories of the "eyewitnesses," there were inconsistencies between and among them. Holmes testified, for example, that the shooter was wearing a blue "Members Only" brand jacket (Tr.II/224,226), and it was plain that Holmes spent most of his encounter with the shooter looking at the weapon and not at the man (Tr.II/228-30). He refused to give hospital personnel a description, (Tr.II/235-36), and refused to give the police any information about the shooter (Tr.II/241-42). According to Monroe, by contrast, the shooter was wearing a black or dark colored hooded sweatshirt, with the hood pulled up on top of his head, covering part of his face (Tr.III/161-62). Monroe told the grand jury, in contrast to his trial testimony, that he did not see Holmes try to stop the gunman (Tr.III/129-30). He also admitted running away when the shooting started, (Tr.III/133), and that he lied to the police about how far he ran (Tr.III/135).

Monroe testified that he saw the gunman walking **\*25** toward the Carrington vehicle and that he saw Holmes try to stop him (Tr.III/86-87). Buford testified that the gunman was running up to the vehicle (Tr.III/179). According to Holmes, the gunman stood still as Carrington drove away (Tr.II/130-31). Monroe and Buford said that he ran away (Tr.III/93,181-82).

Mattie Buford conceded that she changed her testimony after lunch recess about the direction from which the shooter arrived at the scene after going over the testimony "a little" with the prosecutor (Tr.III/192). This was critical because it was relevant to Tony's ability to see his killer.

Donna Carrington, in contrast to both Holmes and Monroe, testified that the shooter was wearing a Champion sweatshirt (Tr.III/258-59,264). Consistent with Monroe and Carrington's description of the shooter's clothing, and corroborating Tony's assertion that Williams was the shooter, a criminalist testified that police collected a gray sweatshirt from Williams the night he was arrested within hours of the shooting (Tr.IV/152), containing blood consistent with the victims' blood (Tr.IV/153-54,174).

Mistaken identification is a primary cause of erroneous convictions. *See* **\*26***Commonwealth v. Johnson,* 420  Mass. 458 465 (1995); *Manson v. Brathwaite,* 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977) (discussion unreasonably suggestive identification procedures). *See* Gross, *Loss of Innocence: Eyewitness*

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Identification and Proof of Guilt,* 16 J. Legal Stud. 395, 396 (1987); Note, *Twenty-Years of Diminishing Protection: A Proposal to Return to the Wade Trilogy's Standards,* 15 Hofstra L. Rev. 583, 605-606 (1987). Particularly relevant in this case, and compounding this problem, is the tendency of juries to be unduly receptive to eyewitness evidence. *Manson v. Brathwaite,* 432 U.S. at 120 (Marshall, J., dissenting). For all of these reasons, there is too great a risk of misidentification, either deliberate or accidental, in this case, to avoid reversal.

II. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL, AND THERE WAS PREJUDICIAL ERROR, BECAUSE THE TRIAL COURT DENIED A MOTION FOR A MISTRIAL AFTER HOLMES MENTIONED QUALLS' PREVIOUS TRIAL TWICE, AND BECAUSE THE TRIAL COURT FAILED TO GIVE AN SECOND CURATIVE INSTRUCTION.

The Fifth and Fourteenth Amendments to the United States Constitution and Articles 10 and 12 of the Massachusetts Declaration of Rights guarantee Qualls' constitutional rights to due process of law and to a fair trial. *Commonwealth v. Neuymer,* 432 Mass. 23, 33 (2000); *Commonwealth v. McCravey,* 430 Mass. 758, 759-60 (2000).

Due process of law is afforded to every defendant **\*27** under the Fourteenth Amendment, through which the Sixth Amendment confers the right to a trial by an impartial jury. This includes a right not to have jurors tainted by knowledge of a prior conviction because" a jury has an obligation to exercise its untrammeled judgement upon the worth and weight of the testimony and to bring its verdict and not someone else's." *United States v. Sorondo,* 845 F.2d 945, 949 (11th Cir. 1988). The defendant has similar guaranties under art. 12 of the Declaration of Rights of the Constitution of the Commonwealth. These guaranties are violated, and the defendant is deprived of a fair trial, when proceedings give rise to a probability of prejudice. *Estes v. Texas,* 381 U.S. 532, 542-543 (1965). The Supreme Court, in reversing criminal convictions, has lent frequent emphasis to the guaranties of due process of law and a fair trial before an impartial jury. *Ward v. Monroeville,* 409 U.S. 57 (1972). *Webb v. Texas,* 409 U.S. 95 (1972). *Cool v. United States,* 409 U.S. 100 (1972). *Ham v. South Carolina,* 409 U.S. 524 (1973). *Gagnon v. Scarpelli,* 411 U.S. 778 (1973). *Wardius v. Oregon,* 412 U.S. 470 (1973).

In this case, Holmes testified that he told Qualls that he was not going to testify again and that he did not want to go through that again (Tr.II/175). He **\*28** testified that the prosecutor gave him "transcripts from the trial last time" (Tr.II/174). Defense counsel preserved the issue (Tr.II/174). Review is for harmlessness, beyond a reasonable doubt. *Chapman,* 386 U.S. at 24.

During cross-examination, to clarify a question, Holmes asked defense counsel if he were "talking about the [first] trial when we testified at the [first trial]" (Tr.II/197). The trial court denied defense counsel's motion for a mistrial (Tr.II/199). Although the trial court gave a sua sponte curative instruction once, trial counsel failed to request a curative instruction after the second mention of a prior trial (Tr.III/197-99).

Disclosing to the jurors that Qualls had been tried once before caused prejudice and destroyed juror impartiality. *See Commonwealth v. Seabrooks,* 433 Mass. 439, 443 (2001) (implying that juror knowledge of a defendant's first trial could have supported a defendant's argument that jurors were no longer impartial). *See also Commonwealth v. Arsenault,* 361 Mass. 287, 300 (1972) ( "It would be unrealistic to think that the numerous references to and questions about a 'prior proceeding' and to the evidence presented at that **\*29** proceeding could leave the jury unaware of the fact that there had been a previous trial."); *Arthur v. Bordenkircher,* 715 F.2d

2003 WL 23282258         FOR EDUCATIONAL USE ONLY                    Page 18
2003 WL 23282258 (Mass.)

118,119 (4th Cir. 1983) ("We are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the charged crime."); _Fullwood v. Lee_, 290 F.3d 663, 682-83 (4th Cir. 2002) (ordering evidentiary hearing inquiry on jurors receiving information that defendant had previously been convicted); _Estes_, 381 U.S. at 542-543 (jurors must be impartial).

Although the decision to deny a mistrial is discretionary, _Commonwealth v. Amirault_, 404 Mass. 221, 232 (1989); _Commonwealth v. Cuneen_, 389 Mass. 216, 223 (1983), this reference to Qualls' first trial was not an isolated incident as in _Commonwealth v. Martino_, 442 Mass. 267, 281 (1992). It was repeated and there were no curative instructions after the first repetition. For these reasons, it was abuse of discretion to deny the motion, which violated Qualls' federal and state constitutional rights to due process and a fair trial with an impartial jury.

*30 III. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AND THERE WAS PREJUDICIAL ERROR BECAUSE THE TRIAL COURT ADMITTED TESTIMONY FROM AN ASSISTANT CHIEF PROBATION OFFICER, WHO WAS NOT ON THE WITNESS LIST, AND WHOSE TESTIMONY INDIRECTLY DISCLOSED THAT QUALLS WAS REPORTING TO HER BEFORE HIS MURDER TRIAL.

Tanya Brooks testified over objection (Tr.III/50-54). Review is for harmlessness, beyond a reasonable doubt. _Chapman_, 386 U.S. at 24. According to Brooks, while acting as assistant chief probation officer, she knew that Qualls was near the courthouse on March 10, 1998, at approximately 2:00 p.m., (Tr.III/55-56), which corroborated Holmes story that Qualls approached him on that date, allegedly to threaten him.

Admitting this evidence violated the same federal and state constitutional principals guaranteeing Qualls' rights to due process and a fair trial set out in Argument II, above. Further, it was unnecessary and cumulative because Holmes had already testified that Qualls was in the area of the courthouse. It had minimal relevancy and immense prejudicial effect. A judge's decision that evidence is relevant, and that the probative value of relevant evidence is not outweighed by its prejudicial effect, will be upheld absent palpable error. _Commonwealth v. Dyous_, 436 Mass. 719, 729 (2002); _Commonwealth v. DiMonte_, 427 Mass. 233, 243-244 (1998). In this case, implying to the jury that Qualls was *31 reporting to the assistant chief probation officer before trial in a case where the sole issue was identity and the evidence on identity was extremely close, caused undue prejudice because it unfairly undermined Qualls' character and bolstered testimony that was ambiguous to show consciousness of guilt.

According to Holmes, Qualls approached him to threaten him and to persuade him not to testify against him (Tr.II/180-81). Qualls just as reasonably could have approached Holmes because he was innocent and had nothing to lose by trying to persuade Holmes and because the Commonwealth was trying to convict him of murders he did not commit. To put the weight of the chief probation officer behind this otherwise weak implication of threat was both gratuitous and grossly prejudicial. It was irrelevant that Qualls was reporting to a probation officer. _See_ Proposed Mass. R. Evid. 401; _Commonwealth v. Fayerweather_, 406 Mass. 78, 83 (1989). The Commonwealth's assertion that the testimony was offered to corroborate Holmes' story was a pretext unfairly offered to damage Qualls' character. Merely because Qualls was in the area of the courthouse does not make it more likely that he approached Holmes, particularly because he had a legitimate reason for being there (reporting to the *32 probation officer). Even assuming relevancy, its relevancy is so slight that it could not have greater probative value than the prejudicial effect. For this reason, this Court should conclude that the prosecutor violated Qualls' federal and state constitutional rights to due process and a fair trial. U.S. Const. Amend 5, and 14, Mass. Const. Art. 10, 12; _Neuymer_, 432 Mass. at 33;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*McCravey*, 430 Mass. at 759-60; *Estes*, 381 U.S. at 542-543.

IV. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AND TO CONFRONTATION, AND SUFFERED PREJUDICIAL ERROR, BECAUSE THE TRIAL COURT ADMITTED AN OUT-OF-COURT STATEMENT TO SHOW MOTIVE THAT DALLAS TOLD QUALLS THAT HE KILLED QUALLS' COUSIN EVEN THOUGH THERE WAS NO EVIDENCE THAT THE PERSON DALLAS KILLED WAS QUALLS' COUSIN.

Hearsay may be admissible to prove the state of mind or intent of a person when it is a material issue. *See, e.g., Commonwealth v. Cyr*, 425 Mass. 89, 94 (1997); *Commonwealth v. Hunter*, 416 Mass. 831, 837 (1994); *Commonwealth v. Lowe*, 391 Mass. 97, 105, *cert. denied*, 469 U.S. 840 (1984).

At trial, Monroe testified that Dallas said to Qualls; "I am the one that stabbed your cousin" (Tr.III/67). Admitting this hearsay evidence was ostensibly justified solely because it tended to show Qualls' state of mind or motive (Tr.III/67). There was no evidence, however, to show that the person Dallas killed *33 was Qualls' cousin. Without this additional proof, there would be no effect on Qualls' state of mind, no proof of motive, and no justification for admitting the evidence. In any event, the failure to limit use of the statement was fatal.

Defense counsel objected to admitting Dallas' statement (Tr.65-67). He did not, however, request a contemporaneous limiting instruction, and no limiting instruction was given at the end of trial (Tr.VI/78-135). Review is for harmlessness, beyond a reasonable doubt regarding the admission of the evidence. *Chapman*, 386 U.S. at 24.

Admitting Dallas' out-court-statement to show motive, where there was no evidence that the person killed was Qualls' cousin and consequently no proof of any effect on Qualls' state of mind, violated the same federal and state constitutional principals guaranteeing Qualls' rights to due process and a fair trial set out in Argument II, above. U.S. Const. Amend 5, and 14, Mass. Const. Art. 10, 12; *Neuymer*, 432 Mass. at 33; *McCravey*, 430 Mass. at 759-60; *Estes*, 381 U.S. at 542-543.

The failure to instruct on the permissible limited use of this statement prevented Qualls from confronting a crucial witness against him (i.e., the victim) *34 regarding a critical issue at trial, motive.

This violated of Article 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the United States Constitution. *See White v. Illinois*, 502 U.S. 346, 352-354, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992); *Idaho v. Wright*, 497 U.S. 805, 813-817, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990); *Ohio v. Roberts*, 448 U.S. 56, 63-66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980); *Commonwealth v. DelValle*, 353 Mass. 684 (1968). The jury was free to use Dallas' statement as substantive evidence. A flat violation of the Confrontation Clause.

This Court reversed Qualls' first conviction because state-of-mind evidence of the victims' was improperly admitted. "The state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it." *Commonwealth v. Vinnie*, 428 Mass. 161, 172 (1998), quoting *Commonwealth v. Qualls*, 425 Mass. 163, 167 (1997). *See Commonwealth v. Zagranski*, 408 Mass. 278, 283 (1990) (same). Although the error in admitting hearsay *35 this time is not exactly the same as the reversible error committed in Qualls first trial, it is just as prejudicial for reasons stated and requires reversal. In Qualls' first trial there was no evidence that Qualls knew of the

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statements, in this trial there was no evidence that the statements had any effect on his statement of mind.

V. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BECAUSE THE PROSECUTOR ASSERTED AN OUT-OF-COURT STATEMENT FOR ITS TRUTH IN OPENING STATEMENT AND ARGUED INCORRECTLY THAT THIS EVIDENCE SHOWED MOTIVE EVEN WITHOUT THE NECESSARY, ADDITIONAL EVIDENCE THAT THE PERSON DALLAS KILLED WAS QUALLS' COUSIN.

A prosecutor may only state in opening what she expects to prove. *Commonwealth v. Fazio*, 375 Mass. 451, 454 (1978). Prosecutors must limit the scope of their arguments to facts in evidence and inferences that may be reasonably drawn from the evidence. *Commonwealth v. Coren*, 437 Mass. 723, 730 (2002). Here, the prosecutor promised during opening to prove that Dallas, in fact, killed Qualls' cousin (Tr.I/188-89). There was no evidence of this. She argued in closing that Qualls' motive was revenge, absent evidence supporting the effect on Qualls' mind that would support finding motive. (Tr.VI/67,71).

This substantive use of hearsay evidence violated the federal and state confrontation clauses. *36U.S. Const. Amends 6,14; Mass. Const. Pt. 1, art. 12; White*, 502 U.S. at 352-354; *Wright*, 497 U.S. at 813-817; *DelValle*, 351 Mass. at 491. It also violated Qualls' federal and state constitutional rights to due process and a fair trial. U.S. Const. Amend 5, and 14, Mass. Const. Art. 10, 12; *Neuymer*, 432 Mass. at 33; *McCravey*, 430 Mass. at 759-60; *Estes*, 381 U.S. at 542-543.

Because the hearsay evidence offered to show motive was inadmissible, and because it did not show motive absent proof the Dallas' victim was Qualls' cousin, the prosecutor's argument that it showed motive was improper and misrepresented a critical fact (whether the person Dallas killed was Qualls' cousin) a fact that served to distinguish Qualls from Williams as the likely shooter, a fact that was likely to have an impact on the jury's decision in light of the suspect eye-witness testimony and other problems in this case, and the absence of physical evidence.

Misrepresenting facts in evidence can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974). For similar reasons, asserting facts that were never admitted into evidence (that *37 Dallas' victim was Qualls's cousin) may mislead a jury in a prejudicial way. *See Berger v. United States*, 295 U.S. 78, 84 (1935). This is particularly true when a prosecutor misrepresents evidence because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty. *See id.* at 88.

Defense counsel did not object to the prosecutor's closing argument or opening statement, did not request a limiting instruction. This Court's review is for substantial likelihood of a miscarriage of justice. *Commonwealth v. Payne*, 426 Mass. 692, 697 (1998). This Court should assess the erroneous argument at issue in light of the entire argument, the judge's instructions, and the evidence at trial. *Commonwealth v. Christian*, 430 Mass. 552, 564 (2000); *See Commonwealth v. Flebotte*, 417 Mass. 348, 353 (1994) ("An error is nonprejudicial only 'if ... the conviction is sure that the error did not influence the jury, or had but very slight effect ...' "). The prosecution relied strongly on this so-called motive evidence in opening statement and in closing argument (Tr.I/188-89; Tr.VI/65-71). "Strong reliance" by the Commonwealth upon erroneously admitted evidence ... in closing argument or otherwise, " 'belies' any *38 Commonwealth claim that the error was harmless. *Commonwealth v. Howard*, 8 Mass. App. Ct. 318, 323 (1979).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The prosecutor's assertion and argument about Qualls' motive of revenge went to the case and there was no curative instruction. *Coren*, 437 Mass. at 731; *Commonwealth v. Kelly*, 417 Mass. 266, 271 (1994); *Commonwealth v. Kozec*, 399 Mass. 514, 518 (1987). There is a high likelihood that this argument for motive did influence the jury because without it there was no reason to conclude that Qualls was more likely to be the shooter than Williams, and the victim had identified Williams as the shooter. For these reasons, this Court should find substantial likelihood of a miscarriage of justice as well as federal and state constitutional violations of due process, right to fair trial, and right to confrontation.

VI. QUALLS WAS HIS DENIED RIGHTS TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

A. *Qualls Had a Right to Competent Counsel*

The Massachusetts Constitution guarantees Qualls' right to competent counsel. *Commonwealth v. Richard*, 398 Mass. 392, 393 (1986) (article 12 provides broader protection than does the sixth amendment). *Commonwealth v. Oliveria*, 431 Mass. 609, 614 (2000); *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974). Because review is *39 plenary under Chapter 276, section 33E, this Court must apply an even more lenient standard than the *Saferian* test. Under G. L. c. 278, sec. 33E, this Court should consider only "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth v. Iglesias*, 426 Mass. 574, 578 (1998), quoting *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992). Under this more favorable standard, this Court will consider Dyous' claim "even if the alleged error ... does not constitute conduct falling 'measurably below' that of 'an ordinary fallible lawyer.' " *Commonwealth v. MacKenzie*, 413 Mass. 498, 517 (1992).

The Sixth and Fourteenth Amendments to the United States Constitution guarantee the same right. To preserve his rights under federal law, Qualls asserts a federal constitutional violation separately. An essential ingredient of the Sixth Amendment right to counsel is that counsel provide constitutionally effective assistance. *See Powell v. Alabama*, 287 U.S. 45, 57 (1932). This Court must use a two-pronged cause and prejudice test. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *40*Hill v. Lockhart*, 474 U.S. 52, 58 (1985)

"Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent, deny a criminal defendant the effective assistance of counsel, if some other action would have better protected a defendant and was reasonably foreseeable as such before trial." *Commonwealth v. Adams*, 374 Mass. 722, 728 (1978), quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974).

B. *Counsel Failed to Object to Improper Prosecutorial Statement and Argument that Violated the Confrontation Clause.*

Failure to object to an offensive opening statement or closing argument may, by itself, amount to ineffective assistance. *See Washington v. Hofbauer*, 228 F.3d 689, 704 (6th Cir. 2000). Here the statement and argument violated due process and the confrontation clause. Mass. Const. Pt. 1, art. 12; U.S. Const. Amends. 6 and 14; *White*, 502 U.S. at 352-354; *Wright*, 497 U.S. at 813-817; *Roberts*, 448 U.S. at 63-66; *DelValle*, 351 Mass. at 491.

For reasons stated in Argument V, above, trial counsel's non-tactical failure to object to the prosecutor's improper, substantive use of inadmissible *41 hearsay evidence amounted to ineffective assistance of counsel. The assertion of motive,

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

based on facts not in evidence, that the person Dallas killed was Qualls' cousin, was a critical component of the prosecutor's case against Qualls. Without a motive assigned to Qualls, it is significantly more likely that the jury would have chosen to believe Tony Price that his killer was Williams. Tony had no motive to lie, to please the prosecutor, or to please the police. By failing to object, trial counsel forfeited a more favorable standard of review before this Court, he permitted hearsay evidence to be asserted substantively and argued for its truth on a critical point, motive, thereby ensuring a violation of his clients right to cross-examine witnesses against him. _White,_ 502 U.S. at 352-354; _Wright,_ 497 U.S. at 813-817; _DelValle,_ 351 Mass. at 491. For these reasons, this Court should reverse the conviction.

C. _Counsel Failed to Request Contemporaneous and Final Limiting Instruction for the Evidence Limited to Showing Motive. Further Ensuring a Further Violation of the Confrontation Clause._

Even without the problems set out in Section V.A, above, defense counsel ensured a violation of Qualls' rights under the Confrontation Clause when he failed to **42 request limiting instructions for Dallas' out-of-court statements. Mass. Const. Pt. 1, art. 12; U.S. Const. Amends. 6 and 14; _White,_ 502 U.S. at 352-354; _Wright,_ 497 U.S. at 813-817; _Roberts,_ 448 U.S. at 63-66; _DelValle,_ 351 Mass. at 491. See also _White v. McAnich,_ 235 F.3d 988,990-1000 (6th Cir. 2000) (ineffective to fail to request contemporaneous limiting instruction when hearsay is introduced).

Cross-examination has been called "the greatest legal engine ever invented for discovering the truth." _Maryland v. Craig,_ 497 U.S. 836, 846, 111 L. Ed. 2d 666, 110 S. Ct. 3157 (1990); _California v. Green,_ 399 U.S. 149, 158, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970). The right to cross-examine witnesses is fundamental to our criminal justice system. _Vardinsky,_ 438 Mass. 444, 2003 Mass. LEXIS 10, 13-14 (January 15 2003, decided). Trial counsel's failure to request a limiting instruction ensured the confrontation clause violation and caused serious damage because motive was critical to persuading the jury that Qualls was more likely the shooter than Williams. The jury was permitted to consider the motive evidence for its truth when there was no evidence that the person Dallas killed was actually Qualls' cousin. Qualls' inability to cross-**43 examine Dallas was the direct result of trial counsel's failure. For these reasons also, reversal is required.

D. _Trial Counsel Did not Request a Curative Instruction After Leroyal Holmes Mentioned His First Trial for the Second Time._

The same constitutional principals set out in Argument II, above, apply here. Trial counsel committed error that could have influenced the verdict. _Iglesias,_ 426 Mass. at 578; _Wright,_ 411 Mass. at 682. The jury should not have heard about Qualls' first trial to avoid speculation and outside influence. There could not have been a strategic reason for failure to protect Qualls from this additional, prejudicial influence. _United States v. Sorondo,_ 845 F.2d 945, 949 (11 Cir. 1988) (reversible error for jury to learn source of evidence resulting in prior guilty verdicts).

E. _Trial Counsel Failed to Move For Relief from Prejudicial Joinder of the Charge for Assault and Battery With A Dangerous Weapon On Grounds That its Prejudicial Effect Outweighed Its Probative Value._

Rule 9 (a) (3) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 859 (1979), provides that, where offenses are related, "the trial judge shall join the charges for trial unless he determines that joinder is not in the best interests of justice." Joinder is a matter "committed to the sound discretion **44 of the trial

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judge." *Commonwealth v. Delaney*, 425 Mass. 587, 593 (1997); *Commonwealth v. Montanez*, 410 Mass. 290, 303 (1991). Qualls bears the burden of showing that joinder was improper. *Commonwealth v. Gallison*, 383 Mass. 659, 671 (1981).

A motion for relief from prejudicial joinder is addressed to the discretion of the judge. *Commonwealth v. Sylvester*, 388 Mass. 749, 754 (1983). *Commonwealth v. Hoppin*, 387 Mass. 25, 32 (1982). See Mass. R. Crim. P. 9 (d), 378 Mass. 859 (1979). While joinder may promote judicial economy, it can pose a danger of prejudice to the defendant. A joint trial of related offenses may be improper if joinder of the offenses has the effect of showing a defendant's criminal propensity. *Commonwealth v. Todd*, 394 Mass. 791, 794 (1985).

Other crimes, wrongs, or bad acts are not admissible to prove character to show that a defendant acted in conformity with that bad character. *See* Prop. Mass. R. Evid. 404(b); *Commonwealth v. Trapp*, 396 Mass. 202 (1985). *See also United States v. Vance*, 871 F.2d 572, 575 (6th Cir. 1989) (providing that "bad acts evidence is not admissible to prove character or criminal propensity" under *Fed. R. Evid.* 404(b)); **\*45** *United States v. Ring*, 513 F.2d 1001, 1004 (6th Cir. 1975) (stating that in jury trials, evidence of a criminal defendant's bad acts or prior misconduct is inadmissible to show criminal propensity because it "tends to confuse the issue of guilt or innocence of the specific offenses charged and to weigh too heavily with the jury").

In this case, that Qualls allegedly stabbed Tony Price outside of the Biarritz several hours before Tony and Dallas were killed (Tr.II/103). Evidence of this stabbing, while presumably a related offense, was highly prejudicial because it very likely had profound persuasive value for the jury. If Qualls stabbed Tony, the reasoning inevitably goes, then he probably also shot Tony and Dallas. Since the issue was whether it was Qualls or Williams who did the shooting, this evidence that Qualls stabbed Tony was hopelessly prejudicial. Its probative value was mild, needlessly showing malice where malice from use of a deadly weapon (a gun) was already present. Malice was not contested. Its prejudicial effect was overwhelming, particularly because the three eye-witnesses were so effectively impeached, and because Tony identified Williams as his killer. Without this stabbing incident evidence, there **\*46** was a far greater likelihood that the jury would not have been convinced beyond a reasonable doubt of the shooter's identity. For this reason, trial counsel overlooked an important opportunity for better advocacy and for a result more consonant with justice, and violated Qualls right to effective assistance of counsel.

In addition, the above-described inclusion of "bad acts" violated substantive, federal, constitutional law. *See Garceau v. Woodford*, 275 F.3d 769, 773-78 and n.3 (9th Cir. 2001, *cert. granted*, 123 S.Ct. 32 (2002) ("while the Supreme Court has never held that the use of prior convictions to show nothing more than a disposition to commit crime would violate the Due Process Clause of the Fourteenth Amendment, its decisions ... suggest that evidence of prior crimes introduced for no purpose other than to show criminal disposition would violate the Due Process Clause" and concluding that "other crimes" jury instruction rendered Garceau's trial so fundamentally unfair as to constitute a violation of the Due Process Clause.), recently reversed and remanded on other grounds. *Woodford v. Garceau*, 2003 U.S. LEXIS 2491 (U.S., Mar. 25, 2003).

**\*47** VII. QUALLS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL AND THE TRIAL COURT ABUSED ITS DISCRETION ADMITTING AUTOPSY PHOTOS SHOWING MEDICAL INSTRUMENTS PROTRUDING FROM TONY'S BODY, BUT WHICH DID NOT OTHERWISE ASSIST THE COMMONWEALTH'S CASE.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282258          FOR EDUCATIONAL USE ONLY                    Page 24
2003 WL 23282258 (Mass.)

The trial court admitted graphic, gruesome, inflammatory autopsy photographs, over objection, that were not necessary to the Commonwealth's proof of its case, because the only contested issue was identification. (Tr.V/27-29; R.20- 21; Tr.V/27-28; Tr.I/50-52; R.13). Admitting this evidence violated the same federal and state constitutional principals guaranteeing Qualls' rights to due process and a fair trial set out in Argument II, above. Review is for harmlessness, beyond a reasonable doubt. *Chapman*, 386 U.S. at 24.

Decisions regarding the admittance of autopsy photographs are left to the discretion of the trial judge. *Commonwealth v. Boateng*, 2003 Mass. LEXIS 92, 16 (January 21, 2003, Decided); *Commonwealth v. Bastarache*, 382 Mass. 86, 106, (1980). The trial court must determine whether the inflammatory nature of the photographs outweighs their probative value. *Commonwealth v. Dagenais*, 437 Mass. 832, 840-41 (2002); *Commonwealth v. DeSouza*, 428 Mass. 667, 670 (1999). Photographs showing the body as altered in the course **\*48** of an autopsy, if of a graphic nature, present a different situation. They should be admitted only if they would assist the jury in making a finding of fact on a contested point; otherwise their introduction would serve no proper purpose. *Commonwealth v. Carlino*, 429 Mass. 692, 696 (1999). The contested issue, here, was the identity of the shooter. The photographs show instruments protruding from a wound and a graphic, gaping incision exposing internal organs. The Court of Appeals found abuse of discretion where autopsy photographs exposed an internal organ, the brain. *See Commonwealth v. St. Peter*, 48 Mass. App. Ct. 517, 523 (2000). That was exactly the offense in this case, protruding instruments and exposed internal organs. This abuse of discretion should be deemed reversible error because this case was close on the identification evidence, there were other mistakes set out above that undermined Qualls' character, trial counsel caused a violation of Qualls' rights to confront and other problems, and because the gruesome views of Tony body, including exposed internal organs had nothing to do with the identify of his shooter or with extreme atrocity or cruelty.

**\*49** VIII. THIS COURT SHOULD GRANT RELIEF UNDER G.L. C. 278, SECTION 33E UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE.

Section 33E, of Massachusetts General Laws Chapter requires this Court to engage in plenary review to ensure that a verdict is consonant with justice. *Commonwealth v. Niemic*, 427 Mass. 718, (1998); *See Commonwealth v. Garabedian*, 399 Mass. 304, 316 (1987), quoting *Commonwealth v. Davis*, 380 Mass. 1, 15 n.20 (1980).

The problems and errors set out in Arguments I through VII combined to violate Qualls federal and state due process rights. U.S. Const. Amend 5, and 14, Mass. Const. Art. 10, 12; *Neuymer*, 432 Mass. at 33; *McCravey*, 430 Mass. at 759-60; *Estes*, 381 U.S. at 542-543. *See Commonwealth v. Cancel*, 394 Mass. 567 (1985) (several errors are less likely to be harmless than a single error and viewed in combination are sufficiently likely to require reversal); *Commonwealth v. Kowalski*, 33 Mass. App. Ct. 49- 54 (1992) (all asserted unpreserved errors [considered with preserved errors] cause illegitimate damage to defendant's credibility). *See also United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993) "individual errors, insufficient in themselves to necessitate a new trial, **\*50** may in the aggregate have a more debilitating effect."); *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988) (same); *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003) (same).

*CONCLUSION*

For the above reasons, Defendant Ronald Qualls respectfully requests that this Honorable Court reverse his conviction, order a new trial, reduce his conviction, or provide other relief that it deems proper.

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
2003 WL 23282258            FOR EDUCATIONAL USE ONLY                    Page 25
2003 WL 23282258 (Mass.)
```

Appendix not available.

COMMONWEALTH OF MASSACHUSETTS, v.  Ronald QUALLS, Defendant-Appellant.
2003 WL 23282258

### Briefs and Other Related Documents  (Back to top)

• 2003 WL 23282257   (Appellate Brief) Commonwealth's Brief on Appeal from the Suffolk Superior Court (Sep. 30, 2003)Original Image of this Document with Appendix (PDF)

• 2002 WL 32364746   (Appellate Brief) Brief and Record Appendix for the Defendant on Appeal from the Suffolk Division of the Superior Court Department (Mar. 2002)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2003 WL 23282257            FOR EDUCATIONAL USE ONLY                    Page 1
2003 WL 23282257 (Mass.)

For opinion see 800 N.E.2d 299

**Briefs and Other Related Documents**

Supreme Judicial Court of Massachusetts.
COMMONWEALTH OF MASSACHUSETTS, Appellee,
v.
Ronald QUALLS, Defendant - Appellant.
**No. SJC-08088.**
September 30, 2003.

Commonwealth's Brief on Appeal from the Suffolk Superior Court
Daniel F. Conley, District Attorney, For The Suffolk District, Rami M. Vanegas,
Assistant District Attorney, For The Suffolk District, BBO # 641099, One Bulfinch
Place, Boston, MA 02114, (617) 619-4070.

*i *TABLE OF CONTENTS*

TABLE OF AUTHORITIES ... iii

ISSUES PRESENTED ... 1

STATEMENT OF THE CASE ... 2

STATEMENT OF FACTS ... 4

 I. THE COMMONWEALTH'S CASE ... 4

  A. The Shooting ... 4

  B. The Investigation ... 8

   1. Identification Evidence ... 8

   2. Other Evidence ... 10

  C. Consciousness of Guilt ... 13

 II. THE DEFENDANT'S CASE ... 14

ARGUMENT ... 15

 I. THE TRIAL JUDGE PROPERLY DENIED THE DEFENDANT'S MOTION FOR A REQUIRED FINDING
OF NOT GUILTY OF MURDER WHERE THE DEFENDANT HAD A MOTIVE TO KILL, THREE
EYEWITNESSES IDENTIFIED HIM AS THE SHOOTER, HIS DESCRIPTION MATCHED THAT GIVEN BY
ANOTHER WITNESS, AND HIS FINGERPRINT AND BLOOD CONSISTENT WITH HIS OWN WERE FOUND
ON THE PASSENGER SIDE OF THE CAR THAT DROVE BY IMMEDIATELY BEFORE THE SHOOTING ...
15

 II. THE DEFENDANT WAS NOT HARMED BY TESTIMONY REFERRING TO A PREVIOUS TRIAL WHERE
SUCH TESTIMONY DID NOT GIVE RISE TO AN INFERENCE THAT THE DEFENDANT HAD BEEN
PREVIOUSLY CONVICTED ... 20

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257
2003 WL 23282257 (Mass.)                    FOR EDUCATIONAL USE ONLY                    Page 2

III. PROBATION OFFICER TANYA BROOKS WAS PROPERLY ALLOWED TO STATE THAT SHE HAD
SEEN THE DEFENDANT OUTSIDE OF THE COURTHOUSE ON A CERTAIN DAY, AT A CERTAIN TIME
WHERE SUCH TESTIMONY CORROBORATED THAT OF HOLMES, WHO SAID THE DEFENDANT HAD
CONFRONTED HIM THERE, AND WAS NOT PREJUDICIAL ... 23

*ii  IV. MONROE WAS PROPERLY ALLOWED TO PROVIDE MOTIVE EVIDENCE BY TESTIFYING THAT
DALLAS HAD TOLD THE DEFENDANT ON THE NIGHT OF THE SHOOTING THAT HE HAD STABBED THE
DEFENDANT'S COUSIN ... 25

V. THE PROSECUTOR PROPERLY STATED IN HER OPENING THAT THE EVIDENCE WOULD PROVE
THAT THE DEFENDANT WAS MOTIVATED BY REVENGE TO COMMIT THE MURDERS, AND SHE PROPERLY
SO ARGUED IN HER CLOSING ... 27

VI. THE TRIAL JUDGE PROPERLY ADMITTED AUTOPSY PHOTOGRAPHS WHERE THEY ASSISTED THE
JURY IN UNDERSTANDING THE MEDICAL EXAMINER'S TESTIMONY, WERE RELEVANT TO THE ISSUE
OF PREMEDITATION, AND WERE NOT INFLAMMATORY IN NATURE ... 29

VII. THE DEFENDANT HAS FAILED TO SUSTAIN A CLAIM OF INEFFECTIVE ASSISTANCE OF
COUNSEL GIVEN THAT THERE WAS (1) NO ERROR IN THE PROSECUTOR'S OPENING OR CLOSING,
(2) NO ERROR IN THE ADMISSION OF MOTIVE EVIDENCE, (3) NO HARM WITH RESPECT TO THE
REFERENCE TO A PREVIOUS TRIAL, AND (4) NO ERROR IN JOINING FOR TRIAL THE CHARGE OF
ASSAULT AND BATTERY BY MEANS OF A DANGEROUS WEAPON ... 33

VIII. THIS COURT SHOULD REFUSE TO GRANT THE DEFENDANT A NEW TRIAL AND SHOULD
REFUSE TO REDUCE THE VERDICT PURSUANT TO G. L. C. 278, § 33E WHERE THE DEFENDANT'S
CLAIMS ARE MERITLESS AND THE EVIDENCE SHOWED THAT THE DEFENDANT DELIBERATELY
ADVANCE UPON A PARKED JEEP AND FIRED SHOTS, AT CLOSE RANGE, INTO TWO VICTIMS
TRAPPED WITHIN ... 37

CONCLUSION ... 39

ADDENDUM ... 40

*iii *TABLE OF AUTHORITIES*

Cases

*Commonwealth v. Almon*, 387 Mass. 599 (1982) ... 37

*Commonwealth v. Alphas*, 430 Mass. 8 (1999) ... 21, 23

*Commonwealth v. Arsenault*, 361 Mass. 287 (1972), *rev'd in part on other grounds,*
373 Mass. 617 (1977) ... 22, 23

*Commonwealth v. Barnoski*, 418 Mass. 523 (1994) ... 38

*Commonwealth v. Bastarache*, 382 Mass. 86 (1980) ... 30

*Commonwealth v. Bowman*, 373 Mass. 760 (1977) ... 37

*Commonwealth v. Cappellano*, 392 Mass. 676 (1984) ... 36

*Commonwealth v. Clarke*, 381 Mass. 319 (1980) ... 23

*Commonwealth v. Chavis*, 415 Mass. 703 (1993) ... 29

*Commonwealth v. Clarke*, 418 Mass. 207 (1994) ... 36

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Commonwealth v. Cortez*, 438 Mass. 123 (2002) ... 22

*Commonwealth v. Cyr*, 433 Mass. 617 (2001) ... 26

*Commonwealth v. Dagenais*, 437 Mass. 832 (2002) ... 30

*Commonwealth v. Delaney*, 425 Mass. 587 (1997), *cert. denied,* 522 U.S. 1058 (1998) ... 35, 36

*Commonwealth v. DiBenedetto*, 427 Mass. 414 (1998) ... 22

*Commonwealth v. Emence*, 47 Mass. App. Ct. 299 (1999) ... 24

*Commonwealth v. Errington*, 390 Mass. 875 (1984) ... 28

**\*iv** *Commonwealth v. Feijoo*, 419 Mass. 486 (1995) ... 35

*Commonwealth v. Gonzalez*, 47 Mass. App. Ct. 255, *rev. denied,* 430 Mass. 1105 (1999) ... 25

*Commonwealth v. Haas*, 398 Mass. 806 (1986) ... 32

*Commonwealth v. Harbin*, 435 Mass. 654 (2002) ... 33, 38

*Commonwealth v. Healey*, 393 Mass. 367 (1984) ... 32

*Commonwealth v. Jackson*, 428 Mass. 455 (1998) ... 31

*Commonwealth v. Johnson*, 429 Mass. 745 (1999) ... 29

*Commonwealth v. Latimore*, 378 Mass. 671 (1979) ... 17

*Commonwealth v. Leonardi*, 413 Mass. 757 (1992) ... 23, 27

*Commonwealth v. Maia*, 429 Mass. 585 (1999) ... 16, 17

*Commonwealth v. Maldonado*, 429 Mass. 502 (1999) ... 31

*Commonwealth v. Mercado*, 24 Mass. App. Ct. 391 (1987) ... 20

*Commonwealth v. Nerette*, 432 Mass. 534 (2000) ... 38

*Commonwealth v. Ortiz*, 393 Mass. 523 (1984) ... 15

*Commonwealth v. Paszko*, 391 Mass. 164 (1984) ... 32

*Commonwealth v. Pleas*, 49 Mass. App. Ct. 321, *rev. denied,* 432 Mass. 1105 (2000) ... 24

*Commonwealth v. Qualls*, 425 Mass. 163 (1997) ... 3, 26

*Commonwealth v. Robinson*, 14 Mass. App. Ct. 591 (1982) ... 32

**\*v** *Commonwealth v. Seabrooks*, 425 Mass. 507 (1997) ... 26

*Commonwealth v. Shabo*, 47 Mass. App. Ct. 923 (1999) ... 15

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Commonwealth v. St. Germain,* 381 Mass. 256 (1980) ... 28

*Commonwealth v. Sullivan,* 436 Mass. 799 (2002) ... 23, 27

*Commonwealth v. Todd,* 394 Mass. 791 (1985) ... 30, 32, 36

*Commonwealth v. Torres,* 24 Mass. App. Ct. 317, *rev. denied,* 400 Mass. 1104 (1987) ... 15

*Commonwealth v. Torres,* 420 Mass. 479 (1995) ... 37

*Commonwealth v. Tucker,* 189 Mass. 457 (1905) ... 24

*Commonwealth v. Tyree,* 387 Mass. 191 (1982), *cert. denied,* 459 U.S. 1175 (1983) ... 25, 30

*Commonwealth v. Vaughn,* 23 Mass. App. Ct. 40 (1986) ... 16

*Commonwealth v. Vizcarrondo,* 431 Mass. 360 (2000) ... 30

*Commonwealth v. Whipple,* 377 Mass. 709 (1979) ... 38

*Commonwealth v. Williams,* 439 Mass. 678 (2003) ... 21, 25, 27, 30

*Commonwealth v. Wright,* 411 Mass. 678 (1992) ... 33, 34, 36

### Statutes

G. L. c. 265, § 1 ... 2

G. L. c. 265, § 15A(b) ... 3

G. L. c. 265, § 15B(b) ... 3

G. L. c. 269, § 10(a) ... 3

G. L. c. 278, § 33E ... 2, 33, 37, 38

### Rules

Mass. R. Crim. P. 9(a)(3) ... 35

### *vi Other Authorities

P.J. Liacos, *Handbook of Massachusetts Evidence,* §§ 8.2 and 8.2.2 at 464, 468 (7th Edition 1999) ... 26

### *1 ISSUES PRESENTED

1. Whether the trial judge properly denied the defendant's motion for a required finding of not guilty of murder where the defendant had a motive to kill, three eyewitnesses identified him as the shooter, his description matched that given by another witness, and his fingerprint and blood consistent with his own were found on the passenger side of the car that drove by immediately before the shooting.

2. Whether the defendant was harmed by testimony referring to a previous trial where such testimony did not give rise to an inference that the defendant had been

2003 WL 23282257          FOR EDUCATIONAL USE ONLY                    Page 5
2003 WL 23282257 (Mass.)

previously convicted.

3. Whether a probation officer was properly allowed to state that she had seen the defendant outside of the courthouse on a certain day, at a certain time, where such testimony corroborated that of another witness, who said the defendant had confronted him there, and was not prejudicial.

4. Whether a witness was properly allowed to provide motive evidence by testifying that one of the decedents had told the defendant on the night of the shooting that he had stabbed the defendant's cousin.

5. Whether the prosecutor properly stated in her opening that the evidence would prove that the defendant was motivated by revenge to commit the *2 murders, and whether she properly so argued in her closing.

6. Whether the trial judge properly admitted autopsy photographs where they assisted the jury in understanding the medical examiner's testimony, were relevant to the issue of premeditation, and were not inflammatory in nature.

7. Whether the defendant has failed to sustain a claim of ineffective assistance of counsel given that there was (1) no error in the prosecutor's opening or closing, (2) no error in the admission of motive evidence, (3) no harm with respect to the reference to a previous trial, and (4) no error in joining for trial the charge of assault and battery by means of a dangerous weapon.

8. Whether this Court should refuse to grant the defendant a new trial or reduce the verdict pursuant to G. L. c. 278, § 33E where the defendant's claims are meritless and the evidence showed that the defendant deliberately advance upon a parked jeep and fired shots, at close range, into two victims trapped within.

*STATEMENT OF THE CASE*

On November 10, 1992, a Suffolk County grand jury returned indictments against the defendant, Ronald Quails, charging him with two counts of first degree murder (G. L. c. 265, § 1), assault and battery by *3 means of a dangerous weapon (G. L. c. 265, § 15A(b)), assault by means of a dangerous weapon (G. L. c. 265, § 15B(b)), and unlawful possession of a firearm (G. L. c. 269, § 10(a)) (No. SUCR92-11850) (R. 1-6). [FN1]

> FN1. References in this brief will be as follows: to the record appendix as (R. _); to the trial transcript as (Tr. volume:page); and to the defendant's brief as (D. Br. _). The fourth day of trial, March 26, 1998, has been labeled volume five by the transcriber. For ease of reference, the Commonwealth will adopt this numbering in its brief, with subsequent volumes numbered accordingly.

A jury trial was held from October 25 to November 3, 1993, which resulted in the defendant's conviction on all counts (R. 8). On June 6, 1997, this Court reversed the defendant's convictions (R. 10). See *Commonwealth v. Qualls*, 425 Mass. 163 (1997).

The defendant was tried on the same charges before a second jury from March 23 to March 31, 1998, the Honorable Patrick Brady presiding (R. 13). On March 31, 1998, the jury returned guilty verdicts on all counts (R. 13-14).

On that same day, the defendant was sentenced to two consecutive life terms for first degree murder, and was sentenced to concurrent terms of 9 to 10 years and 3 to 5 years for assault and battery by means of a dangerous weapon and unlawful

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257         FOR EDUCATIONAL USE ONLY                    Page 6
2003 WL 23282257 (Mass.)

possession of a firearm, respectively (R. 14, 17). The defendant's conviction *4 for assault by means of a dangerous weapon was placed on file with the defendant's consent (R. 14, 17). [FN2]

> FN2. The defendant had received the same disposition at his first trial (R. 9).

The defendant filed a timely notice of appeal on April 10, 1998 (R. 14). The case was docketed in this Court on August 5, 1999 (R. 19).

## STATEMENT OF FACTS
### I. The Commonwealth's Case
#### A. The Shooting

On the night of October 2, 1992, going into October 3, 1992, Leroyal Holmes, Fred Monroe, and the decedents, Tony and Dallas Price, went to the Biarritz bar in the Roxbury section of Boston (Tr. 2:36-37 90-95; 3:61-62). There, Dallas saw the defendant and told him that he had heard that the defendant had been looking for him (Tr. 3:67). The defendant said that he did not know who Dallas was (Tr. 3:67). Dallas responded that he was person who had stabbed the defendant's cousin (Tr. 3:67). [FN3] At that point, Dallas and the defendant began fighting (Tr. 2:41-42, 3:6869). The defendant was escorted out of the bar by an off-duty police officer (Tr. 2:68-69, 3:69-70).

> FN3. There was an objection to this testimony (Tr. 3:65-67). Dallas had been convicted of manslaughter in 1988 for killing a man named Paul Mahoney (Tr. 1:211).

Dallas then approached one James "Junior" Williams, the defendant's companion, and asked him why *5 he was on the defendant's side (Tr. 2:44-45, 3:70-71). Dallas protested that Williams was supposed to be his cousin (Tr. 2:45, 71-72). Williams countered that he was "down" with the defendant because the defendant put his life on the line for Williams every day (Tr. 2:44-45, 72).

Some moments later, the defendant became involved in a fight with Dallas's brother, Tony, outside of the bar (Tr. 2:51-52, 101-103). During the fight, the defendant pulled out a knife and swung it at Tony (Tr. 2:103-104). The defendant then got into the passenger seat of William's car, a dark-colored Ford Escort, and Williams drove off (Tr. 2:99-100, 104, 106-107; 3:73-74).

The Price brothers, Holmes, and Monroe later proceeded to another bar, Studio 88 (Tr. 2:109-110, 3:75). On the way, they ran into Donna Carrington and Mattie Buford, Monroe's girlfriend, in a parking lot (Tr. 2:110-111; 3:75-76, 173, 232-233). The men told the women to park Carrington's Geo Tracker in the lot while the men went over to Studio 88 for last call (Tr. 3:76-78, 174, 3:232- 234). Because the bar was about to close, the men were denied admission, and so headed back to the parking lot (Tr. 3:78-79, 175, 234-235; 5:55-56).

Once back in the parking lot, Tony told the group that he did not feel well (Tr. 2:115; 3:80, 175). *6 Upon closer examination, the group discovered that Tony had been stabbed near his right arm-pit (Tr. 2:116; 3:80, 175, 235). The group decided that Carrington should drive Tony to the hospital (Tr. 2:116- 117; 3:81, 177, 235). Buford, who had been sitting in the front passenger seat of the Tracker, got out so that the Price brothers could get in the back seat (Tr. 3:177, 235-236). Tony got in first, followed by Dallas (Tr. 3:82, 84, 86, 88, 177, 236).

As the price brothers were getting into the Tracker, Williams's car drove by (Tr. 2:117-119, 3:82, 236-237). As he observed the car, Dallas said, "Oh, Man. That's

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257          FOR EDUCATIONAL USE ONLY                    Page 7
2003 WL 23282257 (Mass.)

Junior's car. That's them right there" (Tr. 3:82). Monroe was able to see that
Williams was the driver and that the defendant was the passenger (Tr. 3:83).
Concerned, Holmes walked towards a building in the direction that the car had
headed (Tr. 2:119-120, 3:85). The defendant "popped up" in front of Holmes as
Holmes neared the building (Tr. 2:120, 3:86). Holmes grabbed the defendant and told
him to "let it go" (Tr. 2:121, 3:87). The defendant pulled out a .38 caliber
revolver and pointed it at Holmes, stating that he would blow Holmes's head off if
he did not get out of the way (Tr. 2:122-124, 127). As the defendant advanced upon
the Tracker, Holmes shouted a warning that the defendant was "strapped," meaning he
was armed with a gun (Tr. 2:125; 3:88, 178, 236).

*7 Upon hearing the warning, Buford, who was still standing outside of the
Tracker, ran across the street (Tr. 3:90, 178). Monroe ran to the corner of the
parking lot (Tr. 3:89-90). Carrington, however, was not able to drive off in time
to avoid the defendant, who fired multiple shots into the back of the Tracker and
into the right passenger side closest to Dallas (Tr. 2:125-128, 3:89-93, 180-181,
236, 240-241). After firing the shots, the defendant fled towards and past Ruggles
Street (Tr. 3:94, 243). As he did so, he ran right past Buford (Tr. 3:182).

Monroe went back to the Tracker and jumped in (Tr. 3:95). A frightened Carrington
then drove over medians and curbs a short distance to 1111 Harrison Avenue, Tony's
apartment (Tr. 2:139-140, 3:95-96, 185, 243-244). Tony got out of the Tracker and
went into the building (Tr. 2:141; 3:97, 186). Dallas was slumped over in the back
seat, and blood was running from his mouth (Tr. 2:142- 143; 3:97, 186). Carrington
did not feel that she could safely drive any further (Tr. 3:244). Holmes, who had
run behind the Tracker as it drove off, got into the passenger seat and told Monroe
to get in and drive Dallas to the hospital (Tr. 2:139-145; 3:98, 186). Dallas died
within minutes of their arrival at Boston City Hospital, which was nearby (Tr.
2:147, 3:100, 247).

## *8 B. The Investigation
### 1. Identification Evidence

Police and emergency medical workers soon arrived at 1111 Harrison Avenue (Tr.
5:32). Tony approached the police and told them that "Junior" had shot him (Tr.
5:33-35, 62). He added that "Junior" drove a black or blue Ford Escort, lived at
Columbia Point, and had a sister who lived on Ruggles Street (Tr. 5:34, 62; 6:86,
88). He stated that two males had been in the Escort when it drove by (Tr. 5:62).
Tony was transported to the hospital and died a short time later (Tr. 5:20-21;
6:23, 33-34).

The police subsequently stopped Williams's Ford Escort near Dudley Square (Tr.
5:67-69, 91-98, 192-193). Upon being stopped, Williams pointed at Holmes, who
happened to be walking in the area (Tr. 2:151-153; 5:196-197, 199). Holmes had
earlier fled from Boston City Hospital because he did not want to get involved in
the matter (Tr. 2:148, 150-151; 5:36-37). Both Williams and Holmes separately
accompanied the police back to the police station for questioning (Tr. 2:154, 240;
5:69, 200). [FN4] Williams was wearing a gray sweatshirt (Tr. 5:195). Holmes
subsequently identified the defendant as the shooter from a photo array (Tr. 2:156-
158; 5:217, 251). He stated that the *9 defendant had been wearing a light blue
Members Only jacket (Tr. 2:224-226; 3:15; 5:238-239).

    FN4. Williams was taken to the homicide unit at 274 D Street, while Holmes
    was taken to the unit at 273 D Street (Tr. 5:200).

Monroe initially gave the police false identification information because he did
not want to get involved (Tr. 3:101-102, 145; 5:240). After speaking with the
police, however, he identified the defendant as the shooter from a photo array (Tr.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3:103-104; 5:216, 251-252). Monroe told the police that the defendant had been
wearing a dark hooded sweatshirt (Tr. 3:161). Buford also identified the defendant
as the shooter from a photo array about one week after the murders (Tr. 3:189-190;
5:217, 252).

Carrington was unable to make an identification of the defendant (Tr. 5:217, 252).
She was able, however, to describe the shooter as a light-skinned black male, 18-19
years old, 5' 7", medium build, and wearing a dark blue Champion sweatshirt (5:86-
87, 252-255). She described the driver of the Escort as darker-skinned than the
shooter (Tr. 3:238, 252). She was also able to identify Williams's Ford Escort as
the car she had seen drive by immediately prior to the shooting (Tr. 3:236-237,
250).

At trial, Holmes was impeached with minor inconsistencies in his recollection and
with prior convictions (Tr. 2:192-193, 205, 213-214, 251-252, 257-260). The fact
that he had pending cases both at the time of the shooting and at trial was brought
out *10 (Tr. 2:249-253, 260-261; 3:30-31), as was the fact that the District
Attorney's Office had provided him with a train ticket and money for food and for a
hotel while testifying (Tr. 3:39, 45).

Monroe and Buford were also impeached with mostly minor inconsistencies in their
recollections and with prior convictions (Tr. 3:114-115, 125-129, 133- 137, 160,
164, 203-207, 221-225). Monroe had pending cases against him at the time he spoke
with the police and at trial (Tr. 3:151-158, 165). He had some assistance with
clearing up some defaults and a probation matter (Tr. 3:159, 165-166). The District
Attorney's Office paid for a plane ticket for Monroe and for a hotel while he
testified (Tr. 3:160-161). Buford had cases pending against her at the time she
spoke to the police (Tr. 3:218-219, 225). The office was also helping Buford to
relocate (Tr. 3:226).

### 2. Other Evidence

An autopsy revealed that Tony had a gunshot wound on his outer right arm just
below his shoulder (Tr. 6:24). The bullet had passed through his arm and re-entered
his body on the right side of his chest (Tr. 6:24). The bullet had then traveled
through his body to his left side, where it had lodged (Tr. 6:26). These wounds
were consistent with the shooter having stood to the right of Tony (Tr. 6:26). Tony
also had a stab wound to his right chest (Tr. 6:27).

*11 Dallas had two gunshot wounds (Tr. 6:35). One wound was at his right front
shoulder, and the second was at his lower right back (Tr. 6:35, 38). This latter
injury was consistent with the shooter having stood behind Dallas (Tr. 6:39). The
bullet hole in the back window of the Tracker indicated that the shot from behind
Dallas had been fired at close range (Tr. 5:162-163). With respect to the wound to
Dallas's right shoulder, there was a deposit of gunpowder at the entrance site as
well as on the corresponding hole in his jacket (Tr. 5:137-138, 6:36). This
indicted that the shot causing the wound had been fired from close range (Tr.
5:137-138, 6:36). This was consistent with Dallas being closer to the shooter than
Tony, the shooter being to the right of both (Tr. 6:36).

Three .38 caliber bullets were recovered from Tony's and Dallas's bodies (Tr.
5:124-129). Two definitely, and likely all three, had been fired from the same gun
(Tr. 5:130-131). The police did not find any spent casings in the parking lot (Tr.
5:38-40), but Sergeant Detective Mark Vickers testified that empty .38 caliber
casings stay in a .38 caliber revolver until the gun is manually emptied (Tr.
5:113). He also stated that one must re-pull the trigger on a .38 caliber gun each
time a round is fired (Tr. 5:114-115).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257          FOR EDUCATIONAL USE ONLY                    Page 9
2003 WL 23282257 (Mass.)

**\*12** The gray sweatshirt that Williams was wearing when he was apprehended had several very small (1/8" - 1/4") stains on the front and back which were later determined to be type B human blood (Tr. 5:152-154). Tony and Dallas had type B blood, but so did Williams himself (Tr. 5:135, 154). The stains did not penetrate through the sweatshirt (Tr. 5:154). They were consistent with someone getting a paper cut and then wiping their hand on their shirt, or coming into contact with someone who had a small amount of blood on their clothing (Tr. 5:154-155). The stains were not consistent with having come into contact with either Tony's or Dallas's clothing, which was covered in blood (Tr. 5:156). There was no blood on the back window of the Tracker (Tr. 5:177). This was an indication that blood had not passed through the window (Tr. 5:177).

The defendant has type A blood (Tr. 5:160). Type A blood was found on the front passenger seat of the Escort and on the passenger door handle (Tr. 5:157, 194). The defendant's fingerprint was found on the outside of the passenger door window (Tr. 6:8-11).

The defendant turned himself in on October 29, 1992 (Tr. 5:203-204). The defendant is a 5' 9" light-skinned black male weighing 140 pounds (Tr. 2:71-72, 5:204). Williams, by contrast, is darker-skinned, 210 pounds in weight, and more muscular (Tr. 2:71-72, 162; **\*13** 5:196). At the time the defendant turned himself in, he was wearing a dark blue Champion sweatshirt (Tr. 5:205). He had a cut on his right hand between his thumb and forefinger which had healed (Tr. 5:209-210).

### C. Consciousness of Guilt
In the spring of 1993, the defendant called Holmes and told him to tell Monroe, Buford, and Carrington that they had picked the wrong person (Tr. 2:164-165). On March 10, 1998, Holmes saw the defendant when Holmes went to the courthouse around 2:30 P.M. to speak with the defendant's attorney (Tr. 2:167- 168). As Holmes walked down Washington Street, the defendant confronted him (Tr. 2:169). The defendant said he knew where Holmes worked, lived, and hung out, and also knew where Holmes's son's mother lived (Tr. 2:170-180). He then added that the court was trying to put him away for life and that he had nothing to lose (Tr. 2:180). A couple of the defendant's friends then followed Holmes to the bus stop (Tr. 2:181-182). Holmes decided not to get on the bus (Tr. 2:181-182). Instead, he took a cab home and made sure that no one was following him (Tr. 2:182-183). He subsequently called the police (Tr. 2:183). Holmes testified that, since the time of the shootings, he had moved to New Jersey and was in the process of again relocating with the help of the District Attorney's Office (Tr. 2:184, 3:44).

**\*14** During this portion of the testimony, Holmes referenced the "trial last time" when answering a question about papers he had obtained while at the courthouse (Tr. 2:174-175). This response was stricken from the record after objection (Tr. 2:174). Holmes subsequently testified without objection that he had told the defendant he was not going to testify again and that he did not want "to go through that again" (Tr. 2:175). Later, on cross-examination, in response to defense counsel's question about a "hearing," Holmes asked counsel if he was referring to the previous trial (Tr. 2:197). The defendant's request for a mistrial was denied (Tr. 2:199).

Over objection (Tr. 3:50-54), Probation Officer Tanya Brooks corroborated Holmes's testimony that the defendant had been in the area of the courthouse around the time indicated by Holmes on March 10, 1998 (Tr. 3:56). She stated that the defendant was reporting to her as a condition to his having been released prior to trial in this case (Tr. 3:57), and that he had been in the area of the courthouse around 2:00 P.M. on that day (Tr. 3:56).

### II. The Defendant's Case

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The defendant called two police officer witnesses. The first testified that Dallas had had a confrontation with Williams in the Biarritz wherein Dallas questioned Williams's loyalties (Tr. 6:63). He *15 added that Monroe initially told him he did not know who the shooter was (Tr. 6:66-67). The second officer confirmed that Tony had identified Williams as the shooter (Tr. 6:86, 88), which was the defendant's theory of the case (Tr. 7:23).

*ARGUMENT*

I. THE TRIAL JUDGE PROPERLY DENIED THE DEFENDANT'S MOTION FOR A REQUIRED FINDING OF NOT GUILTY OF MURDER WHERE THE DEFENDANT HAD A MOTIVE TO KILL, THREE EYEWITNESSES IDENTIFIED HIM AS THE SHOOTER, HIS DESCRIPTION MATCHED THAT GIVEN BY ANOTHER WITNESS, AND HIS FINGERPRINT AND BLOOD CONSISTENT WITH HIS OWN WERE FOUND ON THE PASSENGER SIDE OF THE CAR THAT DROVE BY IMMEDIATELY BEFORE THE SHOOTING.

The defendant argues that the trial judge should have granted his motion for a required finding of not guilty, contending that the witnesses who identified him as the shooter were not credible (D. Br. 18-26). The short response to this assertion is that credibility of witnesses is an issue for the jury to decide. *See Commonwealth v. Ortiz,* 393 Mass. 523, 536 n.14 (1984) (rejecting as spurious the defendant's argument that a required finding of not guilty should have been granted because the prosecution rested on "noncredible witnesses" and noting that credibility is a question for the jury). *See also Commonwealth v. Shabo,* 47 Mass. App. Ct. 923, 924 (1999), *quoting Commonwealth v. Torres,* 24 Mass. App. Ct. 317, 324, *rev. denied,* 400 Mass. 1104 (1987) (when determining *16 the sufficiency of the evidence, a judge " 'cannot weigh the evidence or assess the credibility of the witnesses. To hold otherwise would allow [judges] to invade the province of the jury as the sole finder of fact in a jury trial' ").

*Commonwealth v. Vaughn,* 23 Mass. App. Ct. 40, 43-44 (1986), upon which the defendant relies (D. Br. 19), is inapposite. In *Vaughn,* undisputed prison records showed that the defendant was in jail at the time of the crime. *Vaughn,* 23 Mass. App. Ct. at 43-44. This is clearly a different situation from that here, where the defendant is simply claiming that the identification witnesses should not have been believed. The distinction is borne out by *Commonwealth v. Maia,* 429 Mass. 585, 588-589 (1999), also cited by the defendant (D. Br. 19), in which this Court found the evidence sufficient to support the defendant's convictions even though the defendant there introduced documentary and testimonial evidence to support his claim that he was in a treatment center at the time the crime was committed. The defendant's evidence in *Maia,* however, was rebutted by testimony of a detective who had investigated security at the center prior to trial, cross-examination of the keeper of the records, and other documentary evidence. *Id.* at 589. In rejecting the defendant's claim that he should have been granted a required finding, the Court *17 noted that the defendant's evidence was controverted, ruled that the credibility of witnesses was for the jury, and added that the evidence introduced by the defendant had to be weighed against contrary evidence, including the defendant's identification by the eyewitness to the crime. *Id.* at 589 & n.5.

Such is the case here. Although the witnesses identifying the defendant as the shooter were impeached with some inconsistencies in their recollections, pending cases, and prior convictions (Tr. 2:192-193, 205, 213-214, 249-253, 257-261; 3:30-31, 39, 45, 114-115, 125-129, 133-137, 151-161, 164-166, 203-207, 218-226), and there was evidence that Tony had named Williams as the shooter (Tr. 5:33-35, 62), it was for the jury to evaluate the witnesses' testimony. That the jury chose to believe the witnesses who identified the defendant in spite of the impeachment evidence is something about which the defendant cannot complain.

Under the well-established standard of *Commonwealth v. Latimore,* 378 Mass. 671,

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257            FOR EDUCATIONAL USE ONLY                    Page 11
2003 WL 23282257 (Mass.)

677 (1979) (question is whether, when viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt), there was more than sufficient evidence to convict the defendant. Holmes, Monroe, and Buford all identified *18 the defendant as the shooter (Tr. 2:156-158; 3:103-104, 189-190; 5:216-217, 251-252). Notably, Holmes actually interacted with the defendant as the defendant advanced upon the Tracker (Tr. 2:120-125, 127; 3:86- 88, 178, 236), and the defendant ran right past Buford as he fled the scene (Tr. 3:182). In addition, Holmes, Monroe, and Buford, who were outside of the Tracker at the time the shots were fired, were in a better position to see who was actually firing the shots than was Tony, who was in the back seat of the jeep (Tr. 2:120-127; 3:82-90, 177-178, 236). The limited view Tony would have had from inside the jeep was further restricted by the fact that the shooter was first standing behind him, and then to the right on the other side of the jeep, with Dallas in-between him and the shooter (Tr. 2:125-128; 3:89-93, 180- 181, 236, 240-241). Moreover, Carrington's description of the shooter matched the defendant, who was lighter-skinned and thinner than Williams (Tr. 2:71-72, 162; 5:86-87, 196, 252-255).

Also, the fact that Dallas was shot twice at close range and was more seriously injured than Tony, who was only shot once, indicates that Dallas was the primary target of the shooting (Tr. 2:125-128, 141-143, 147; 3:89-93, 97, 100, 180-181, 186, 236, 240-241, 247; 5:137-138, 162-163; 6:24, 35-36). The defendant had a much stronger motive to kill Dallas *19 than did Williams. In the hours immediately prior to the shooting, Dallas told the defendant that he had stabbed the defendant's cousin (Tr. 3:67). Hence, the defendant would have been motivated by revenge to retaliate against Dallas. Williams's motive, proffered by the defendant at trial, was simply that Williams had aligned himself with the defendant and perhaps did not approve of the fact that Dallas had gotten into a fight with the defendant at the Biarritz (Tr. 7:23).

Furthermore, blood evidence corroborated the witnesses' testimony that the defendant had been a passenger in Williams's Escort and ballistics evidence corroborated their testimony that the defendant had fired shots from behind and to the right of the Tracker (Tr. 5:157, 160, 162-163, 194; 6:8-11, 26, 35-36, 38-39). The fact that the witnesses were correct about these details lends support to the fact that they were correct in identifying the defendant as the shooter.

In addition, Holmes was able to identify the gun the defendant pointed at him as a .38 caliber revolver - the type of gun in fact used in the shooting (Tr. 2:122-124, 127; 5:124-131). Also, Carrington said that the shooter was wearing a dark blue Champion sweatshirt (Tr. 5:86-87, 252-255), and the defendant was wearing a dark blue Champion sweatshirt when he *20 turned himself in (Tr. 5:205). Williams, by contrast, was wearing a gray sweatshirt when was apprehended shortly after the shooting (Tr. 5:195). The defendant also had a healed cut on his hand when he turned himself in - evidence which helped explain the presence of blood consistent with his own on Williams's Escort (Tr. 5:209-210). Although there may have been some discrepancies in other aspects of the witnesses' recollections, as in Commonwealth v. Mercado, 24 Mass. App. Ct. 391, 398 (1987), the defendant ignores the fact that "evidence may be sufficient as against a motion for a required finding although there are elements in it that are inconsistent or contradictory."

Lastly, the defendant displayed consciousness of guilt when he tried to convince Holmes to tell other witnesses that they had picked the wrong person, and when he threatened Holmes shortly before trial (Tr. 2:164-165, 2:169-183). Accordingly, the defendant's motion for a required finding was properly denied.

II. THE DEFENDANT WAS NOT HARMED BY TESTIMONY REFERRING TO A PREVIOUS TRIAL WHERE

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257            FOR EDUCATIONAL USE ONLY                    Page 12
2003 WL 23282257 (Mass.)

SUCH TESTIMONY DID NOT GIVE RISE TO AN INFERENCE THAT THE DEFENDANT HAD BEEN
PREVIOUSLY CONVICTED.

On direct examination, the prosecutor asked Holmes about the contents of an
envelope he had picked up from the courthouse on March 10, 1998 (Tr. 2:167, 174).
Holmes testified that the envelope contained *21 "[t]ranscripts from the trial last
time" (Tr. 2:174). This response was stricken from the record after the defendant
objected (Tr. 2:174). Holmes subsequently testified without objection that he had
told the defendant he was not going to testify again and that he did not "want to
go through that again" (Tr. 2:175). [FN5] Later, on cross-examination, in response
to defense counsel's question about a "hearing," Holmes asked counsel if he was
"talking about the trial? When we testified at the trial?" (Tr. 2:197). The
defendant's request for a mistrial was denied (Tr. 2:199). The defendant claims on
appeal that he was prejudiced by this testimony because it informed the jury that
he had been previously convicted of first degree murder, and that his request for a
mistrial should have been granted (D. Br. 26-29). This argument is baseless.

> FN5. This portion of the testimony would thus be reviewed only to determine
> whether a substantial likelihood of a miscarriage of justice exists.
> _Commonwealth v. Williams_, 439 Mass. 678, 682 (2003) (claims not raised at
> trial only reviewed to determine whether a substantial likelihood of a
> miscarriage of justice exists). The remainder would be reviewed for
> prejudicial error. _Commonwealth v. Alphas_, 430 Mass. 8, 13 n.7 (1999)

The first reference by Holmes to trial transcripts was stricken from the record
and the jury was instructed to disregard the testimony (Tr. 2:174). There was thus
no testimony before the jury for its *22 consideration, see _Commonwealth v. Cortez_,
438 Mass. 123, 130 (2002) (jurors are presumed to follow instructions to disregard
testimony), and therefore no claim for this Court to review.

With respect to the remainder of the testimony, although there was reference to a
previous trial, there is nothing in the testimony to indicate (1) that the previous
trial was necessarily a trial of the exact same charges, or (2) what the outcome of
that trial was. It was thus unlikely that the jury would have concluded that the
defendant had previously been convicted of first degree murder on the same set of
facts, the harm about which the defendant complains. See _Commonwealth v.
DiBenedetto_, 427 Mass. 414, 423 (1998) (fact that prosecutor told grand jury that
Juvenile Court judge had transferred defendant to Superior Court would not require
reversal where prosecutor did not tell grand jury that judge had found probable
cause, and grand jury was unlikely to come to such a conclusion on its own). _Cf._
_Commonwealth v. Arsenault_, 361 Mass. 287, 300 (1972), _rev'd in part on other
grounds_, 373 Mass. 617 (1977) (references to prior proceeding coupled with
testimony that witness had met defendant while in prison gave rise to inference
that defendant had been previously convicted). Moreover, the last reference was a
response to an unclear question by the defendant (Tr. *23 2:197). The defendant,
thus, cannot complain about that portion of Holmes's testimony on appeal. See
_Arsenault_, 361 Mass. at 300-301 (defendant could not complain about testimony
elicited from witness he had called).

Lastly, the trial judge was not required to give a limiting or curative
instruction, as no such instruction was requested. See _Commonwealth v. Sullivan_,
436 Mass. 799, 809 (2002) (no requirement that judges give limiting instructions
_sua sponte_); _Commonwealth v. Leonardi_, 413 Mass. 757, 764 (1992) (same);
_Commonwealth v. Cefalo_, 381 Mass. 319, 336-337 (1980) (no judicial duty to give
limiting or curative instructions _sua sponte_). The defendant's claim thus fails.

III. PROBATION OFFICER TANYA BROOKS WAS PROPERLY ALLOWED TO STATE THAT SHE HAD

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SEEN THE DEFENDANT OUTSIDE OF THE COURTHOUSE ON A CERTAIN DAY, AT A CERTAIN TIME
WHERE SUCH TESTIMONY CORROBORATED THAT OF HOLMES, WHO SAID THE DEFENDANT HAD
CONFRONTED HIM THERE, AND WAS NOT PREJUDICIAL.

 The defendant claims that Probation Officer Tanya Brooks was improperly allowed to
testify that the defendant was reporting to her as a condition of his pretrial
release in this case and that she had seen him near the courthouse on March 10,
1998 around 2:00 P.M. (D. Br. 30-32; Tr. 56-57). [FN6] He contends that the *24
testimony was not relevant and that it prejudiced him (D. Br. 30-32). This argument
is without merit.

    FN6. Because the defendant objected to this testimony at trial (Tr. 3:50-
    54), review is for prejudicial error. _Alphas_, 430 Mass. at 13 n.7.

 First, the testimony was relevant because, by placing the defendant near the
courthouse on March 10 around 2:00 P.M., it corroborated Holmes's testimony that he
had been threatened by the defendant on that date around that time near the
courthouse (Tr. 2:167-183). _See Commonwealth v. Emence_, 47 Mass. App. Ct. 299, 302
(1999), _quoting Commonwealth v. Tucker_, 189 Mass. 457, 467 (1905) ("It is not
necessary that the evidence in question bear directly on the issue or be conclusive
of it. So long as it has a tendency to prove a proposition, it is admissible simply
because it 'helps a little' ").

 Second, the defendant was not prejudiced in any way. Probation Officer Brooks
testified that the defendant was reporting to her as a condition of his pre-trial
release _in this case_ (Tr. 3:57). Thus, she did not imply that the defendant had any
prior involvement in the criminal justice system. There was, accordingly, no
impropriety. _See Commonwealth v. Pleas_, 49 Mass. App. Ct. 321, 328, _rev. denied_,
432 Mass. 1105 (2000) (identification testimony from police officers based on prior
contact with defendant often upheld where jury never hears of prior arrests or
convictions of the defendant); _Commonwealth v. Gonzalez_, 47 Mass. App. Ct. 255,
259, _rev. denied_, *25 430 Mass. 1105 (1999) (officer's testimony that he knew the
defendant "from dealing with [him] in the past" was not prejudicial). Thus, the
defendant's claim fails.

IV. MONROE WAS PROPERLY ALLOWED TO PROVIDE MOTIVE EVIDENCE BY TESTIFYING THAT
DALLAS HAD TOLD THE DEFENDANT ON THE NIGHT OF THE SHOOTING THAT HE HAD STABBED THE
DEFENDANT'S COUSIN.

 At trial Monroe testified that Dallas had told the defendant in the Biarritz that
he was the one who had stabbed the defendant's cousin (Tr. 3:67). On appeal, the
defendant claims that Monroe should not have been allowed to so testify because
there was no evidence that Dallas had actually stabbed the defendant's cousin (D.
Br. 35-38). The defendant did not object on this ground at trial (Tr. 3:65-67), so
review is limited to whether there is a substantial likelihood of a miscarriage of
justice. _See Commonwealth v. Williams_, 439 Mass. 678, 682 (2003); _Commonwealth v.
Tyree_, 387 Mass. 191, 209 (1982), _cert. denied_, 459 U.S. 1175 (1983). There was no
error, let alone a substantial likelihood of a miscarriage of justice.

 Monroe's testimony was properly offered as an exception to the hearsay rule to
show the defendant's state of mind. The salient point was that Dallas had
communicated to the defendant that he had stabbed the defendant's cousin. _See
*26 Commonwealth v. Cyr_, 433 Mass. 617, 625 (2001) (evidence communicated to
defendant indicating that victim and defendant were involved in heated custody
dispute was probative of defendant's motive to kill); _Commonwealth v. Quails_, 425
Mass. 163, 169 (1997) (if hostility of victim towards defendant is communicated to
defendant, such communication is probative of defendant's state of mind);

        © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257            FOR EDUCATIONAL USE ONLY                    Page 14
2003 WL 23282257 (Mass.)

*Commonwealth v. Seabrooks*, 425 Mass. 507, 511 n.5 (1997) (fact that victim had
communicated to defendant that she would not allow him to see their child until he
paid child support was relevant to defendant's motive for killing her). Whether
Dallas had actually stabbed the defendant's cousin was immaterial. See P.J. Liacos,
*Handbook of Massachusetts Evidence*, § § 8.2 and 8.2.2 at 464, 468 (7th Edition
1999) (statement offered as evidence that "person to whom it was addressed had
notice or knowledge of the contents of the statement" is not hearsay and is thus
offered without regard to whether the contents of the statement are true). What was
important was the effect that this information would have had on the defendant if
the defendant believed it to be true. *Id.* If the defendant believed that Dallas had
stabbed his cousin, he would have been motivated by revenge to retaliate against
Dallas. The Commonwealth was within its right to put forth such a theory of the
case.

**\*27** The defendant also claims that a limiting instruction should have been given
with respect to this motive evidence (D. Br. 33-34). A trial judge is not required
to give a limiting instruction as to the use of evidence, however, if none is
requested. *See Sullivan*, 436 Mass. at 809; *Leonardi*, 413 Mass. at 764. Moreover,
there is little chance that the jury used the statement for an improper or
prejudicial purpose, as the statement, if true, affected only Dallas's character,
not the defendant's. *Compare Sullivan*, 436 Mass. at 809 (statement could have been
used to assess defendant's character or propensity to commit crime). In sum, there
was no error, and the defendant's claims fail.

V. THE PROSECUTOR PROPERLY STATED IN HER OPENING THAT THE EVIDENCE WOULD PROVE
THAT THE DEFENDANT WAS MOTIVATED BY REVENGE TO COMMIT THE MURDERS, AND SHE PROPERLY
SO ARGUED IN HER CLOSING.

On a related note, the defendant argues that the prosecutor improperly stated in
her opening that the evidence would show that Dallas had killed the defendant's
cousin and argued in her closing that the defendant was motivated by revenge (D.
Br. 35-38). There was no objection to either the opening or the closing (Tr. 1:188-
189; 7:67-78). Thus, review is limited to whether there is a substantial likelihood
of a miscarriage of justice. *Williams*, 439 Mass. at 682. There is none, as there
was no error.

**\*28** The prosecutor stated in her opening that the jury would learn that one of the
Price brothers had stabbed the defendant's cousin (Tr. 1:188-189). During the
trial, a witness was called who testified that Dallas had been convicted in 1988 of
killing a man named Paul Mahoney (Tr. 1:211). Although his testimony did not go so
far as to establish that Mahoney was the defendant's cousin, the defendant has made
no showing that the prosecutor anticipated that this link would be missing. A
prosecutor may reasonably state in her opening anything she reasonably can and in good
faith believes she will be able to prove. *See Commonwealth v. Errington*, 390 Mass.
875, 883 (1984); *Commonwealth v. St. Germain*, 381 Mass. 256, 271 (1980). Absent a
showing of bad faith, the fact that certain evidence fails to materialize at trial
is not a ground for reversal. *See Errington*, 390 Mass. at 883 (absent indication
that opening made in bad faith, prosecutor not to be faulted when testimony
predicted does not materialize; neither unreasonableness nor bad faith presumed);
*St. Germain*, 381 Mass. at 271 (witnesses at times, from lack of memory or
otherwise, do not fulfill expectations of counsel; bad faith not presumed). Here,
the defendant has offered no evidence of bad faith. Thus, he has failed to show any
impropriety in the prosecutor's opening.

**\*29** The defendant's challenge to the prosecutor's closing is also baseless. A
prosecutor may, in her closing argument, comment on the evidence that was
introduced at trial and ask the jury to draw inferences from that evidence.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Commonwealth v. Chavis*, 415 Mass. 703, 713 (1993). *See also Commonwealth v. Johnson*, 429 Mass. 745, 748 (1999). As discussed *supra*, the fact that Dallas had told the defendant that he was the one who had stabbed his cousin was properly introduced as evidence of motive. Accordingly, it was proper for the prosecutor to argue that those words "set [the defendant] off" (Tr. 7:71). She at no time argued that Dallas had actually killed the defendant's cousin, and thus did not misrepresent any facts (Tr. 7:67-78). In any event, as discussed *supra*, whether Dallas had actually killed the defendant's cousin was immaterial to the defendant's motive. In sum, there was no error.

VI. THE TRIAL JUDGE PROPERLY ADMITTED AUTOPSY PHOTOGRAPHS WHERE THEY ASSISTED THE JURY IN UNDERSTANDING THE MEDICAL EXAMINER'S TESTIMONY, WERE RELEVANT TO THE ISSUE OF PREMEDITATION, AND WERE NOT INFLAMMATORY IN NATURE.

The defendant complains that two autopsy photographs of Tony appearing on pages 20-21 of the record appendix were improperly admitted because one shows an incision and the other shows a probe going through Tony's arm (D. Br. 47- 48). Before trial, the **\*30** only objection the defendant made to the autopsy photographs was that one of the photographs showed the victim's head (Tr. 1:51- 53, 6:27-28). [FN7] Accordingly, the current appellate claim should be reviewed only to determine whether a substantial likelihood of a miscarriage of justice exists. *Williams*, 439 Mass. at 682; *Tyree*, 387 Mass. at 209. As there was no error in the admission of the photographs, no such risk exists.

> FN7. The photograph to which the defendant was objecting was not identified
> in any other way. The Commonwealth has viewed the autopsy photographs and
> assumes that the defendant was referring to the photograph that happens also
> to show the probe going through Tony's arm (exhibit 53) (R. 20).

"The admissibility of photographic evidence rests almost entirely in the discretion of the judge, and a defendant carries a heavy burden in proving an abuse of that discretion." *Commonwealth v. Todd*, 394 Mass. 791, 796 (1985), *citing Commonwealth v. Bastarache*, 382 Mass. 86, 106 (1980). "Indeed, 'this court has almost never ruled that it was error to admit photographs of ... homicide victims.' " *Commonwealth v. Dagenais*, 437 Mass. 832, 841 (2002), *quoting Commonwealth v. Vizcarrondo*, 431 Mass. 360, 362 (2000). Special care, however, should be taken if the photographs show the body as altered in the course of an autopsy and if such photographs are likely to be inflammatory or otherwise prejudicial. **\*31***Bastarache*, 382 Mass. at 106. There was no error here under these principles.

The photographs to which the defendant now objects, which showed the location and nature of the victim wounds, were relevant to proving premeditation, an element of first degree murder that the Commonwealth must prove beyond a reasonable doubt even if it is not contested by the defendant. *See Commonwealth v. Maldonado, 429 Mass. 502, 507 (1999)*, *quoting Commonwealth v. Jackson*, 428 Mass. 455, 464 (1998) ("it is settled law that photographs showing the nature and extent of the victim's injuries are admissible as evidence that the defendant killed the victim with deliberate premeditation"). In this regard, exhibit 52 shows two bullet wounds to Tony's arm, a bullet wound to his chest, and a stab wound (R. 21). Exhibit 53 uses a probe to demonstrate the trajectory of the bullet (R. 20). These things were relevant to showing premeditation. The stab wound, which was inflicted by the defendant shortly before the shooting (Tr. 2:103-104), demonstrates that the defendant harbored hostile feelings towards Tony shortly before he killed him. The bullet wounds to Tony's right arm and chest, and in particular, the trajectory of the bullet that caused all three wounds, proved that the defendant, while standing to the right of Tony, shot Tony while he was sitting in a prone **\*32** position inside the jeep (Tr. 6:26). These photographs assisted the jury in evaluating the medical examiner's

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

testimony on these relevant issues. See Commonwealth v. Haas, 398 Mass. 806, 816 (1986) (autopsy photographs aided the jury in evaluating the pathologist's testimony); Todd, 394 Mass. at 796 ("oral testimony describing the victim's injuries may be supplemented with photographs"). The photographs, thus, had probative value.

Moreover, the Commonwealth has viewed the photographs, and as the trial judge stated (Tr. 1:51-52), they are not unduly gruesome. The incision appearing in exhibit 52, about which the defendant complains, does show some bloody tissue, but does not expose to view any internal organs, and the tissue is not the focal point of the photo (D. Br. 48). See Commonwealth v. Robinson, 14 Mass. App. Ct. 591, 596-597 (1982) (photographs showing surgical incisions, stab wounds, and tubes which had been inserted into the victim's throat during emergency treatment not inflammatory). The probe showing the trajectory of the bullet in exhibit 53 is also not particularly shocking to the senses. See Commonwealth v. Healey, 393 Mass. 367, 377 (1984) (photograph of body with probe inserted into chest wound not inflammatory); Commonwealth v. Paszko, 391 Mass. 164, 194 (1984) (photograph of victim with metal probe inserted into *33 and protruding from entrance wound admissible). In sum, the judge properly exercised his considerable discretion in admitting the photographs here into evidence.

VII. THE DEFENDANT HAS FAILED TO SUSTAIN A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL GIVEN THAT THERE WAS (1) NO ERROR IN THE PROSECUTOR'S OPENING OR CLOSING, (2) NO ERROR IN THE ADMISSION OF MOTIVE EVIDENCE, (3) NO HARM WITH RESPECT TO THE REFERENCE TO A PREVIOUS TRIAL, AND (4) NO ERROR IN JOINING FOR TRIAL THE CHARGE OF ASSAULT AND BATTERY BY MEANS OF A DANGEROUS WEAPON.

The defendant claims that his trial counsel was ineffective in several respects (D. Br. 38-50). "In evaluating a claim of ineffective assistance of counsel in a case of murder in the first degree, [the Court] begin[s] by determining whether there was a serious failure by trial counsel. If so, the [the Court] determine[s] whether the failure resulted in a substantial likelihood of a miscarriage of justice." Commonwealth v. Harbin, 435 Mass. 654, 656 (2002) See also Commonwealth v. Wright, 411 Mass. 678, 681-682 (1992) (statutory standard under G. L. c. 278, § 33E more favorable to defendant than constitutional ineffective assistance standard). The defendant's ineffective assistance of counsel claims fail under this standard.

The defendant first claims that his trial counsel was ineffective because his counsel failed to object to the prosecutor's opening statement and closing *34 argument regarding motive evidence (D. Br. 40-41). Because there was no error (see section five, supra), however, there can be no ineffective assistance of counsel. See Wright, 411 Mass. at 682 (if there is no substantial likelihood of a miscarriage of justice, a defendant cannot prevail "by asserting as to the same issue the ineffectiveness of his counsel").

Second, the defendant claims that counsel was ineffective for failing to request a limiting instruction for the motive evidence (D. Br. 41-42). As discussed in section four, supra, however, the motive evidence was properly introduced, and there is little likelihood that the jury used the motive testimony (Tr. 3:67) for anything other than evidence of motive. A limiting instruction, thus, would not have significantly aided the defendant. Counsel, therefore, was not ineffective for failing to request such an instruction. See Wright, 411 Mass. at 682.

Third, the defendant claims that counsel was ineffective for failing to request a curative instruction when Holmes mentioned a previous trial on cross-examination (D. Br. 43). As discussed in section two, supra, however, no harm accrued to the

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257                FOR EDUCATIONAL USE ONLY                          Page 17
2003 WL 23282257 (Mass.)

defendant as a result of the mention of a previous trial. Thus, the defendant's
ineffective assistance of counsel claim fails in this regard as well. *See Wright,*
411 Mass. at 682.

**\*35** Lastly, counsel was not ineffective for failing to file a motion to sever the
assault and battery by means of a dangerous weapon indictment from the murder
indictments (D. Br. 43-46). Where offenses are related, a trial judge is to join
the charges for trial unless joinder is not in the best interests of justice.
*Commonwealth v. Delaney,* 425 Mass. 587, 593-594 (1997), *cert. denied,* 522 U.S. 1058
(1998); *Mass. R. Crim. P.* 9(a) (3). "[O]ffenses are related if the evidence 'in its
totality shows a common scheme and pattern of operation that tends to prove all the
indictments.' " *Delaney,* 425 Mass. at 594, *quoting Commonwealth v. Feijoo,* 419
Mass. 486, 494-495 (1995) Time and place are important in determining relatedness.
*Delaney,* 425 Mass. at 594.

The decision on whether to join charges for trial rests within the sound
discretion of the trial judge, and the defendant bears the burden of proving that
he has been prejudiced by joinder. *Delaney,* 425 Mass. at 593-594. In this regard,
it is not enough for the defendant to show that his chances for acquittal would
have been better had the charges been tried separately. *Delaney,* 425 Mass. at 595.
Rather, "the defendant's burden is to show that 'the prejudice resulting from a
joint trial is so compelling that it prevented [him] from obtaining a fair trial.'
" *Delaney,* 425 Mass. at 595, *quoting \*36Commonwealth v.  Clarke,* 418 Mass. 207, 217
(1994) (alteration in original). The defendant has failed to carry his burden, and
has thus failed to demonstrate ineffective assistance of counsel. *See Wright,* 411
Mass. at 682.

Here, the stabbing of Tony was related to his murder a short time later. The
defendant stabbed Tony outside the Biarritz sometime around 1:00 A.M. (Tr. 5:55),
and murdered him near Studio 88, which was within walking distance, within the hour
(Tr. 3:74-75, 108-109; 5:57-59). Accordingly, the offenses were related in time and
space. *See Delaney,* 425 Mass. at 594 (eight weeks separated incidents); *Todd,* 394
Mass. at 794-795 (four hours). Furthermore, the stabbing was relevant to proving
deliberate premeditation. See *Todd,* 394 Mass. at 794 (offenses may be joined where
evidence of other crime demonstrates defendant's state of mind). The evidence of
Tony's stabbing showed that the defendant harbored ill will towards Tony and tended
to prove that the defendant sought him out after leaving the Biarritz to finish
what he had not earlier been able to accomplish. *See Commonwealth v. Cappellano,*
392 Mass. 676, 678 (1984) (connection between crimes was defendant's desire in
later crime to complete what he was unable to earlier finish or to eliminate a
witness to the earlier events). Accordingly, there was no misjoinder and, **\*37**
consequently, no ineffective assistance of counsel for failing to file a motion to
sever.

VIII.THIS COURT SHOULD REFUSE TO GRANT THE DEFENDANT A NEW TRIAL AND SHOULD REFUSE
TO REDUCE THE VERDICT PURSUANT TO G. L. C. 278, § 33E WHERE THE DEFENDANT'S CLAIMS
ARE MERITLESS AND THE EVIDENCE SHOWED THAT THE DEFENDANT DELIBERATELY ADVANCE UPON
A PARKED JEEP AND FIRED SHOTS, AT CLOSE RANGE, INTO TWO VICTIMS TRAPPED WITHIN.

The defendant claims that, pursuant to this Court's powers under G. L. c. 278, §
33E, and in light of the cumulative effect of his claims of error, this Court
should grant him a new trial or reduce the verdict (D. Br. 49-50). As the
Commonwealth has demonstrated, the defendant's claims have no merit (*see, supra,*
pp. 15-36), and thus do not provide a ground for relief under § 33E.

"Under G. L. c. 278, § 33E, [this Court] must consider whether the verdict of
murder in the first degree was against the weight of the evidence considered in a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 23282257          FOR EDUCATIONAL USE ONLY          Page 18
2003 WL 23282257 (Mass.)

large or nontechnical sense." *Commonwealth v. Almon,* 387 Mass. 599, 604 (1982), *citing Commonwealth v. Bowman,* 373 Mass. 760, 765 (1977). The review is performed with restraint and only to discover whether there has been a miscarriage of justice. *Almon,* 387 Mass. at 604. *Accord Commonwealth v. Torres,* 420 Mass. 479, 494 (1995). Because the conviction of the defendant for first degree murder is "amply supported and just," **38 *Commonwealth v. Nerette,* 432 Mass. 534, 539 (2000), there is no need for this Court to exercise its powers under § 33E.

Here, the defendant tracked Dallas and Tony down after the altercation in the Biarritz, and then deliberately approached the Tracker and fired shots at close range into Dallas's and Tony's back and chest while they were trapped within (Tr. 2:41-42, 103-104, 117-119, 125-128; 3:68, 82-83, 89-93, 180-181, 236-237, 240-241; 6:24, 35, 38). This the defendant did even after Holmes tried to reason with him and stop him (Tr. 2:121-124, 127; 3:87). Thus, the first degree murder verdicts were just, and this Court should not disturb the jury's verdicts by reducing the convictions or in ordering a new trial. *See Harbin,* 435 Mass. at 663 (evidence did not warrant § 33E relief where defendant fired shot at point blank range into victim's head as victim held hands before his face in defense); *Commonwealth v. Barnoski,* 418 Mass. 523, 541 (1994) ( § 33E relief not warranted; no profound doubt as to defendant's guilt where "jury heard and credited evidence that the defendant shot two men each twice in the head at point-blank range"); *Commonwealth v. Whipple,* 377 Mass. 709, 715 (1979) (§ 33E relief regularly denied where evidence shows that defendant is a "party to a dispute or affray, leaves the scene, procures a weapon, and returns to do murderous work")

**39 *CONCLUSION*
For the foregoing reasons, this Court should affirm the defendant's convictions.

Appendix not available.
COMMONWEALTH OF MASSACHUSETTS, Appellee, v. Ronald QUALLS, Defendant - Appellant.
2003 WL 23282257

## Briefs and Other Related Documents (Back to top)

• 2003 WL 23282258 (Appellate Brief) Brief and Record Appendix of Ronald Qualls (May. 30, 2003)Original Image of this Document with Appendix (PDF)

• 2002 WL 32364746 (Appellate Brief) Brief and Record Appendix for the Defendant on Appeal from the Suffolk Division of the Superior Court Department (Mar. 2002)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CLERK'S COPY

RECEIVED
SUPREME JUDICIAL COURT

DEC 3 0 2003

FOR THE COMMONWEALTH
SUSAN MELLEN, CLERK

# GREG T. SCHUBERT

## Counsellor at Law

**1365 Main Street**          **Tel. 413-746-1313  Fax. 413-746-3102**
**Springfield, MA  01103**    **E-Mail:** MURDERONE@MSN.COM

December 22, 2003

Supreme Judicial Court
The Honorable John M. Greaney
One Beacon Street, 3rd Floor
Boston, MA 02108-3106

**RE:  Commonwealth v. Ronald Qualls**
      **SJC-08088**
      **Petition for Rehearing**

Dear Justice Greaney:

The Petitioner Qualls respectfully suggests that the Court has misapprehended parts of his argument and asks it to reconsider other parts.

In Petitioner's statement of facts he asserted that, in the bar before the shooting, Dallas Price approached Qualls and told him that he (Dallas) was the one who killed Qualls' cousin a few years earlier. This disclosure triggered a fight between Dallas and Qualls inside the bar. Qualls' friend, Williams, who was a cousin to Tony and Dallas Price, began fighting with Tony. Eventually, Qualls and Tony were escorted outside where these two started fighting, during which Qualls stabbed Tony, then drove off with Williams.

Although he further argued that the trial court erroneously admitted this out-of-court statement to show motive, with no limiting instruction, he made the further point that the lack of limiting instruction caused a confrontation clause violation. According to Monroe, Dallas said to Qualls; "I am the one that stabbed your cousin" (Tr.III/67). This out-of-court statement was admitted, over objection, to show motive (Tr.III/67). There was no limiting instruction and none was requested (Tr.III/67). It was admitted for its truth, and there was no opportunity to cross-examine the speaking.

Petitioner Qualls argued that his due process rights and his right to confrontation were violated when this evidence was admitted allegedly to show his motive to kill the victims. This evidence would not have provided motive unless it were true making it inadmissible hearsay and denying Qualls the right to confront this witness who did not testify at trial.

At trial, Monroe testified that Dallas said to Qualls; "I am the one that stabbed your cousin" (Tr.III/67). Admitting this evidence was ostensibly justified solely because it tended to show Qualls' state of mind or motive (Tr.III/67). There was no evidence, however, to show that the person Dallas killed was Qualls' cousin. Without this additional proof, there would be no effect on Qualls' state of mind, no proof of motive, and no justification for admitting the evidence. Making matters worse, what this Court apparently overlooked was the fact that this statement came in substantively.

Defense counsel objected to admitting Dallas' statement (Tr.65-67). He did not, however, request a contemporaneous limiting instruction, and no limiting instruction was given at the end of trial (Tr.VI/78-135). Admitting Dallas' out-court-statement to show motive, where there was no evidence that the person killed was Qualls' cousin and consequently no proof of any effect on Qualls' state of mind, violated the federal and state constitutional principals guaranteeing Qualls' rights to due process and a fair trial. U.S. Const. Amend 5, and 14, Mass. Const. Art. 10, 12; Commonwealth v. Neuymer, 432 Mass. 23, 33 (2000); Commonwealth v. McCravey, 430 Mass. 758, 759-60 (2000) Estes v. Texas, 381 U.S. 532, 542-543 (1965).

In the opinion rejecting Qualls argument, this Court merely ruled that this evidence was properly admitted to show Qualls' state of mind and was not hearsay. Commonwealth v. Qualls, SJC 08088, at 13. The Court ignored Qualls argument that to show motive, this out of court statement must be accepted as true, and for this reason, constitution testimony from a witness who was not subjected to cross-examination.

The failure to instruct on the permissible limited use of this statement prevented Qualls from confronting a crucial witness against him (i.e., the victim) regarding a critical issue at trial, motive.

This violated of Article 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the United States Constitution. See White v.

Illinois, 502 U.S. 346, 352-354, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992); Idaho v. Wright, 497 U.S. 805, 813-817, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990); Ohio v. Roberts, 448 U.S. 56, 63-66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980); Commonwealth v. DelValle, 353 Mass. 684 (1968). The jury was free to use Dallas' statement as substantive evidence. A flat violation of the Confrontation Clause.

Additionally, in the section of the opinion discussion ineffective assistance of counsel, this court considered only whether counsel was ineffective if failing to move for relief from prejudicial joinder. Commonwealth v. Qualls, SJC 08088, at 16. It does not mention or seem to consider the other grounds asserted to support a finding of ineffective assistance of counsel. Particularly, because trial counsel permitted a confrontation clause violation, just discussed, Qualls was denied effective assistance of counsel. The Massachusetts Constitution guarantees Qualls' right to competent counsel. Commonwealth v. Richard, 398 Mass. 392, 393 (1986) (article 12 provides broader protection than does the sixth amendment). Commonwealth v. Oliveria, 431 Mass. 609, 614 (2000); Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). Under G. L. c. 278, sec. 33E, this Court had to consider only "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." Commonwealth v. Iglesias, 426 Mass. 574, 578 (1998), quoting Commonwealth v. Wright, 411 Mass. 678, 682 (1992). Under this more favorable standard, this Court will consider Qualls claim "even if the alleged error . . . does not constitute conduct falling 'measurably below' that of 'an ordinary fallible lawyer.'" Commonwealth v. MacKenzie, 413 Mass. 498, 517 (1992).

The Sixth and Fourteenth Amendments to the United States Constitution guarantee the same right. To preserve his rights under federal law, Qualls asserts a federal constitutional violation separately. An essential ingredient of the Sixth Amendment right to counsel is that counsel provide constitutionally effective assistance. See Powell v. Alabama, 287 U.S. 45, 57 (1932). This Court must use a two-pronged cause and prejudice test. Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984); Hill v. Lockhart, 474 U.S. 52, 58 (1985).

Because this Court did not address the confrontation clause violation resulting from the admission of the so-called motive evidence, it did not fairly consider that trial counsel failed to request contemporaneous and final

limiting instruction for the evidence limited to showing motive, further ensuring a further violation of the confrontation clause. Essentially defense counsel ensured a violation of Qualls' rights under the Confrontation Clause when he failed to request limiting instructions for Dallas' out-of-court statements. Mass. Const. Pt. 1, art. 12; U.S. Const. Amends. 6 and 14; White, 502 U.S. at 352-354; Wright, 497 U.S. at 813-817; Roberts, 448 U.S. at 63-66; DelValle, 351 Mass. at 491. See also White v. McAnich, 235 F.3d 988,990-1000 (6th Cir. 2000) (ineffective to fail to request contemporaneous limiting instruction when hearsay is introduced).

Trial counsel's failure to request a limiting instruction ensured the confrontation clause violation and caused serious damage because motive was critical to persuading the jury that Qualls was more likely the shooter than Williams. The jury was permitted to consider the motive evidence for its truth when there was no evidence that the person Dallas killed was actually Qualls' cousin. Qualls' inability to cross-examine Dallas was the direct result of trial counsel's failure.

Finally Petitioner respectfully requests this Court to reconsider its decision regarding the prejudice resulting from the joinder of the stabbing offense with the shooting offense. Rule 9 (a) (3) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 859 (1979), provides that, where offenses are related, "the trial judge shall join the charges for trial unless he determines that joinder is not in the best interests of justice." Joinder is a matter "committed to the sound discretion of the trial judge." Commonwealth v. Delaney, 425 Mass. 587, 593 (1997); Commonwealth v. Montanez, 410 Mass. 290, 303 (1991). Qualls bears the burden of showing that joinder was improper. Commonwealth v. Gallison, 383 Mass. 659, 671 (1981). A joint trial of related offenses may be improper if joinder of the offenses has the effect of showing a defendant's criminal propensity. Commonwealth v. Todd, 394 Mass. 791, 794 (1985).

Other crimes, wrongs, or bad acts are not admissible to prove character to show that a defendant acted in conformity with that bad character. See Prop. Mass. R. Evid. 404(b); Commonwealth v. Trapp, 396 Mass. 202 (1985). See also United States v. Vance, 871 F.2d 572, 575 (6th Cir. 1989) (providing that "bad acts evidence is not admissible to prove character or criminal propensity"

under Fed. R. Evid. 404(b)); United States v. Ring, 513 F.2d 1001, 1004 (6th Cir. 1975) (stating that in jury trials, evidence of a criminal defendant's bad acts or prior misconduct is inadmissible to show criminal propensity because it "tends to confuse the issue of guilt or innocence of the specific offenses charged and to weigh too heavily with the jury").

In this case, that Qualls allegedly stabbed Tony Price outside of the Biarritz several hours before Tony and Dallas were killed (Tr.II/103). Evidence of this stabbing, while presumably a related offense, was highly prejudicial because it very likely had profound persuasive value for the jury. If Qualls stabbed Tony, then he probably also shot Tony and Dallas. Since the issue was whether it was Qualls or Williams who did the shooting, this evidence that Qualls stabbed Tony was prejudicial. It presented Qualls as violent and predisposed the jury to convict him for the shooting as well. Its probative value was mild, needlessly showing malice where malice from use of a deadly weapon (a gun) was already present. Malice was not contested. The prejudicial effect of the joinder was overwhelming, particularly because the three eye-witnesses were not credible, and because Tony identified Williams as his killer. Without this stabbing incident evidence, there was a far greater likelihood that the jury would not have been convinced beyond a reasonable doubt of the shooter's identity. For this reason, trial counsel overlooked an important opportunity for better advocacy and for a result more consonant with justice, and violated Qualls right to effective assistance of counsel.

In addition, the above-described inclusion of "bad acts" violated substantive, federal, constitutional law. See Garceau v. Woodford, 275 F.3d 769, 773-78 and n.3 (9th Cir. 2001, cert. granted, 123 S.Ct. 32 (2002) ("while the Supreme Court has never held that the use of prior convictions to show nothing more than a disposition to commit crime would violate the Due Process Clause of the Fourteenth Amendment, its decisions ... suggest that evidence of prior crimes introduced for no purpose other than to show criminal disposition would violate the Due Process Clause" and concluding that "other crimes" jury instruction rendered Garceau's trial so fundamentally unfair as to constitute a violation of the Due Process Clause.), recently reversed and remanded on other grounds. Woodford v. Garceau, 2003 U.S. LEXIS 2491 (U.S., Mar. 25, 2003).

For the above reasons, therefore, Petitioner Qualls
respectfully requests a rehearing.

Sincerely,

Greg T. Schubert

GTS/bmg



# Supreme Judicial Court for the Commonwealth of Massachusetts
One Beacon Street, Third Floor, Boston, Massachusetts 02108
(617) 557-1020


Rami M. Vanegas, A.D.A.
Office of the District Attorney/Suffolk
One Bulfinch Place
Boston, MA 02114


RE:   No. SJC-08088

COMMONWEALTH
vs.
RONALD QUALLS


NOTICE OF DENIAL OF PETITION FOR REHEARING


The Petition for Rehearing filed in the above captioned case has been considered by the court and is denied.


Susan Mellen, Clerk

Dated: January 29, 2004

To:   Rami M. Vanegas, A.D.A.
      Greg T. Schubert, Esquire
      Suffolk Superior Court Dept.

# Westlaw.

800 N.E.2d 299
440 Mass. 576, 800 N.E.2d 299
**(Cite as: 440 Mass. 576, 800 N.E.2d 299)**

FOR EDUCATIONAL USE ONLY

Page 1

# H

**Briefs and Other Related Documents**

Supreme Judicial Court of Massachusetts,
Suffolk.
**COMMONWEALTH**
v.
Ronald **QUALLS**.

Argued Nov. 7, 2003.
Decided Dec. 15, 2003.

Defendant was convicted in the Superior Court, Robert W. Banks, J., of first-degree murder, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and unlawful possession of firearm. Defendant appealed. The Supreme Judicial Court reversed and remanded for new trial. On remand for new trial, the defendant was convicted in the Superior Court, Suffolk County, Patrick F. Brady, J., of murder in the first degree, assault and battery by means of a dangerous weapon, and assault by means of a dangerous weapon, and unlawful possession of a firearm. Defendant appealed. The Supreme Judicial Court, Greaney, J., held that: (1) evidence was sufficient to support conviction for two counts of first degree murder; (2) witness's testimony that victim stated to defendant hours before victim was shot that victim was individual who stabbed defendant's cousin, was admissible under the state-of-mind exception to hearsay rule; and (3) prosecutor's statement during opening statements, in which prosecutor stated that she promised to prove that victim killed defendant's cousin and that defendant's motive for killing victim was revenge, did not create a substantial likelihood of a miscarriage of justice.

Affirmed.

West Headnotes

**[1] Homicide 🔑1181**
203k1181 Most Cited Cases
Evidence was sufficient to support finding that defendant was individual who shot victims, and thus was sufficient to support conviction for two counts of first degree murder; two witnesses positively identified the defendant as the shooter, and other

witness identified the defendant as the individual who approached vehicle in which victims were shot and as the individual she saw flee crime scene after hearing gunshots.

**[2] Criminal Law 🔑867**
110k867 Most Cited Cases
Trial court did not abuse its discretion in murder trial by denying defendant's motion for mistrial that was based on witness's references to defendant's first murder trial that ended in convictions being vacated, where one of witness's reference to first trial was struck and jury was instructed to disregard such testimony, defendant's further references did not indicate that first trial was on the same charges, and other references to first trial made by defendant were elicited by the defendant's trial counsel in an attempt to impeach witness with his testimony from the first trial.

**[3] Criminal Law 🔑1144.15**
110k1144.15 Most Cited Cases
Jurors are presumed to follow instructions to disregard testimony.

**[4] Criminal Law 🔑338(6)**
110k338(6) Most Cited Cases
Probative value of testimony of defendant's probation officer in murder prosecution, in which officer testified that defendant was near the court house on date where witness met with defendant's attorney, substantially outweighed its prejudicial effect to be admissible in murder prosecution; testimony corroborated witness's testimony that defendant approached witness in area near court house on particular date and engaged in threatening comments and actions toward witness.

**[5] Criminal Law 🔑629.5(1)**
110k629.5(1) Most Cited Cases
Trial court did not abuse its discretion in allowing defendant's probation officer to testify in murder prosecution, even though officer was not included in prosecutor's witness list; no evidence was presented that prosecutor acted in bad faith by not putting officer on witness list, and defendant did not present any prejudice resulting from prosecutor's late disclosure to call officer as witness.

**[6] Criminal Law 🔑419(2.20)**
110k419(2.20) Most Cited Cases

800 N.E.2d 299
440 Mass. 576, 800 N.E.2d 299
**(Cite as: 440 Mass. 576, 800 N.E.2d 299)**

FOR EDUCATIONAL USE ONLY

Page 2

Witness's testimony that victim stated to defendant hours before victim was shot that victim was individual who stabbed defendant's cousin, was admissible under the state-of-mind exception to hearsay rule.

**[7] Homicide ☜956**
203k956 Most Cited Cases
Admission of witness's testimony that defendant, in response to hearing victim tell defendant hours before victim was shot that victim was individual who stabbed defendant's cousin, became angry and started pacing, did not result in a substantial likelihood of a miscarriage of justice in murder prosecution absent request of limiting instruction.

**[8] Criminal Law ☜438(6)**
110k438(6) Most Cited Cases
Trial court did not abuse its discretion in murder prosecution by admitting two autopsy photographs of victim; neither photograph was particularly inflammatory, and both photographs aided the jury in evaluating the medical examiner's testimony concerning the trajectory of the bullets that inflicted the various wounds of victim.

**[9] Criminal Law ☜720(9)**
110k720(9) Most Cited Cases
Prosecutor's statement during opening statements of murder prosecution, in which prosecutor stated that she promised to prove that victim, did in fact, kill defendant's cousin and that defendant's motive for killing victim was revenge, did not create a substantial likelihood of a miscarriage of justice; prosecutor's statement concerning motive was supported by witness's testimony that victim had told the defendant that victim had stabbed defendant's cousin.

**[10] Criminal Law ☜703**
110k703 Most Cited Cases
A prosecutor can state in her opening statement anything she reasonably, and in good faith, expected to prove.

**[11] Criminal Law ☜1171.2**
110k1171.2 Most Cited Cases
Absent a showing of bad faith or prejudice from a prosecutor's statement in opening statements concerning evidence she reasonably expected to prove, the fact that certain evidence fails to materialize is not a ground for reversal.

**[12] Criminal Law ☜641.13(2.1)**

110k641.13(2.1) Most Cited Cases
Trial counsel's failure to move for relief after defendant was to be tried jointly for murder and assault and battery by means of a dangerous weapon charge, did not constitute ineffective assistance, even though defendant claimed that if jury found defendant assaulted victim, he probably shot and killed victim; assault of victim was related in time and space to victim's shooting, and assault was relevant to show deliberate premeditation by indicating that the defendant harbored ill will toward victim. U.S.C.A. Const.Amend. 6.
**\*\*301\*577**  Greg T. Schubert for the defendant.

Rami M. Vanegas, Assistant District Attorney, for the Commonwealth.

Present:  GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

GREANEY, J.

Based on a shooting that occurred in the early morning of October 3, 1992, in a parking lot in the Roxbury section of Boston, a jury found the defendant guilty on two indictments charging murder in the first degree, and on indictments charging assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and unlawful possession of a firearm.  [FN1]  The defendant had been retried after we reversed his initial convictions on the ground that improperly admitted hearsay evidence had caused prejudice. See *Commonwealth v. Qualls,* 425 Mass. 163, 169-170, 680 N.E.2d 61 (1997).  Represented by new counsel, the defendant argues that the evidence was insufficient to convict him and that the judge erred in denying his motion for a mistrial based on a witness's reference to the first trial and in failing to give an adequate curative instruction;  in admitting testimony of the defendant's probation officer;  in admitting hearsay evidence;  and in admitting in evidence autopsy photographs of one of the victims.  The defendant also **\*578** argues that a substantial likelihood of a miscarriage of justice exists because of improper statements made by the prosecutor in her opening statement and closing argument and that his trial counsel furnished ineffective assistance.  Finally, the defendant argues that we should exercise our power under G.L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt or to order a new trial.  We affirm the convictions and deny relief under G.L. c. 278, § 33E.

FN1. The conviction of assault by means of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 N.E.2d 299
440 Mass. 576, 800 N.E.2d 299
(Cite as: 440 Mass. 576, 800 N.E.2d 299)

FOR EDUCATIONAL USE ONLY

Page 3

a dangerous weapon was placed on file with the defendant's consent and, therefore, is not before us. See *Commonwealth v. Delgado,* 367 Mass. 432, 438, 326 N.E.2d 716 (1975).

The jury could have found the following facts. On the evening of October 2, 1992, Leroyal Holmes, Fred Monroe, and the victims, Ronald Price, known as "Dallas," **302 and his brother, Roosevelt Price, known as "Tony," got together at the Biarritz bar in the Roxbury section of Boston. There, Dallas saw the defendant [FN2] and told him that he had heard that the defendant had been looking for him. The defendant said that he did not know who Dallas was. Dallas replied that he was the person who had stabbed the defendant's cousin. A fist fight between the two ensued. During the fight, Tony became involved, grabbed the defendant, and placed him in a headlock. An off-duty police detective and a bouncer at the bar broke up the fight, and the detective escorted the defendant outside.

> FN2. The defendant was five feet, nine inches tall, and weighed 140 pounds.

Back inside the bar, Dallas approached the defendant's companion, James Earl "Junior" Williams, [FN3] and asked him why he was on the defendant's side. Dallas protested that Williams was "supposed to be" his cousin. Williams said that he was "down" with the defendant because the defendant put his "life on the line" for Williams.

> FN3. Williams was five feet, nine inches tall, weighed 210 pounds, and was darker skinned than the defendant.

Moments later, outside the bar, the defendant got into a fight with Tony. During the fight, the defendant pulled out a knife and swung it at Tony. The defendant then got into the front passenger seat of Williams's automobile, a dark-colored Ford Escort, and the two drove off.

Tony, Dallas, Holmes, and Monroe went to another bar. They encountered Donna Carrington and Mattie Buford, Monroe's girl friend, in the bar's parking lot. The men told the women to park Carrington's Geo Tracker, a two-door vehicle, in the lot *579 while they went into the bar. After being denied admission because the bar was closing, the men returned to the parking lot, where Tony told the group that he did not feel well.

The group discovered that Tony had been stabbed

near and beneath his right armpit. Tony and Dallas got into the back seat of Carrington's vehicle so that she could drive Tony to a nearby hospital. Tony sat in the back seat behind Carrington, and Dallas sat in the right rear passenger seat next to Tony.

As Tony and Dallas were getting into the vehicle, Dallas observed Williams's automobile drive by. Monroe saw that Williams was the driver and that the defendant was a passenger. Concerned, Holmes walked over to where Williams's automobile was headed and the defendant "popped up" in front of him. Holmes grabbed the defendant and told him to "let it go." The defendant pulled out a .38 caliber revolver and pointed it at Holmes, stating that he would blow Holmes's head off if he did not get out of the way. As the defendant approached Carrington's vehicle, Holmes shouted that the defendant was "strapped," meaning that he was armed.

Hearing Holmes's warning, Buford ran across the street. Monroe ran to the corner of the parking lot. The defendant approached the rear of Carrington's vehicle and fired multiple shots into the plastic covering in the back of the vehicle, then, from the front passenger side of the vehicle, through the open window, fired more shots into the back seat. The defendant then fled on foot, running past Buford.

Monroe ran to Carrington's vehicle and jumped in. Carrington drove to Tony's apartment. Tony went into the apartment. Dallas was slumped over in the back seat, blood running out of his mouth. Holmes, who ran behind the vehicle as it drove off, got into the passenger seat and **303 told Monroe to get inside the vehicle and drive Dallas to a hospital. Dallas died within minutes of his arrival.

Police and emergency medical workers went to Tony's apartment. Tony approached the police and told them that Junior Williams had shot him, adding that Junior drove a black or blue Ford Escort. He also gave them Junior's address, and told them that Junior had a sister who lived on Ruggles Street. He stated *580 that two males had been in the Ford Escort when it drove by. Tony was transported to a hospital, where he subsequently died.

Shortly after 4 A.M., October 3, 1992, the police stopped Williams's Ford Escort. During the stop, Williams pointed at Holmes, who happened to be walking by. Earlier, Holmes had fled the hospital because he did not want anyone questioning him. The police brought both men in for questioning separately. Williams was wearing a gray sweatshirt.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 N.E.2d 299
440 Mass. 576, 800 N.E.2d 299
**(Cite as: 440 Mass. 576, 800 N.E.2d 299)**

At the police station, Holmes identified the defendant as the shooter from a photographic array. He stated that the defendant had been wearing a blue "Members Only" jacket. Monroe initially gave the police false identification information because he did not want to get involved. However, he later identified the defendant as the shooter from a photographic array. Monroe told police that the defendant had been wearing a dark-colored hooded sweatshirt.

Approximately one week after the shootings, Buford identified the defendant as the man she saw approach Carrington's vehicle at the time of the shooting. Buford did not actually observe the defendant shoot into, or at, Carrington's vehicle, but, after hearing the warning that the defendant was "strapped," saw the defendant run through the parking lot over to the back of the Tracker. She heard gunshots and then saw the defendant run away from the vehicle. The defendant ran right past her.

Carrington was not able to identify the defendant as the shooter. She described the shooter, however, as a black male, about eighteen or nineteen years of age; about five feet, seven inches tall; medium build; and wearing a dark blue Champion sweatshirt. She described the driver of the Ford Escort as darker skinned than the passenger, and identified Williams's Ford Escort as the automobile that drove by them prior to the shooting.

Both Dallas and Tony died of gunshot wounds to the chest. One of the shots fired at Dallas had been at close range. Of the three .38 caliber bullets recovered from their bodies, at least one from each body had been fired from the same weapon.

The gray sweatshirt that Williams had been wearing when he had been apprehended had several very small stains on the front and back which were later determined to be type B human **\*581** blood. Williams, Dallas, and Tony had type B blood. The stains did not penetrate through the sweatshirt and were consistent with someone getting a paper cut and then wiping a hand on a shirt. There had been no blood on the back window of Carrington's vehicle, which suggested that blood had not passed through the window. A leather coat, such as the one Dallas had been wearing when he was shot, could prevent blood splatter or spurting from a gunshot wound.

The defendant had type A blood. Type A blood was found on the front passenger seat of Williams's Ford

Escort, and on the passenger door handle. The defendant's fingerprint was found on the outside of the passenger door window.

**\*\*304** The jury could also have found that the defendant exhibited consciousness of guilt. In the spring of 1993, the defendant telephoned Holmes and told him to tell Monroe and Buford that they had picked the wrong person. In March, 1998, Holmes encountered the defendant in downtown Boston, after Holmes had met with the defendant's attorney at the court house. The defendant told Holmes that he knew where Holmes worked and lived, and also knew where Holmes's son's mother lived. The defendant added that the court was trying to put him away for life and that he had nothing to lose. A couple of the defendant's friends followed Holmes to the bus stop. Holmes took a taxi cab, and subsequently relocated.

The defendant did not testify. His defense was that Williams was the shooter. He called two police officers to testify. The first officer testified that Dallas had had a confrontation with Williams at the Biarritz bar, and that Monroe initially had told him that he did not know the identity of the shooter. The second officer confirmed that Tony had named Williams as the shooter.

1. *Sufficiency of the evidence.* The judge denied the defendant's motions for required findings of not guilty presented at the close of the Commonwealth's case and at the close of all the evidence. The defendant argues that the Commonwealth's proof was insufficient to sustain the convictions because the identification evidence was, as a matter of law, unreliable. He also contends that, in light of Tony's identification of Williams as the shooter, and his own assessment that the identification evidence was not credible, we should apply the exception **\*582** formulated in *Commonwealth v. Vaughn,* 23 Mass.App.Ct. 40, 43. 498 N.E.2d 1072 (1986), in the following terms:

"Normally we would look to the jury to weigh the identification testimony against the evidence offered to support a defense. To avoid the conviction of a possibly innocent person, however, it is necessary that there be an exception to that general rule. The exception would include cases which involve evidence indicative of innocence in the form of documents, photographs, or other physically-verifiable items, which an appellate court is in a position equal to that of the jury to consider" (footnote and citation omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1] Under the applicable test, see *Commonwealth v. Latimore,* 378 Mass. 671, 677, 393 N.E.2d 370 (1979), the Commonwealth's evidence was sufficient to prove identity, and the Commonwealth's position as to proof did not deteriorate during the defendant's case, see *Commonwealth v. Basch,* 386 Mass. 620, 622 & n. 2, 437 N.E.2d 200 (1982). Two witnesses, Monroe and Holmes, positively identified the defendant as the shooter. Buford identified the defendant as the man who approached Carrington's vehicle, and as the man she saw flee the area after hearing gunshots. Carrington's description of the man who approached both the back and side of her vehicle, in some aspects, was consistent with a description of the defendant. Buford's and Carrington's testimony furnished further proof that the defendant was the shooter. See *Commonwealth v. Castro,* 438 Mass. 160, 165, 778 N.E.2d 900 (2002). The Commonwealth also introduced evidence from which the jury could have inferred that the defendant displayed consciousness of guilt, including evidence that he told Holmes to tell Monroe and Buford that they had picked the wrong person, and evidence that he threatened Holmes. See *id.* Although the defendant impeached the testimony of Holmes, Monroe, and Buford in **305 various ways, [FN4] it was for the jury to evaluate their testimony and determine credibility. See *Commonwealth v. Clary,* 388 *583 Mass. 583, 589, 447 N.E.2d 1217 (1983); *Commonwealth v. Hoffer,* 375 Mass. 369, 377, 377 N.E.2d 685 (1978).

> FN4. The defendant's impeachment evidence showed that one or more of the witnesses had lied to police, had made inconsistent statements, had pending criminal matters that potentially swayed their testimony, had multiple prior convictions, had default or outstanding warrants, and had police or prosecutorial assistance in removing defaults or resolving pending criminal matters.

There is also nothing in the *Vaughn* case that aids the defendant. *Vaughn* involved two armed robberies that the facts indicated had been committed by the same person. *Commonwealth v. Vaughn, supra* at 41-42, 498 N.E.2d 1072. Jail records, however, disclosed that the defendant was incarcerated when the second robbery occurred, thus conclusively undermining the jury's acceptance of the testimony identifying the defendant as the robber. *Id.* at 42, 498 N.E.2d 1072. There is no similar documentary or tangible evidence in this case. Rather, the jury could have permissibly disregarded Tony's dying

declaration [FN5] and accepted the identification and other evidence outlined above to convict the defendant.

> FN5. Tony was the only person to name Williams as the shooter. Tony had been seriously wounded, the shooting occurred when it was dark, there was evidence that the defendant and Williams were the same height and that each had been wearing a hooded sweatshirt, and there was evidence that the shooter stood behind Tony, and then to his right, obstructed by Dallas. There was also no dispute at trial that, just prior to the shooting, Williams and the defendant had been together, driving in the same automobile, and together in that automobile approached the parking lot where Carrington's vehicle was parked.

2. *Denial of motion for a mistrial.* Holmes testified on direct examination that he had run into the defendant in March, 1998. Holmes had just met with the defendant's lawyer. The defendant asked Holmes about an envelope in Holmes's possession, which, Holmes testified, contained "[t]ranscripts from the trial last time." The defendant's trial counsel objected, and the judge instructed the jury to disregard Holmes's statement.

Holmes subsequently testified that he told the defendant that he had met with the defendant's lawyer and "wasn't going to testify again," and that he "didn't want to go through that again." The defendant's trial counsel did not object.

Later, during his cross-examination in which the defendant's trial counsel was trying to elicit a prior inconsistent statement, Holmes made two other references to a prior trial. At a sidebar conference, the defendant's trial counsel moved for a mistrial, which was denied. A curative instruction was not requested. The defendant argues that the judge abused his discretion in refusing to grant his motion for a mistrial based on Holmes's references *584 to the defendant's first trial and the absence of a curative instruction.

[2][3] Holmes's first reference to the "trial last time" was struck, and the jury were instructed to disregard the testimony. Jurors are presumed to follow instructions to disregard testimony. *Commonwealth v. Cortez,* 438 Mass. 123, 130, 777 N.E.2d 1254 (2002). In the remaining references, Holmes did not indicate that the previous trial was on the same

charges, nor did he suggest the outcome of that trial. Cf. *Commonwealth v. Arsenault,* 361 Mass. 287, 299-300, 280 N.E.2d 129 (1972) (numerous references to "prior proceeding" coupled with testimony that witness had met defendant while in prison gave rise to inference that defendant had **306 been previously tried and convicted). The final two references to the "trial" were elicited by the defendant's trial counsel in an attempt to impeach Holmes with his testimony from the first trial. See *id.* at 300-301, 280 N.E.2d 129.

There is no requirement that, in circumstances like these, a judge must give a curative instruction sua sponte. See *Commonwealth v. Leonardi,* 413 Mass. 757, 764, 604 N.E.2d 23 (1992). Potential prejudice to the defendant was remedied when, in his final instructions, the judge told the jury: "You should not speculate about why so much time has elapsed since the events ... which gave rise to this case. Neither the Commonwealth [n]or the defendant is responsible or at fault for the delay. Any speculation about the delay by you would be very improper, most likely certainly incorrect, and like any speculation, might lead to a miscarriage of justice." This instruction, in substance, advised the jury not to engage in conjecture about what may have occurred between the date of the shooting and the date of the current trial. There was no abuse of discretion in denying the defendant's motion for a mistrial. [FN6]    See *Commonwealth v. Gallagher,* 408 Mass. 510, 517, 562 N.E.2d 80 (1990).

> FN6. For these same reasons, we find no substantial likelihood of a miscarriage of justice based on the defendant's trial counsel's failure to request a curative instruction. See *Commonwealth v. Frank,* 433 Mass. 185, 187, 740 N.E.2d 629 (2001).

[4][5]  3. *Evidentiary issues.* (a) We reject the defendant's argument that he was prejudiced by testimony of his probation officer. The probation officer testified that the defendant was near the court house on March 10, 1998, at approximately 2 P.M. She *585 indicated that the defendant had reported on that date, as a condition of his pretrial release in connection with this case, and she did not suggest in any manner that the defendant had prior involvement with the criminal justice system. The probation officer's testimony corroborated Holmes's testimony that the defendant had been in the area about the time when the defendant engaged in threatening comments and actions. The judge concluded, within his discretion, that the probative value of the testimony

outweighed any prejudice. [FN7]

> FN7. Although the probation officer should have been included in the prosecutor's witness list, in the absence of any evidence of bad faith, and in the absence of any demonstration of prejudice by the defendant from the late disclosure, there was no abuse of discretion on the part of the judge in permitting her to testify. See *Commonwealth v. Trapp,* 423 Mass. 356, 363-364, 668 N.E.2d 327, cert. denied, 519 U.S. 1045, 117 S.Ct. 618, 136 L.Ed.2d 542 (1996); *Commonwealth v. Donovan,* 395 Mass. 20, 24, 478 N.E.2d 727 (1985).

[6][7]  (b) At trial, Monroe testified, over objection, that, hours before being shot, Dallas told the defendant, "I am the one who stabbed your cousin." The defendant argues that this evidence was improperly admitted because there was no evidence that the person Dallas killed was, in fact, the defendant's cousin. The testimony was not prohibited hearsay because it was not admitted for its truth, but to show the defendant's state of mind and possible motive, see *Commonwealth v. Qualls,* 425 Mass. 163, 167, 680 N.E.2d 61 (1997). In addition to Monroe's testimony that Dallas communicated the statement to the defendant, Monroe testified that, in response to Dallas's statement, the defendant became angry and started pacing, permitting an inference that the defendant had heard Dallas's statement. A limiting instruction as to the use of the testimony was not requested, see *Commonwealth v. Leonardi, supra* at 764, 604 N.E.2d 23, and its **307 absence does not create a substantial likelihood of a miscarriage of justice. [FN8]

> FN8. No substantial likelihood of a miscarriage of justice exists by reason of the defendant's trial counsel's failure to request a limiting instruction as to the use of Monroe's testimony. See *Commonwealth v. Frank, supra.* We note that the defendant's trial counsel pointed out in his closing argument to the jury that the prosecutor had failed to prove that Dallas actually killed the defendant's cousin.

[8]  (c) The judge did not abuse his discretion, see *Commonwealth v. DeSouza,* 428 Mass. 667, 670, 704 N.E.2d 190 (1999), in admitting two autopsy photographs of Tony, one depicting a probe going *586 through two bullet wounds in Tony's arm, and the other showing, the defendant claims, "a graphic,

800 N.E.2d 299
440 Mass. 576, 800 N.E.2d 299
(Cite as: 440 Mass. 576, 800 N.E.2d 299)

FOR EDUCATIONAL USE ONLY

Page 7

gaping incision exposing internal organs." While more care could have been taken by the Commonwealth in not showing the incision and exposed tissue depicted in the second photograph, see *Commonwealth v. Bastarache,* 382 Mass. 86, 106, 414 N.E.2d 984 (1980), neither photograph was particularly inflammatory. Moreover, both photographs aided the jury in evaluating the medical examiner's testimony concerning the trajectory of the bullets that inflicted the various wounds. See *Commonwealth v. Haas,* 398 Mass. 806, 816, 501 N.E.2d 1154 (1986); *Commonwealth v. Todd,* 394 Mass. 791, 796, 477 N.E.2d 999 (1985); *Commonwealth v. Paszko,* 391 Mass. 164, 194, 461 N.E.2d 222 (1984) (Appendix). The issue of trajectory would become relevant if the jury rejected the eyewitness testimony of Holmes and Monroe that the defendant was the shooter. Without that testimony, the jury would have to analyze the testimony of Carrington and Buford, from which they could have inferred that the defendant was the shooter. While Carrington and Buford did not see the actual shooting, they observed the defendant approach Carrington's vehicle immediately prior to hearing gunshots and observed where the victims were seated in Carrington's vehicle before they were shot. Carrington testified that she heard gunshots from the rear of her vehicle and from the passenger side. The autopsy photographs, as explained by the medical examiner, corroborated their testimony, particularly Carrington's, concerning where the shooter stood in relation to the victims. Both photographs were also relevant to proving premeditation. See *Commonwealth v. Jackson,* 428 Mass. 455, 464, 702 N.E.2d 1158 (1998).

[9][10][11] 4. *Statements by the prosecutor.* We reject the defendant's argument that a substantial likelihood of a miscarriage of justice exists because the prosecutor, during her opening statement, promised to prove that Dallas did, in fact, kill the defendant's cousin, and because, in her closing argument, the prosecutor argued that the defendant's motive was revenge. The prosecutor could state in her opening statement anything she reasonably, and in good faith, expected to prove. *Commonwealth v. Errington,* 390 Mass. 875, 883, 460 N.E.2d 598 (1984). Absent a showing of bad faith or prejudice, which has not been made, the fact that certain evidence fails to materialize is not a ground for reversal. See *id.*

**\*587** Contrary to the defendant's contention, the challenged remarks from the prosecutor's closing argument concerning motive find support in

Monroe's testimony that Dallas had told the defendant that he (Dallas) had stabbed the defendant's cousin. Whether true or not, the defendant's belief that Dallas was responsible for that stabbing death provided a motive for the defendant's subsequent shooting of Dallas. That the prosecutor did not prove that Dallas had, in fact, stabbed and killed the **\*\*308** defendant's cousin, as previously explained, was not required to admit Dallas's statement. The prosecutor did not argue that Dallas had actually killed the defendant's cousin. We note that the defendant's trial counsel, in his closing argument to the jury, pointed out the fact that the prosecutor had not shown that Dallas had stabbed the defendant's cousin. There was no error in the closing argument. [FN9]

> FN9. Because no substantial likelihood of a miscarriage of justice arose by virtue of the challenged statements made by the prosecutor in her opening statement, and because there was no error in her closing argument, the defendant's ineffective assistance of trial counsel claim, based on his trial counsel's failure to object to those statements, also fails. See *Commonwealth v. Wright,* 411 Mass. 678, 682, 584 N.E.2d 621 (1992).

[12] 5. *Effective assistance of trial counsel.* The defendant maintains that he was deprived of his constitutional right to effective assistance of trial counsel based on his trial counsel's failure to move for relief from prejudicial joinder of the charge of assault and battery by means of a dangerous weapon (resulting from the defendant's stabbing Tony outside the bar). The defendant argues that joinder of this offense was prejudicial because if the defendant "stabbed Tony ... then he probably also shot Tony and Dallas." The defendant has not satisfied his burden of showing that "the prejudice resulting from a joint trial is so compelling that it prevent[ed] [him] from obtaining a fair trial." *Commonwealth v. Delaney,* 425 Mass. 587, 595, 682 N.E.2d 611 (1997), cert. denied, 522 U.S. 1058, 118 S.Ct. 714, 139 L.Ed.2d 655 (1998), quoting *Commonwealth v. Clarke,* 418 Mass. 207, 217, 635 N.E.2d 1197 (1994). The stabbing of Tony was related in time and space to the shooting, and the stabbing was relevant to show deliberate premeditation by indicating that the defendant harbored ill will toward Tony.

6. *G. L. c. 278, § 33E.* We have reviewed the entire record under our statutory obligation, and we are not persuaded that **\*588** anything requires us to reduce the jury's verdicts of murder in the first degree or to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

order a new trial.

*Judgments affirmed.*

440 Mass. 576, 800 N.E.2d 299

**Briefs and Other Related Documents (Back to top)**

• 2003 WL 23282257 (Appellate Brief) Commonwealth's Brief on Appeal from the Suffolk Superior Court (Sep. 30, 2003)Original Image of this Document with Appendix (PDF)

• 2003 WL 23282258 (Appellate Brief) Brief and Record Appendix of Ronald Qualls (May. 30, 2003)Original Image of this Document with Appendix (PDF)

• 2002 WL 32364746 (Appellate Brief) Brief and Record Appendix for the Defendant on Appeal from the Suffolk Division of the Superior Court Department (Mar. 2002)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

680 N.E.2d 61                    FOR EDUCATIONAL USE ONLY                    Page 1
425 Mass. 163, 680 N.E.2d 61
**(Cite as: 425 Mass. 163, 680 N.E.2d 61)**

▷

Supreme Judicial Court of Massachusetts,
Suffolk.
**COMMONWEALTH**
v.
Ronald **QUALLS**.

Argued Dec. 5, 1996.
Decided June 6, 1997.

Defendant was convicted in the Superior Court, Robert W. Banks, J., of first-degree murder, assault and battery by means of dangerous weapon, assault by means of dangerous weapon, and unlawful possession of firearm. Defendant appealed. The Supreme Judicial Court, O'Connor, J., held that: (1) out-of-court statements by victim indicating that he feared defendant and thought defendant was going to kill him were irrelevant and not admissible under state-of-mind exception to hearsay rule, and (2) admission of such statements was error requiring new trial.

Reversed and remanded for new trial.

West Headnotes

**[1] Criminal Law** ☞**419(1)**
110k419(1) Most Cited Cases
Broad rule on hearsay evidence interdicts admission of statement made out of court which is offered to prove truth of what it asserted.

**[2] Criminal Law** ☞**419(2.40)**
110k419(2.40) Most Cited Cases
State of mind or intent of person, whenever material, may be shown by his declarations out of court.

**[3] Criminal Law** ☞**419(2.20)**
110k419(2.20) Most Cited Cases
State-of-mind exception to hearsay rule calls for admission of evidence of murder victim's state of mind as proof of defendant's motive to kill victim when and only when there also is evidence that defendant was aware of that state of mind at time of crime and would be likely to respond to it.

**[4] Criminal Law** ☞**419(2.20)**
110k419(2.20) Most Cited Cases

**[4] Homicide** ☞**960**
203k960 Most Cited Cases
        (Formerly 203k169(8))
Out-of-court statements by victim indicating that he feared defendant and thought defendant was going to kill him were irrelevant and, therefore, not admissible in murder prosecution under state-of-mind exception to hearsay rule, where there was no evidence that victim's state of mind was communicated to defendant or that defendant was otherwise aware of it.

**[5] Homicide** ☞**960**
203k960 Most Cited Cases
        (Formerly 203k169(8))
Murder victim's statement that he feared defendant, even if made known to defendant, sheds no light on whether defendant had motive to kill victim, and therefore is not admissible in defendant's trial for murder.

**[6] Criminal Law** ☞**1169.1(10)**
110k1169.1(10) Most Cited Cases
Error resulting from admission of out-of-court statements by victim in murder prosecution, which statements indicated that victim feared defendant and thought defendant was going to kill him, resulted in prejudice requiring new trial; only disputed issue at trial was identity of gunman who shot victim, there was no physical or scientific evidence that decisively resolved such issue, limiting instructions did not preclude use of victim's state-of-mind to infer defendant's motive. other witnesses who identified defendant as gunman were impeached at trial, other murder victim stated before dying that someone else was gunman, and prosecutor referred to statements in both opening and closing arguments.
 **\*\*62\*163**  Eric S. Brandt, Committee for Public Counsel Services, Boston, for defendant.

Kenneth H. Anderson, Assistant District Attorney, for the Commonwealth.

Before WILKINS, C.J., and ABRAMS, LYNCH, O'CONNOR and GREANEY, JJ.

O'CONNOR, Justice.

A jury found the defendant, Ronald Qualls, guilty of two indictments charging murder in the first degree, assault and battery by means of a dangerous weapon,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

680 N.E.2d 61                    FOR EDUCATIONAL USE ONLY                         Page 2
425 Mass. 163, 680 N.E.2d 61
**(Cite as: 425 Mass. 163, 680 N.E.2d 61)**

assault by means of a dangerous weapon, and unlawful possession of a firearm. The assault by means of a dangerous weapon charge was placed on file with the defendant's consent. The defendant was given consecutive sentences of life imprisonment without parole on the murder convictions. He also received sentences of from nine to ten years on the assault and battery *164 by means of a dangerous weapon conviction and from three to five years on the firearm conviction, both of which were ordered to be served concurrently with the first life sentence. The defendant appeals from the several convictions.

The evidence relevant to this appeal was as follows. At approximately 10:30 P.M. on October 2, 1992, Ronald Price, known as "Dallas," and his brother, Roosevelt Price, known as "Tony," left their mother's apartment located in the Orchard Park housing project in the Roxbury section of Boston and went to a nearby bar called the Biarritz Lounge. They were soon joined there by two friends, Leroyal Holmes and Fred Monroe. The defendant was also present in the bar, accompanied by Junior Williams.

Dallas approached the defendant around 1:30 A.M. on October 3 and said, "I heard you [have] been looking for me on Shawmut." The defendant responded, "I don't even know you, man," to which Dallas stated, "I'm the one that stabbed your cousin." Dallas and the defendant then separated, but a few minutes later a fight erupted between them. Dallas's brother, Tony, became involved, putting the defendant in a headlock. Others in the bar broke up the fight and the defendant was escorted to the sidewalk just outside the bar. Tony then left the bar and the defendant approached him. After exchanging words, the defendant and Tony began to fight. The defendant stabbed Tony underneath his right armpit with a knife. Leroyal Holmes grabbed the knife from the defendant and separated the two combatants.

Meanwhile, inside the bar, Junior Williams had initiated a heated confrontation with Dallas. The two men grasped each other's jackets. Dallas said to Williams, "I don't understand why you're with [the defendant] against me," and "You're supposed to be my cousin, how [can] you turn on me for another person ... ?" Williams responded, "I'm not your cousin no more ... [the defendant is] my [friend] from Columbia Point ... [he's] down with me." Williams also told Dallas that he was not going to lose his friendship with the defendant because the defendant "puts his life on the line [for Williams] every day." Dallas and Williams were ultimately separated.

Williams then left the bar, and the defendant and Williams drove away in Williams's black Ford Escort automobile, with Williams driving and the defendant in the passenger seat.

**63 *165 After stopping briefly at their mother's house, Dallas and Tony, accompanied by their friends, Holmes and Monroe, headed to another bar in the area. On their way, they saw Monroe's girl friend, Mattie Buford, in a Geo Tracker automobile driven by Donna Carrington, a friend of Buford. After speaking with them, Carrington parked the automobile facing Washington Street in a parking lot bounded on three sides by Harrison Avenue, Washington Street, and Palmer Street. After being informed that it was too late to enter the second bar, the four men walked back to the Geo Tracker.

A dark Ford Escort then came into view on Washington Street and turned abruptly down Palmer Street, disappearing behind a building. Dallas observed, "There goes Junior [Williams's] car." Holmes, being concerned, walked across the parking lot toward Palmer Street to investigate.

When Holmes arrived at the corner of the parking lot nearest Palmer Street, a man identified at the trial by Holmes, Monroe, and Buford as the defendant, came around the corner and into the parking lot. After exchanging words with Holmes, the man drew a revolver and pointed it at Holmes, demanding that Holmes get out of his way. Holmes stepped aside, and the gunman proceeded across the parking lot toward the Geo Tracker. Holmes then yelled to his friends that the person approaching the Geo Tracker had a gun. Monroe and Buford ran from the Geo Tracker, while Dallas and Tony, who had climbed into the back seat, remained there. Carrington slouched down beneath the steering wheel and did not get a good look at the gunman. The gunman approached the back window of the Geo Tracker and fired one or more bullets at Dallas and Tony in the back seat. He then moved to the passenger side window, which was lowered, and fired one or more additional bullets at Dallas and Tony. The gunman then ran down Washington Street, past Monroe and Buford. Dallas had been struck by one bullet and Tony had been struck by two bullets.

Carrington then drove the Geo Tracker a very short distance to the building in which Tony's girl friend lived, and Tony, who had been seriously wounded, got out of the Geo Tracker. Holmes and Monroe drove Dallas to the hospital where he was pronounced dead.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The police were called to the building in which Tony's girl friend lived and, when they arrived, they encountered Tony, *166 who was in obvious pain and told the officers that he had been shot.    In response to questions from two different officers, Tony twice stated that "Junior [Williams] did it," and provided additional details regarding the shooting and Junior's identity. During this time, Tony told his girl friend "to take care of [their] baby because [I'm not] coming back."  Moments later, Tony was taken by ambulance to the hospital where he later died from the gunshot wounds.

On the first day of trial, the Commonwealth filed a motion in limine for leave to introduce evidence of out-of-court statements made by Dallas Price "indicating that the defendant was seeking to kill him."  The prosecutor argued that the testimony was admissible to show Dallas's state of mind.  Over the defendant's written opposition, the judge allowed the Commonwealth's motion.

Edie Price, the mother of Dallas and Tony, then testified that, when Dallas returned home from the Biaritz Lounge briefly on the night of the shooting, he said to her, "[E]verywhere I go and I look back, [the defendant] is right behind me, looking right over my shoulder ... [the defendant is] the one that was threatening me all the time.... I think he's going to try to kill me tonight."    After Edie Price testified, defense counsel renewed his objection, and the judge instructed the jury as follows:

> "Ordinarily, we do not permit a witness to testify to a conversation with someone else.  However, we do have some exceptions to that hearsay rule and, in this case, I'm permitting this witness to testify as to what her son said to her that evening for a very limited purpose:  one, as evidence of possible motive in the case--it is for you to decide eventually whether or not it is evidence of motive of anything or if it isn't--and, also, as evidence of the state of mind of her son at the time she alludes to, evidence of her son's state of mind, not for the truth of the words asserted actually."

**64 Marie Fletcher, Dallas's girl friend, testified that on the night before the shooting, Dallas said to her, "[R]emember, I told you about this dude, Ron Qualls, that wanted to kill me....  [The defendant is] after [me] for something that happened a long time ago....  [H]e's gonna kill me."  Before Marie Fletcher testified, the judge referred the jury to the *167 limiting instruction he had given following Edie Price's testimony, that is that the testimony was

admitted "as evidence of possible motive [and] as evidence of [Dallas's] state of mind, not for the truth of the words asserted."

The judge repeated that instruction after September Sturrup, Dallas's close friend, testified.  She testified that approximately one week before the shooting, Dallas said to her that the defendant "was back and [Dallas] felt [the defendant] was going to get him this time."    Sturrup testified that Dallas also said, "Either [the defendant's] going to get me or I'll have to get him."    In addition, she testified that a few years before the shooting, as she and Dallas were walking in Orchard Park, Dallas saw the defendant and commented, "[H]ere comes that dude again ... [d]on't turn around ... I'm going to cut through the building and I'll meet you up on Dudley."

Leroyal Holmes testified that, in the Biarritz Lounge on the night of the shooting, Dallas stated that his "worst enemy was in the bar."    The judge, once again, referred the jury to the limiting instruction.

On every occasion that the Commonwealth elicited the above testimony, defense counsel objected and those objections were overruled.    At the close of the Commonwealth's case, defense counsel moved to strike the testimony "relative to Dallas Price's state of mind, and whether or not that reflects on [the defendant's] motive or feeling towards Dallas Price."  The judge denied the defendant's motion.

[1][2][3] "The broad rule on hearsay evidence interdicts the admission of a statement made out of court which is offered to prove the truth of what it asserted."  *Commonwealth v. DelValle,* 351 Mass. 489, 491, 221 N.E.2d 922 (1966), *S.C.,* 353 Mass. 684, 234 N.E.2d 721 (1968).  However, "the state of mind or intent of a person, whenever material, may be shown by his declarations out of court." *Goldman, Petitioner,* 331 Mass. 647, 651, 121 N.E.2d 843 (1954), cert. denied sub nom. *Goldman v. Fogarty,* 348 U.S. 942, 75 S.Ct. 363, 99 L.Ed. 737 (1955). *Commonwealth v. Trefethen,* 157 Mass. 180, 181-188, 31 N.E. 961 (1892).    The state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it.    See *Commonwealth v. Cruz,* 424 Mass. 207, 212, 675 N.E.2d 764 (1997);  *168 Commonwealth v. Hunter,* 416 Mass. 831, 837, 626 N.E.2d 873 (1994); *Commonwealth v. Zagranski,* 408 Mass. 278, 283,

558 N.E.2d 933 (1990); _Commonwealth v. Olszewski,_ 401 Mass. 749, 759, 519 N.E.2d 587 (1988), _S.C.,_ 416 Mass. 707, 625 N.E.2d 529 (1993), cert. denied, 513 U.S. 835, 115 S.Ct. 113, 130 L.Ed.2d 60 (1994); _Commonwealth v. Todd,_ 394 Mass. 791, 797, 477 N.E.2d 999 (1985). A murder victim's attitude of contempt or hostility toward the defendant, when it is known to the defendant, would constitute some evidence which, augmented by other evidence, might warrant a fact finder's determination that the defendant responded by killing the victim. However, a victim's contempt for the defendant or hostile attitude toward him, unknown to the defendant, would be irrelevant and inadmissible at the defendant's trial for murder. See _Commonwealth v. Borodine,_ 371 Mass. 1, 8, 353 N.E.2d 649 (1976), cert. denied, 429 U.S. 1049, 97 S.Ct. 760, 50 L.Ed.2d 765 (1977) ( "Obviously, the victim's state of mind can be relevant to the defendant's motive only if there is reason to believe that the defendant knew of that state of mind").

[4] In its argument that the judge did not commit reversible error by admitting evidence of Dallas Price's state of mind, the Commonwealth's principal focus is on the testimony of September Sturrup. The Commonwealth also argues, although briefly, that Leroyal Holmes's testimony was admissible. The Commonwealth does not argue, however, that the state of mind testimony given by **65 Edie Price and Marie Fletcher was properly admitted. Instead, the Commonwealth makes the following two statements in its brief: (1) "Although perhaps it would have been better if the statements made by Marie Fletcher and Edie Price had not been offered, the balance of the testimony was properly admitted as probative evidence of the victim's state of mind toward the defendant, and therefore there was no reversible error"; (2) "Although it was probably error to admit the statements of Edie Price and Marie Fletcher ... such evidence was merely cumulative of other, properly admitted evidence, and therefore no reversible error occurred."

As we have said earlier in this opinion, September Sturrup testified that approximately one week before Dallas was shot Dallas told Sturrup that the defendant "was back and [Dallas] felt like [the defendant] was going to get him this time." Sturrup also testified that Dallas also said, "Either [the defendant's] going to get me or I'll have to get him." In addition, Sturrup testified that a few years before Dallas was shot, *169 as Sturrup and Dallas were walking in Orchard Park, Dallas saw the defendant and commented, "[H]ere comes that dude again ... [d]on't

turn around ... I'm going to cut through the building and I'll meet you up on Dudley."

[5] For the most part, these statements went no further than to indicate Dallas's fear of the defendant. A murder victim's statement that he feared the defendant, even if made known to the defendant, sheds no light on whether the defendant had a motive to kill him, and therefore is not admissible in the defendant's trial for murder. See _Commonwealth v. Cyr,_ 424 Mass. 89, 92- 95, 679 N.E.2d 550 (1997); _Commonwealth v. Williams,_ 30 Mass.App.Ct. 543, 548, 571 N.E.2d 29 (1991), citing _Commonwealth v. DelValle, supra_ at 492- 493, 221 N.E.2d 922; _Commonwealth v. Bond,_ 17 Mass.App.Ct. 396, 399, 458 N.E.2d 1198 (1984); _United States v. Brown,_ 490 F.2d 758, 765 (D.C.Cir.1974); McCormick, Evidence § 296, at 853-854 (3d ed.1984).

Dallas's statement, as testified to by Sturrup, that either the defendant would get him or he would get the defendant, perhaps could be construed not so much as indicating fear but as indicating Dallas's intention to "get" the defendant. In any event, unless that state of mind was communicated somehow to the defendant, it sheds no light on the defendant's state of mind, and it is the defendant's state of mind that is at issue. The principal danger in admitting evidence of a homicide victim's fear of the defendant or desire to "get" the defendant when there is no evidence of the defendant's awareness of the victim's state of mind is that the jury will consider the victim's statement of fear or intention, standing alone, as somehow reflecting on the defendant's state of mind rather than that of the victim. See _United States v. Brown, supra_ at 766.

The Commonwealth directs our attention to _Commonwealth v. Weichell,_ 390 Mass. 62, 453 N.E.2d 1038 (1983), cert. denied, 465 U.S. 1032, 104 S.Ct. 1298, 79 L.Ed.2d 698 (1984), asserting that that case supports its position that Sturrup's testimony that Dallas Price told her that the defendant "was back" and that "either he's going to get me or I'll have to get him" was properly admitted because that was "precisely the state of mind evidence that was properly admitted" in the _Weichell_ case. _Weichell_ does not support the Commonwealth's position. In _Weichell,_ the court said, "We consider first whether the evidence of the victim's state of mind toward the defendant during the ten days prior to the victim's death *170 should be admitted in the absence of direct evidence that the defendant was even aware of the victim's hostility toward him. Such evidence is admissible only if the jury could have reasonably

FOR EDUCATIONAL USE ONLY

680 N.E.2d 61                                                        Page 5
425 Mass. 163, 680 N.E.2d 61
**(Cite as: 425 Mass. 163, 680 N.E.2d 61)**

inferred that the defendant knew of the victim's state of mind. *Commonwealth v. Borodine, supra.* We conclude that the jury could so have inferred." *Id.* at 74, 453 N.E.2d 1038. The *Weichell* court then set forth the evidence that the defendant knew of the victim's state of mind during the ten days before the victim's death. There is no comparable evidence in the present case. In this case, Sturrup's testimony concerning Dallas's state of mind with respect to the defendant prior to their confrontation at the Biarritz Lounge was irrelevant because there **66 was no evidence that the defendant was aware of it.

We reach the same result with respect to Leroyal Holmes's testimony that, in the Biarritz Lounge on the night of the shooting, Dallas stated that his "worst enemy was in the bar." There was no evidence that Dallas's state of mind as reflected by that statement was known to the defendant when the shooting occurred. The evidence should not have been admitted. Also, we are content, as the Commonwealth appears to be, that the evidence concerning Dallas's state of mind presented through the testimony of Edie Price and Marie Fletcher should not have been admitted. Their testimony was admitted only to establish Dallas's state of mind--his fear--and under the *DelValle, supra,* line of cases was inadmissible.

[6] Having concluded that the state of mind evidence we have been discussing should not have been admitted, the question before us is whether "the error[s] possibly weakened [the defendant's] case in some significant way so as to require a new trial." *Commonwealth v. Schulze,* 389 Mass. 735, 741, 452 N.E.2d 216 (1983). See *Commonwealth v. Daggett,* 416 Mass. 347, 352 n. 5, 622 N.E.2d 272 (1993). The critical question is whether the court fairly can say that "the jury could not have been influenced by the [erroneously admitted evidence]." *Commonwealth v. Stone,* 321 Mass. 471, 474, 73 N.E.2d 896 (1947).

The only disputed issue at the trial was the identity of the gunman. An important consideration would be whether the defendant had a reason--a motive-- to kill either Dallas or Tony. In his limiting instructions to the jury concerning the four witnesses' testimony as to what Dallas had told them, *171 the judge instructed the jury that the witnesses were permitted to testify as to what Dallas had told them "for a very limited purpose: one, as evidence of possible motive in the case ... and also as evidence of the state of mind of [Dallas]." We cannot, therefore, be confident that the jury did not conclude, in part at

least from the inadmissible evidence, that the defendant had a motive to kill Dallas and, as a result, fired into the rear seat of the Geo Tracker where Dallas and Tony Price were located.

The Commonwealth relied principally on identifications of the defendant by Holmes, Buford, and Monroe, who testified that they were familiar with the defendant. However, the credibility of these witnesses was impeached by the evidence of the witnesses' prior convictions, the existence of outstanding warrants against them at the time of the murders, and felony charges against them at the time of their testimony. Holmes had been previously convicted of carrying a firearm without a license, unlawful possession of ammunition, possession of cocaine with intent to distribute, unlawful possession of marihuana, distribution of marihuana, and conspiracy to violate the drug laws. At the time of trial, Holmes was awaiting prosecution on charges of distribution of cocaine, and receiving a stolen motor vehicle.

Buford had been previously convicted on two separate occasions of possession of cocaine with intent to distribute, distribution of cocaine, unlawful possession of a firearm, and conspiracy to violate the drug laws. At the time of trial, Buford stood charged with unlawful possession of a firearm, and at least two offenses related to the possession of illegal drugs with intent to distribute.

Monroe had been previously convicted of conspiracy to violate the drug laws. At the time of trial, Monroe faced pending charges of assault and battery by means of a dangerous weapon, threats, and possession of a stolen motor vehicle.

There was no physical or scientific evidence that decisively resolved the question of the killer's identity.

The defendant presented statements made by Tony Price to two police officers as he was dying from the gunman's bullets (dying declarations) that "Junior [Williams] did it." There was evidence that Dallas Price and Williams had a confrontation at the Biarritz Lounge earlier on the evening of the murders. It was also undisputed that it was Williams's Ford *172 Escort that turned down Palmer Street, from which, moments later, the gunman emerged.

**67 In this context, it seems clear that the Commonwealth's case against the defendant may have been significantly enhanced by the introduction

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

680 N.E.2d 61                        FOR EDUCATIONAL USE ONLY                        Page 6
425 Mass. 163, 680 N.E.2d 61
(Cite as: 425 Mass. 163, 680 N.E.2d 61)

of statements made by one of the victims in the hours, days, and weeks prior to the murders expressing fear that the defendant was going to kill him. Dallas's statements that he was afraid that the defendant would kill him could have been seen by the jury as "a prophecy of what might happen to him," *United States v. Day,* 591 F.2d 861, 883 (D.C.Cir.1978). His statements of fear were certainly "a voice from the grave casting an incriminating shadow on the defendant." *United States v. Brown,* 490 F.2d 758, 781 (D.C.Cir.1974). The inadmissible testimony may very well have "fulfilled the broad purpose of proving that threats on the deceased's life were made by the defendant[ ], and the jury were left to infer from this that the defendant[ ] desired his death and, in fact, accomplished it." *DelValle, supra* at 492-493, 221 N.E.2d 922.

In a case quite similar to this one, *United States v. Brown, supra* at 762, the court considered the prejudicial effect, in a prosecution for murder, of an improperly admitted statement made by the victim to his wife prior to his death that he was frightened that the defendant would kill him. The court concluded that:

"clearly a palpable danger exists that the jury will infer from the statement of [the victim's wife] ... that [the victim] stated 'I am afraid I will be killed by [the defendant],' that [the defendant] was a man capable of murder, that he had done things in the past to [the victim] to justify this fear, or that [the defendant] had explicitly threatened [the victim's] life in the past. Any or all of the above conclusions are inevitably present in the jury's collective mind. Yet all such inferences insofar as they may reflect on defendant's intentions or past conduct would be improperly drawn. Moreover, the statement is extremely closely related to the issues at hand. The defendant here directly placed his identity in issue, and the challenged testimony expressly names him as the probable murderer. To the jury it must have been as simple as this: [the victim] feared being killed by [the defendant], **\*173** and sure enough [the victim] was killed. Therefore, odds are good that it was done by [the defendant]. Thus the danger that the statement in question would be misused by the jury on the disputed issue of identity is extremely high." *Id.* at 778-779.

In addition to eliciting Dallas's statements from the Commonwealth's witnesses, the prosecutor referred to these statements in both her opening and closing arguments. In her closing, the prosecutor told the jury that they "had more than identification in this case. You have evidence of motive," and then recounted the testimony concerning Dallas's statements of fear of the defendant. In this case, " 'we cannot say that the evidence and the prosecutor's [use of it in her] argument did not have the effect the Commonwealth intended it to have.' *Commonwealth v. Reed,* 397 Mass. 440, 443, 492 N.E.2d 80 (1986)." *Commonwealth v. Rosa,* 412 Mass. 147, 158, 587 N.E.2d 767 (1992), *S.C.,* 422 Mass. 18, 661 N.E.2d 56 (1996). A new trial therefore is required.

The judgments are reversed, and the verdicts are set aside. The cases are remanded to the Superior Court for a new trial.

*So ordered.*

425 Mass. 163, 680 N.E.2d 61

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)____Ronald Qualls v. Louis Russo_____

    _____

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
    rule 40.1(a)(1)).

    [✓]  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    [ ]  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.              for patent, trademark or copyright cases

    [ ]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

    [✓]  IV.   220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

    [ ]  V.    150, 152, 153.

3.  Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this
    district please indicate the title and number of the first filed case in this court.
    None

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                              YES  [ ]      NO  [✓]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC
    §2403)
                                                              YES  [ ]      NO  [✓]
    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                              YES  [ ]      NO  [ ]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                              YES  [ ]      NO  [✓]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
    Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                              YES  [✓]      NO  [ ]

        A.   If yes, in which division do all of the non-governmental parties reside?

             Eastern Division  [✓]       Central Division  [ ]        Western Division  [ ]

        B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
             residing in Massachusetts reside?

             Eastern Division  [ ]       Central Division  [ ]        Western Division  [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes,
    submit a separate sheet identifying the motions)
                                                              YES  [ ]      NO  [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME __Brad Bailey_____

ADDRESS __Four Longfellow Place, 35th Floor, Boston, MA 02114_____

TELEPHONE NO. __(617) 227-2800_____

(CategoryForm.wpd - 2/15/05)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Ronald Qualls

## DEFENDANTS
Louis Russo, Superintendent, Souza-Bernowski Correctional Center

(b) County of Residence of First Listed Plaintiff   Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Middlesex
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Brad Bailey, Denner O'Malley, LLC, Four Longfellow Place, 35th Floor,
Boston, Massachusetts  -  tel. (617) 227-2800

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                      and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane  **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product  ☐ 362 Personal Injury - | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability  Med. Malpractice | of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &  ☐ 365 Personal Injury - | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander  Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'  ☐ 368 Asbestos Personal | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability  Injury Product | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine  Liability | Safety/Health |  | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product  **PERSONAL PROPERTY** | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability  ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle  ☐ 380 Other Personal | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability  Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal  ☐ 385 Property Damage | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury  Product Liability | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**  **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting  ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment  Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/  **Habeas Corpus:** | Security Act | ☐ 871 IRS —Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations  ☒ 530 General |  | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare  ☐ 535 Death Penalty |  |  | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 540 Mandamus & Other |  |  | Under Equal Access |
|  | Employment  ☐ 550 Civil Rights |  |  | to Justice |
|  | ☐ 446 Amer. w/Disabilities -  ☐ 555 Prison Condition |  |  | ☐ 950 Constitutionality of |
|  | Other |  |  | State Statutes |
|  | ☐ 440 Other Civil Rights |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

Appeal to District Judge from Magistrate Judgment

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 2254
Brief description of cause:
Petitioner in custody inviolation of rights under 5th and 14th Amendments of the U.S. Constitution

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE

DOCKET NUMBER

DATE
04/29/2005

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE